```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA,

 4                    Plaintiff,
         -v-                                 Case No. 15-20040
 5
      TASHUN YVONNE WHITE,
 6
                      Defendant.
 7    _____/

 8                         JURY TRIAL
                            EXCERPT
 9
                 BEFORE THE HONORABLE JUDITH E. LEVY
10                  UNITED STATES DISTRICT JUDGE

11                       DECEMBER 1, 2016

12
      APPEARANCES:
13
      For the Plaintiff:    Carl Gilmer-Hill
14                          United States Attorney's Office
                            211 West Fort Street, Suite 2001
15                          Detroit, Michigan 48226

16    For the Defendant:    Carl Jordan
                            26677 West Twelve Mile Road
17                          Southfield, Michigan 48034

18

19

20

21

22

23           To Obtain a Certified Transcript Contact:
              Jeseca C. Eddington, RDR, RMR, CRR, FCRR
24                Federal Official Court Reporter
                   United States District Court
25        200 East Liberty Street - Ann Arbor, Michigan 48104
```

December 1, 2016

1 | **I N D E X**

2 | WITNESSES                                                    PAGE

3 | JIMMY MCWHERTER
           Direct examination by Mr. Gilmer-Hill...3
4 |        Cross-examination by Mr. Jordan.........54

5

6

7

8 | MISCELLANY

       Proceedings.................................3
9 |    Certificate................................67

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

December 1, 2016

| | |
|---|---|
| 1 | **E X C E R P T   O F   P R O C E E D I N G S** |
| 2 | *        *        * |
| 3 | -        -        - |
| 4 | MR. GILMER-HILL:  Your Honor, the Government calls |
| 5 | Mr. Jimmy McWherter. |
| 6 | THE COURT:  Okay. |
| 7 | Thereupon, |
| 8 | **J I M M Y   M C W H E R T E R ,** |
| 9 | having been called as a witness and having been first duly |
| 10 | sworn testified as follows: |
| 11 | THE COURT:  Thank you.  You can have a seat in our |
| 12 | witness box. |
| 13 | DIRECT EXAMINATION |
| 14 | BY MR. GILMER-HILL: |
| 15 | Q.  Good afternoon, Mr. McWherter.  Would you please state |
| 16 | your name and spell your last name? |
| 17 | A.  Jimmy McWherter, M-C-W-H-E-R-T-E-R. |
| 18 | Q.  Thank you, sir.  Sir, do you know a person who goes by the |
| 19 | nickname D? |
| 20 | A.  Yes, I do. |
| 21 | Q.  And is that person's name Derrick White? |
| 22 | A.  Yes, it is. |
| 23 | Q.  And if you would take a look at Exhibit 1F1, please. |
| 24 | Would you tell us, please, is this a picture of the individual |
| 25 | you're referring to as D and Derrick White? |

December 1, 2016

1    A.   Yes, it is.

2    Q.   Thank you.  Sir, did you participate in a drug trafficking

3    conspiracy with Derrick White?

4    A.   Yes, I did.

5    Q.   And in fact, were you charged in relation to that drug

6    trafficking conspiracy?

7    A.   Yes.

8    Q.   Charged with drug trafficking and money laundering,

9    correct?

10   A.   Yes.

11   Q.   And in relation to your drug trafficking and money

12   laundering activities, you were arrested in approximately

13   February of 2010; is that correct?

14   A.   Correct.

15   Q.   And sometime -- at the time of your arrest, you provided

16   an initial statement to the agents on scene on the same day

17   that you were actually arrested?

18   A.   As far as?

19   Q.   Did you say anything to the officers on scene at all?  Did

20   you make a statement that first -- when you were first

21   arrested?

22   A.   I did talk briefly with them.

23   Q.   Okay.  So you were asked questions.  You were willing to

24   talk to them that day?

25   A.   Yes.

December 1, 2016

1    Q.   Did there come a later point in time when you had an

2    attorney where you agreed to speak with the officers and the

3    agents and the Government further in what was called a briefing

4    session?

5    A.   Yes.

6    Q.   And was there a letter agreement that you reviewed in

7    relation to that briefing session?

8    A.   I believe that was the -- is that a Kastigar letter?

9    Q.   You reviewed a Kastigar letter?

10   A.   Yes.

11   Q.   Sir, in that book in front of you -- all right.  And in

12   addition to the letter agreement, in addition to the Kastigar,

13   did you later enter into a Rule 11 plea agreement?

14   A.   Yes.

15   Q.   With the Government?

16   A.   Yes.

17   Q.   And have you, in fact, plead guilty to the drug

18   trafficking and money laundering conspiracies that you were

19   involved in?

20   A.   Yes, I have.

21   Q.   And in relation to your Rule 11 plea agreement, there was

22   a -- both a statutory exposure that you were told about as to

23   how much prison time you could get, correct?

24   A.   Yes, there was.

25   Q.   And there was also a guideline range reflected in the Rule

December 1, 2016

1   11 plea agreement as to how much time the guidelines suggested

2   the judge should take into consideration for sentencing you?

3   A.   Yes.

4   Q.   And those were guidelines that your attorney and the

5   attorney for the Government, myself, had come up with and put

6   into that agreement, correct?

7   A.   Correct.

8   Q.   And so with your guilty plea you were looking at a range

9   of -- a recommended range within of approximately 210 to 262

10  months; is that correct?

11  A.   Yes.

12  Q.   In addition you were also subjected -- you've already been

13  subjected to substantial forfeiture; is that correct?

14  A.   Correct.

15  Q.   You've had motor homes, boats, lots of assets seized?

16  A.   Yes.  Pretty much.

17  Q.   Lots of money seized?

18  A.   Yes.

19  Q.   And as part of the Rule 11 plea agreement, you still

20  remain subject to a forfeiture judgment; is that correct?

21  A.   I believe so.

22  Q.   $250,000 -- an amount up to $250,000; is that correct?

23  A.   Yes.

24  Q.   And in addition to the Rule 11 plea agreement, you entered

25  into a cooperation agreement with the Government; is that

1  correct?

2  A.   Correct.

3  Q.   And the cooperation agreement requires your willingness to

4  sit down to be interviewed by law enforcement officers; is that

5  correct?

6  A.   Yes.

7  Q.   And the Rule 11 plea agreement and its accompanying

8  cooperation agreement requires you to be willing to testify at

9  trial; is that correct?

10 A.   Yes.

11 Q.   And the cooperation agreement requires your truthful -- it

12 requires you to provide truthful and complete information

13 concerning all facts for this case known to you, correct?

14 A.   Correct.

15 Q.   And that same parameter applies to your -- well, to your

16 interviews, to your testimony.  To the information you provide

17 you were required to provide truthful information, correct?

18 A.   Yes.

19 Q.   Not necessarily helpful information, but truthful

20 information?

21 A.   Yes.

22 Q.   All right.  So let's talk about how you first came to meet

23 D, Derrick.  Please tell us how did you meet D?

24 A.   I first met him I was working at a automotive customizing

25 shop where we did custom paint, stereos, wheels, interior

December 1, 2016                                          8

1    stuff.  And the shop just opened.  And somehow the owner of the

2    shop knew him and brought him in as a customer.

3    Q.   Okay.  Do you remember the name of that shop?

4    A.   Yes.  It was Top of the Line Motoring.

5    Q.   And where was Top of the Line Motoring located?

6    A.   It was on Mound Road in Sterling Heights, Michigan.

7    Q.   So the metropolitan Detroit area?

8    A.   Yes.

9    Q.   And approximately when was this shop opened?  You said you

10   began working there when it opened?

11   A.   Yeah.  I was the one that helped open the shop.  It opened

12   around the year of 2002.  2002, 2003, somewhere in there.

13   Q.   Okay.  And once D had been brought in as a customer, did

14   he become a regular customer?

15   A.   We did a couple cars for him.  And we seen him a couple

16   times kind of come to the shop just to either say hi to the

17   owner or talk to the owner.  Then when the shop was closed.

18   Q.   Okay.  And so approximately when did the shop close?

19   A.   The shop was bought out about a year later and changed

20   name.

21   Q.   So it was opened for about a year?

22   A.   Yes.

23   Q.   So during the year, roughly year period that the shop was

24   open, how many cars did D bring in?

25   A.   We worked on, I believe, three of his vehicles.

December 1, 2016                                                    9

1    Q.   Three different cars?

2    A.   Yes.

3    Q.   Do you remember what type of cars they were?

4    A.   Yeah.  One was a Grand National.  It's like an older '86,

5    '87 Grand National.  One was -- I believe it was a Marauder.  I

6    believe it was a four-door large sedan.  Then a newer vehicle.

7    And then also a blue Denali.

8    Q.   What type of Denali?

9    A.   It's a GMC Denali.  It was custom painted.  A light blue

10   color.

11   Q.   Custom painted?

12   A.   Yeah.

13   Q.   And what about these other vehicles that you mentioned,

14   the Grand National and the Marauder.  Were they customized

15   also?

16        MR. JORDAN:  Judge, I'm going to ask as to relevance

17    of these vehicles?

18        THE COURT:  Are these the vehicles at issue in the

19    exhibits we've seen?

20        MR. GILMER-HILL:  No, Your Honor.

21        THE COURT:  Okay.  And so if it's not directly

22    related to the vehicles we need to know about, I'd ask that

23    you move on.

24        MR. GILMER-HILL:  Certainly, your Honor.

25   BY MR. GILMER-HILL:

December 1, 2016

1    Q.   Approximately how old was D when you first met him?

2    A.   Early -- mid 20's.  Probably mid 20's.

3    Q.   And so this regular -- and so the type of customization

4    that you were doing at your shop, was it standard audio

5    installation type of customization?

6    A.   We did a lot of work for athletes, a lot of Piston players

7    had cars that were done there.  So it was not your normal

8    stereo installs.  It was instead of just putting a radio in a

9    dash, it was building custom dashes.  Instead of putting just a

10   regular speaker box, it was all built in.  So it kind of looked

11   more high end kind of built into the car.  Always used to joke

12   with people, kind of like the Pimp My Ride type style of

13   install that we did.

14   Q.   And sir, that microphone, I'd ask you not to lean into it.

15   But could you just pull it so that it's in front of you?

16          THE COURT:  Or just lean a little bit.  It doesn't

17    move is the problem.

18   BY MR. GILMER-HILL:

19   Q.   Perfect.  All right.  So given what you described, fair to

20   say it's a -- the shop handled high end customization?

21   A.   Yeah.

22   Q.   What are the price range of the customization work that

23   you did?

24   A.   Probably the cheapest thing that was ever done through the

25   shop would have been at least a $5,000 install and they went

1  all the way up to somebody we did were hundred thousand dollar

2  installs.

3  Q.  And the work that was done on D's three vehicles,

4  approximately where did that fall?

5  A.  They were probably closer to the somewhere maybe between

6  10 and 15,000.

7  Q.  And did you -- for this 27-year-old with the three

8  vehicles having this type of customization work done, did you

9  notice how he was dressed?

10  A.  I mean, at the time he looked just kind of normal.

11  T-shirt, jeans.  And everything was always clean, nice looking

12  clothes.  But just looked like normal kind of clothes.  Not

13  like a suit and tie or nothing like that.

14  Q.  Did there come a point in time when you did begin to

15  notice how D was dressed?

16  A.  Yeah.  Later on knowing him and seeing him, I started to

17  notice that the jeans were definitely higher end jeans.  The

18  belt and shoes were nicer designer like Louis Vuitton or Gucci.

19  Nice watch.  Sometimes like a nice chain, charm.

20  Q.  And was this after you and D had begun drug trafficking

21  together?

22  A.  Yes.

23  Q.  And when you say -- I believe you made reference to a

24  nicer watch.  Was it the same watch all the time?

25  A.  No.  There was at least a couple of different watches.

December 1, 2016

1   Q.   And so what type of watch was it or what type of watches

2   are you talking about?

3   A.   I'm not really sure on watch makes.  I know it was always

4   like they would call them like big faces.  Like it was a bigger

5   display I guess you would call it.  The bigger face of the

6   watch.  Usually diamonds or something somewhere around the face

7   of it, around the bezel.

8   Q.   More expensive watches?

9   A.   Yeah.  I mean, they definitely, you know, looked more

10  expensive.  But like I said, looked like added diamonds to it.

11  Q.   Oh, like diamonds had been added to a watch?  Not that the

12  diamonds came with the watch?

13  A.   Right.  Kind of looked like something was added to it.

14  Q.   Like a customized watch?

15  A.   Right.

16  Q.   Similar to the customized cars?

17  A.   Right.

18  Q.   And I think you made reference to Louis Vuitton belt.  Was

19  it a Louis Vuitton belt you mentioned?

20  A.   Yes.  Belt and then also Gucci.

21  Q.   So you also mentioned jewelry.  Could you describe the

22  type of jewelry that you saw D wearing?

23  A.   Some were just like longer length white gold chains.  It

24  was a couple with charms that had the little diamond encrusted

25  like micrometer holding another diamond in it as like a charm

December 1, 2016

```
 1   on the chain.
 2   Q.   A diamond encrusted micrometer holding another diamond?
 3   A.   Yeah.  Kind of little diamonds added to it.  It looked
 4   like it was white gold holding another diamond.
 5   Q.   And approximately during what years are we talking about
 6   when you saw D dressed this way?
 7   A.   That would probably have been somewhere between '06, '07.
 8   Until about 2010.
 9   Q.   How frequently did you see D dressed this way?
10   A.   The clothing was pretty much any time I did see him.
11   Q.   When you say any time --
12   A.   I mean --
13   Q.   When you say any time, you mean like any time of day or do
14   you mean every time?
15   A.   Yeah.  Any time.  Any time of day.
16   Q.   Okay?
17   A.   It was kind of, I guess, his normal dress.  Sometimes not
18   like with like the chain or the jewelry or anything or usually
19   the watch and nice clothes.
20   Q.   So usually the watch and the nice clothes?
21   A.   Yeah.
22   Q.   And did you see him dress this way at different locations?
23   A.   Yes.
24   Q.   Different states?
25   A.   Yes.
```

1    Q.    Different cities?

2    A.    Yes.

3    Q.    Did you see him dress this way when he was in Arizona?

4    A.    Yes.

5    Q.    Did you see him dress this way when he was in Detroit?

6    A.    Yes.

7    Q.    Did you see him dress this way in California?

8    A.    I don't remember seeing him in California.

9    Q.    During the beginning phase of your drug trafficking with

10   D, did you take any trips out to California?

11   A.    Yes, I did.

12   Q.    And were those trips to California related to the drug

13   trafficking with D?

14   A.    Yes, they were.

15   Q.    So I'm not quite clear.  When you were discussing how he's

16   dressed, you said any time, in terms of any time of day.  You

17   said it's not always all of the jewelry.  But there was the

18   watches, the sneakers.  As to those aspects, was that all the

19   time or sometimes or what?

20   A.    No.  As far as the clothes and the belt s, that was all

21   the time.

22   Q.    The clothes and the belts, the Gucci belts and the Louis

23   Vuitton belts?

24   A.    Yes.

25   Q.    And different type of belts obviously?

December 1, 2016                                          15

1    A.    Yes.

2    Q.    And different watches?

3    A.    Yeah.

4    Q.    We're still talking about the more expensive watches?  You

5    said there were only two or three that you observed?

6    A.    Yeah.  Not all of them had the diamonds around it.  But I

7    did notice maybe one or two of them did.

8    Q.    But he always wore the watches?

9    A.    Yeah.  Always had a watch.

10   Q.    Okay.  So after your interactions with D at the Top of the

11   Line Motoring, did there come another point in time when you

12   began interactions with D?

13   A.    Yes.

14   Q.    Approximately when was that?

15   A.    The first time maybe 2004, 2005.

16   Q.    Was that -- well, how did that occur?

17   A.    I believe he was asking about doing a vehicle with a

18   hidden compartment in it.

19   Q.    And when you say -- I'm sorry?

20   A.    And we started talking about discussing that.

21   Q.    Okay.  When you say you started talking about doing a

22   vehicle with a hidden compartment in it, are you talking about

23   installing a trap in the vehicle?  A concealed compartment

24   inside a vehicle?

25   A.    Yes, a concealed compartment.

1   Q.   So was D asking you to install a concealed compartment in

2   a vehicle?

3   A.   Yes.

4   Q.   Do you remember what type of vehicle that was?

5   A.   I believe it was a Ford Windstar van.

6   Q.   Would that be a minivan?

7   A.   Yes.

8   Q.   Ford Windstar minivan.  Did you install the concealed

9   compartment, the trap, in the Ford Windstar minivan for D?

10  A.   Yes, I did.

11  Q.   When was it that you actually began drug trafficking with

12  D?

13  A.   I believe that was somewhere around 2006 or 2007 when we

14  began.

15  Q.   And how did it begin?

16  A.   When the van was picked up, it was one of his friends that

17  was asking about taking a trip or if I'd ever be interested in

18  it.

19  Q.   And when D's friend was asking about taking a trip, what

20  type of trip was he talking?

21  A.   Taking a trip to go out of state to Arizona to pick up

22  drugs and bring them back.

23  Q.   The person who picked up the minivan is the person who was

24  talking to you about these things?

25  A.   Yeah.  I believe he was there to pick up the minivan or

December 1, 2016

1    was just coming by to check the minivan out.  I don't remember

2    exactly on that.

3    Q.   Do you remember if he had a name, nickname?

4    A.   The name I remember is Ray.

5    Q.   Was he related to D or did he say whether he was related

6    to D?

7             MR. JORDAN:  Your Honor, this would call for hearsay.

8    And I don't believe this is one of the coconspirators that

9    we're talking about.

10            THE COURT:  Mr. Gilmer-Hill, who are we talking

11   about?

12            MR. GILMER-HILL:  We're speaking about the individual

13   who picked up the minivan that had the concealed compartment

14   installed in it.

15            THE COURT:  Okay.

16            MR. GILMER-HILL:  And asked Mr. McWherter if he were

17   interested in traveling to Arizona to pick up drugs.

18            THE COURT:  Okay.  The objection is overruled.

19            MR. GILMER-HILL:  Thank you.

20   BY MR. GILMER-HILL:

21   Q.   This person Ray, did he say whether he was related to D?

22   A.   He didn't really say nothing.  Later on I heard them

23   joking about --

24            MR. JORDAN:  Objection.  Again, I think this is

25   clearly hearsay.

1          THE COURT:  Yeah, that's --

2          MR. JORDAN:  He's not talking about one of the

3     conspirators.

4          THE COURT:  I think the fact is he doesn't have an

5     answer, Mr. Gilmer-Hill, to your question, other than what

6     he's provided.  So please move on to your next question.

7          MR. GILMER-HILL:  Okay.  May I -- well, if I may

8     inquire further as to this.

9     BY MR. GILMER-HILL:

10    Q.  When you say they were joking around, whom are you

11    referring to by they?

12    A.  D later on.  There was his brother at the time were joking

13    around about calling him Uncle Ray.  So I don't know if it was

14    his uncle, but that's just what was heard.

15    Q.  And the brother whom you're referring to, what was the

16    brother's name?

17    A.  I'm not sure of his name.  I just knew of his nickname.

18    It was Smokey.

19    Q.  And in what context were you with D and Smokey and Uncle

20    Ray?

21    A.  I was making a drop off of the drugs.

22    Q.  Of marijuana?

23    A.  Yes.

24    Q.  Okay.  So you were dropping off.  And were Derrick, his

25    brother Smokey, and Uncle Ray with you or present when you were

December 1, 2016                                    19

1    dropping off the marijuana?

2              MR. JORDAN:  Your Honor --

3              THE COURT:  Just a minute.

4              MR. JORDAN:  I have an objection to saying that it's

5    his uncle or his brother.  That's assuming a fact not in

6    evidence.

7              THE COURT:  Sustained.  Let's refer to him as someone

8    who was once called Uncle Ray or something like that.  I don't

9    know what the relationship is.  He hasn't testified that he

10   knows their blood relationship.

11             MR. JORDAN:  Actually, it was the brother, your

12   Honor.  Not so much the uncle.  He referred to this gentleman

13   as D's brother.  I don't think anything's been established

14   that this was his brother.

15             THE COURT:  Fair enough.  That's sustained.  Let's

16   just refer to him as the person you thought was his brother.

17             MR. GILMER-HILL:  Thank you.  If I may just ask the

18   question.

19   BY MR. GILMER-HILL:

20   Q.   Why is it that you believe this person was D's brother?

21             MR. JORDAN:  Calls for speculation, your Honor.

22             THE COURT:  If he knows the answer.  Overruled.

23             THE WITNESS:  That's just what I was introduced, that

24   it was his brother.

25   BY MR. GILMER-HILL:

December 1, 2016

1    Q.   Who introduced you to this person as Derrick's brother?

2    A.   D did.

3            MR. JORDAN:  Now, your Honor, I would object because

4    that would be hearsay.  Again, it's not in furtherance of

5    anything, so.

6            THE COURT:  Okay.  It's just -- overruled.

7            MR. JORDAN:  Your Honor, may we have a sidebar,

8    please?

9            THE COURT:  We certainly can.

10                       (Bench Conference)

11           THE COURT:  Let me ask a quick question.

12           MR. JORDAN:  I don't want to make it seem like I'm

13   splitting hairs, but my client is charged with committing a

14   crime of her brother.  I don't want somebody to think that

15   there was another brother who was involved in a drug deal

16   because we don't even know who this guy is or whether he

17   really was a brother.  This man just simply heard him referred

18   to as his brother.

19           So unless I can cross-examine the person that said

20   that was his brother.  And it's not in furtherance of any

21   conspiracy.  This is just referring to somebody as -- you can

22   see where referring to somebody as that because Mr.

23   Gilmer-Hill said his brother, blah, blah, blah.  That's my

24   objection.

25           THE COURT:  Okay.  Your response?

December 1, 2016

1         MR. GILMER-HILL:  Your Honor, the witness has

2     testified that D, Derrick White, with whom he was engaged in

3     drug trafficking, introduced another person who was present

4     when marijuana was being delivered by Mr. McWherter and

5     unloaded as being his brother.

6         THE COURT:  Yes.

7         MR. GILMER-HILL:  And whose present marijuana is

8     being unloaded and whom I intend to inquire further as to what

9     else was done in front of and/or by him.  This is another

10    coconspirator.

11        THE COURT:  Who is it?

12        MR. GILMER-HILL:  It is D's brother who Mr. McWherter

13    knows by the name of Smokey.

14        THE COURT:  Okay.

15        MR. GILMER-HILL:  Introduced to Mr. McWherter by D as

16    his brother.  Told the name of Smokey.

17        THE COURT:  Okay.

18        MR. GILMER-HILL:  That is squarely within the

19    coconspirator statements.

20        THE COURT:  I think D's --

21        MR. GILMER-HILL:  It goes towards Mr. McWherter

22    knowing and feeling that he can, in fact, conduct his criminal

23    activities in front of this person who's been introduced to

24    him as a relative of Derrick White.

25        MR. JORDAN:  But that does not make him a relative.

December 1, 2016

22

1    The fact that he -- now if he had said something like I want

2    you to go pick up that van to this person, that's in

3    furtherance of a conspiracy.  But simply saying this is my

4    brother, that's not in furtherance of a conspiracy.  And the

5    harm here is that unless I can cross-examine him about that

6    statement, these jurors might leave the impression that that

7    is, in fact his brother.

8              THE COURT:  Is it his brother?

9              MR. GILMER-HILL:  Yes.

10             MR. JORDAN:  But when you say --

11             THE COURT:  Stop.  Let me just ask another --

12             MR. JORDAN:  He says that it's his brother and you're

13   going to accept the prosecutor saying that.

14             THE COURT:  Not necessarily.

15             MR. JORDAN:  You didn't ask me whether it's his

16   brother, Judge.  I'm just trying to be fair.  You're taking

17   his word for it.  You've got to ask me if is it brother.

18             THE COURT:  Is it his brother?

19             MR. JORDAN:  I've got to go ask my client.

20             THE COURT:  You've already asked your client.  You

21   know.

22             MR. JORDAN:  No, I have not, Judge.  I haven't heard

23   of this person before.  This is my first time hearing about

24   this guy.

25             MR. GILMER-HILL:  Mr. McWherter mentioned it in the

December 1, 2016                                          23

 1   report about his --

 2             THE COURT:  Closer.  Move closer.

 3             MR. GILMER-HILL:  It's mentioned in the report about

 4   Mr. McWherter's prior statements to the Government that have

 5   been provided to you.

 6             MR. JORDAN:  But this is my first time knowing about

 7   this guy, Judge.

 8             THE COURT:  Your objection is overruled in the sense

 9   that it was D who made the statement about working with this

10   other person who Mr. McWherter says he was told was his

11   brother.  And it's all in furtherance of the -- putting the

12   compartment into the car and engaging in drug trafficking

13   together.

14             MR. GILMER-HILL:  And in this instance actually this

15   is the receipt of marijuana.

16             THE COURT:  Right.

17             MR. GILMER-HILL:  And I will further go into the

18   inquiry as to how with this witness.  So the same point, the

19   witness has testified that D and the person who -- and the

20   person who D introduced as his brother introduced the third

21   individual.  They were laughing.  The witness, Mr. McWherter,

22   said that they referred to him laughing as godfather and as

23   their uncle.

24             THE COURT:  Okay.

25             MR. GILMER-HILL:  I do not -- so the context in which

December 1, 2016

1    their label of him as uncle is before the jury.  But I do not

2    -- they -- the two brothers have, themselves, identified this

3    third person as Uncle Ray.  Now, if counsel wants -- my

4    position if counsel wants to cross-examine on that or argue

5    and close that maybe it wasn't a real uncle, fine.  But I

6    should not be precluded from using the same label that the

7    coconspirators used as to this individual.

8            MR. JORDAN:  Are you going to argue that it is

9    actually his uncle or are you just using the label?  It's one

10   thing to say this person Uncle Ray.  It's another thing to

11   argue that that was, in fact, his uncle.

12           If you argue that was, in fact, his uncle, number

13   one, I don't see how that goes to any part of this conspiracy.

14   And if it does go to this conspiracy, that's precisely my

15   point.  You're going to be labeling somebody as being a family

16   member and I do not get an opportunity to rebut that.  It does

17   not go to --

18           THE COURT:  With regard to the uncle, what I'd like

19   you to do is just say the person called Uncle Ray.  Did the

20   person called Uncle Ray.

21           MR. JORDAN:  I've got no problem with that.  It's

22   nothing offered for the truth of the matter asserted that it's

23   his uncle.

24           MR. GILMER-HILL:  I believe you were going to ask

25   another question about the person who's referred to as Uncle

December 1, 2016

1   Ray.  Were you about to ask if he's involved or --

2           THE COURT:  No.  I just -- I don't know enough yet

3   about the testimony.  So as long as he's referred to as the

4   person who's called Uncle Ray, I'm fine.

5           MR. JORDAN:  Thank you, your Honor.  Okay.

6                       (Open Court)

7           THE COURT:  Okay.  You may proceed, Mr. Gilmer-Hill.

8           MR. GILMER-HILL:  Thank you, your Honor.

9   BY MR. GILMER-HILL:

10  Q.   Mr. McWherter, before that interruption, I believe that

11  you were -- I was asking you to describe the context in which

12  you were present with D, his brother Smokey, and this

13  additional person whom they referred to as Uncle Ray.  In what

14  context is it that you were with them?

15  A.   As far as?

16  Q.   What were you doing at the time that you saw them and they

17  made the introductions and were referring to this person they

18  called Uncle Ray as the godfather?

19  A.   That's when we were dropping off or I was dropping off the

20  marijuana.

21  Q.   And when you say we were dropping off the marijuana, who

22  are you referring to?

23  A.   Me and Mr. Hale.

24  Q.   Okay.  And who else was -- so where were you dropping the

25  marijuana off to?

1    A.   It was at a house in Detroit.

2    Q.   Were you told whose house it was?

3    A.   I was told -- it was a duplex house.  I was told the house

4    belonged to his brother, Smokey.

5    Q.   The same -- the brother Smokey, the same person who was

6    present when you were dropping off the marijuana?

7    A.   Yes.

8    Q.   And so were Smokey and this person they called Uncle Ray

9    both able to see you and Mr. Hale unloading the marijuana?

10   A.   Yes.

11   Q.   Did either of them help you and Mr. Hale unload or move or

12   handle the marijuana?

13   A.   Not really so much.

14   Q.   Did they do anything in relation to the marijuana?

15        MR. JORDAN:  Judge, relevance.

16        THE COURT:  Sustained.  We're just talking about

17   unpacking the vehicles.

18        MR. GILMER-HILL:  The marijuana from the vehicle?

19        THE COURT:  Yes.  Okay.  I mean, if you can just move

20   along.  What I'm trying to do is keep the trial moving along.

21   You can ask questions about who touched the marijuana and who

22   was involved.  But then we're just going to try to keep

23   moving.

24   BY MR. GILMER-HILL:

25   Q.   Okay.  And my question is did Smokey do anything with

1    regard to the marijuana?

2    A.   He might have told us where to put it.

3           MR. JORDAN:   Objection with the might have.   I'm

4    sorry.   But it has to be definitive.

5           THE COURT:   Sustained.   Lay a foundation what he saw,

6    what he remembers, and that sort of thing.

7    BY MR. GILMER-HILL:

8    Q.   Sir, when you say might have, if you would, please, I

9    mean, if you can remember what he did, then first tell us

10   whether Smokey did anything with regard to the marijuana and

11   tell us -- if so, tell us what he did.

12   A.   I do remember he told us to put it in the basement because

13   we were able to come in the side door and just drop it down the

14   staircase into the basement.   And I believe he was the one that

15   told us --

16          MR. JORDAN:   Again, your Honor, I'm sorry.   But when

17   he says I believe --

18          THE COURT:   Overruled.   These are the way -- people

19   speak in that manner.   And so Mr. McWherter, when we're here

20   in court, it's very important that we know if you know this

21   for sure.   And we don't want you guessing about what happened.

22   Or if your member is foggy about it, tell us it's foggy.   I

23   can't really remember.   And if you do remember, then just tell

24   us what happened.

25          THE WITNESS:   It's probably not 100 percent remember

USA v Tashun White - Case No. 15-20040

```
 1      that it was him that said it.  But I do believe it was him
 2       that said it.
 3     BY MR. GILMER-HILL:
 4     Q.  Okay.  When you say it, are you now referring to the
 5     additional piece about dropping it -- just drop it down the
 6     stairs?
 7     A.  Yeah.  Where to put it in the house.
 8     Q.  So let's back up a few steps because initially we were
 9     talking about when you began the drug trafficking with D.  You
10     made reference to, I believe, Ray who was later referred to by
11     D and Smokey as Uncle Ray being the first person who approached
12     you about becoming involved in transporting marijuana; is that
13     correct?
14     A.  Yes.
15     Q.  And he did so when -- Ray did so when Ray was --
16          MR. JORDAN:  Your Honor, I'm trying to give some
17      leeway.  But these questions are extremely leading.  He's
18      leading.
19          THE COURT:  Okay.  Sustained.
20     BY MR. GILMER-HILL:
21     Q.  When did Ray do so?
22     A.  Do so?
23     Q.  When did Ray ask you if you wanted to become involved in
24     transporting marijuana?
25     A.  When he came to it was either look at the vehicle or pick
```

December 1, 2016

1    the vehicle up.  I believe he came to look at it.

2    Q.   And by the vehicle, which vehicle are you referring to?

3    A.   The Windstar.

4    Q.   The Windstar minivan?

5    A.   Yes.

6    Q.   That you put a trap in?

7    A.   Yes.

8    Q.   Did there come a later point in time when you did begin

9    drug trafficking and marijuana -- transporting marijuana with

10   D?

11   A.   Yes.

12   Q.   And how did that occur?

13   A.   That occurred talking with D and making arrangements to do

14   so.

15   Q.   And so as you talked to D and made the arrangements, was

16   there a discussion about what roles each of you would play?

17   A.   Not exact roles.  Mine was kind of the take the money to

18   Arizona.

19   Q.   When you say yours was kind of the take the money to

20   Arizona, tell us, sir, please, was your role to take money to

21   Arizona?

22   A.   Yes.  My role was to take money to Arizona.

23   Q.   Did you have any other role in the drug trafficking?

24   A.   To pick up the marijuana in Arizona and bring it back to

25   Detroit.

1    Q.   And deliver it to who in Detroit?

2    A.   And then deliver it to D in Detroit.

3    Q.   And is that what you were doing when you were at Smokey's

4    house?

5    A.   Yes.

6    Q.   When you say your role was to take money to Arizona, tell

7    us how were you to -- or how did you receive the money to take

8    to Arizona?  Who brought it to you?

9    A.   D would bring me the money.

10   Q.   How did D deliver the money?

11   A.   I don't understand.  As far as --

12   Q.   How was the money packaged when D brought it to you?

13   A.   Usually it was packaged in like the airtight food

14   processor type bag.

15   Q.   And by airtight food processor type bags, are you

16   referring to something that might be vacuum sealed?

17   A.   Yes.  Vacuum sealed.

18        THE COURT:  Mr. Gilmer-Hill, my court reporter needs

19   to change something on her machine.  So let's pause for just a

20   minute it may take us just a minute.  I'm sorry to interrupt

21   right in the middle of a question.  Why don't we take a

22   ten-minute break now and then we'll go until about 12:45 and

23   take our lunch break then.  Is that agreeable with everybody?

24   Does that meet what your needs are?  Okay.  So please rise for

25   the jury.

December 1, 2016

```
 1                          (Brief Recess)

 2                           (Jury Out)

 3            THE CLERK:  All rise for the jury.

 4                           (Jury In)

 5            THE COURT:  Please be seated.  Mr. Gilmer-Hill.

 6            MR. GILMER-HILL:  Thank you, your Honor.

 7    BY MR. GILMER-HILL:

 8    Q.   Sir, before this break, we were discussing, I believe, the

 9    vacuum sealed bags of money that D delivered to you to be

10    transported to Arizona.  Do you remember that?

11    A.   Yes, I do.

12    Q.   So when D delivered the vacuum sealed packages, was it

13    more than one vacuum sealed package?

14    A.   Yeah.  Usually there was a couple.

15    Q.   So were those in another container?

16    A.   Usually garbage bags.

17    Q.   What type of garbage bags?  What color were they?

18    A.   Just a black garbage bag.

19    Q.   Kitchen?  Big or small?

20    A.   The bigger ones.  I guess the more like outside trash can

21    type.

22    Q.   So like a 30 or 50 gallons?  The type you sit on the curb?

23    A.   Yes.

24    Q.   And how full of money were these black 30 or 50 gallon

25    trash bags?
```

1    A.    It would fill up the bottom pretty good.  It was -- at

2    certain times it would get -- we actually kind of thought in

3    your head for a second that this is heavy to lift and it's

4    money.

5    Q.    And you said -- again, you said kind of -- did that happen

6    to you?

7    A.    Yes.

8    Q.    So there were a few times when you were trying to lift the

9    bag and were consciously thinking of how heavy it was?

10   A.    Yes.  Me and Mr. Hale actually talked about that.  We're

11   both not small guys.  It's kind of heavy to lift.

12   Q.    And was the -- that money was being -- was that money used

13   to purchase the marijuana in Arizona?

14   A.    Yes, it was.

15   Q.    Was there anyone besides -- so far you've mentioned a few

16   people who were involved with regard to the minivan and the

17   house.  Was anyone else involved in the drug trafficking with

18   you?

19   A.    Yes, there was.

20   Q.    Who else was involved in the drug trafficking with you?

21   A.    There was another gentleman named Shoun.  Then there were

22   also two others, Greg and another guy.  I don't know his name.

23   I know his nickname as Chilly.

24   Q.    Did Greg have a nickname?

25   A.    Yes, he did.

December 1, 2016

1    Q.   What was Greg's nickname?

2    A.   Mr. Hanky.

3    Q.   And through the course of your drug trafficking, did you

4    come to learn how much -- well, so who was actually paying for

5    buying the marijuana in Arizona?  Who was actually paying for

6    the marijuana?

7    A.   So who was giving us the -- coming up with the money in

8    Detroit to take down?

9    Q.   No.  So you transport -- D provides money to you to

10   transport to Arizona, correct?

11   A.   Correct.

12   Q.   And then that money was used to buy marijuana, correct?

13   A.   Correct.

14   Q.   Whose money was it that was being used?  Did D just

15   provide the money to you to deliver it or was it D's money?

16   A.   It was D's money.

17   Q.   Anyone else's money?

18   A.   Some of it was Shoun's money.

19   Q.   And do you know how much D and Shoun were paying for the

20   marijuana in Arizona?

21   A.    It was, depending on the time of year, 400 a pound, 500 a

22   pound.

23   Q.   And how is it that you know that?

24   A.   D and Shoun talking about it.

25   Q.   Were you being paid to transport the marijuana?

December 1, 2016                                                    34

1    A.   Yes, I was.

2    Q.   You weren't just doing it out of the generosity of your

3    heart?

4    A.   No.

5    Q.   How much were you being paid to transport the marijuana?

6    A.   My pay was a hundred dollars per pound.

7    Q.   You say your pay was a hundred dollars per pound.  Was Mr.

8    Hale also helping to transport the marijuana?

9    A.   Yes, he was.

10   Q.   Was his pay separate from yours or was it part of that

11   hundred dollars per pound?

12   A.   It was part of the hundred per pound.

13   Q.   So it was a hundred dollars per pound for the

14   transportation?

15   A.   Yes.

16   Q.   So do you know what -- so once the marijuana was purchased

17   in Arizona, you said it was being brought back here to Detroit?

18   A.   Yes.

19   Q.   Do you know how much -- well, who was selling it -- well,

20   what was being done with it back here in Detroit?

21   A.   It was brought back and then delivered to D and Shoun.

22   Q.   Do you know what D and Shoun were doing with it?

23   A.   They were selling it.

24   Q.   Do you know how much D and Shoun were selling the

25   marijuana for?

December 1, 2016                                          35

1    A.   It would depend on who they were selling it to.  If it was

2    a larger quantity customer, they would get a break on price,

3    around 900 a pound.  If it was smaller quantities, was around a

4    thousand a pound.

5    Q.   So 900 to a thousand dollars per pound.  So D and Shoun

6    were -- excuse me -- clearing 5 to 600 -- well, I guess 4 to

7    600 dollars a pound?

8    A.   Yes.

9    Q.   As their profit.  So they were, in fact, making 4 to 6

10   times as much money as you and Mr. Hale were making?

11   A.   Correct.

12   Q.   And you and Mr. Hale made quite a bit of money in this

13   drug trafficking, didn't you?

14   A.   Yes.

15   Q.   And so D and Shoun made quite a bit of money also then,

16   didn't they?

17   A.   Yes.

18   Q.   This -- D's brother Smokey to whose house you delivered

19   the marijuana while he was present, would you please describe

20   him.

21   A.   Taller.  Slender built.  When I'd see him he had short

22   braids in his hair.

23   Q.   Any distinguishing characteristics?  Tattoos, scars?

24   A.   No.  Don't recall anything.

25   Q.   Facial -- any moles?

December 1, 2016                                    36

1    A.   Not that I recall.

2    Q.   Do you know whether anything happened to Smokey?

3    A.   I was talking to D one day and --

4            MR. JORDAN:  Your Honor, objection.  Calls for

5    hearsay.  Again, I don't believe it's within the scope --

6            THE COURT:  Let me hear the question again.

7            MR. GILMER-HILL:  Do you know what happened to

8    Smokey?

9            THE COURT:  Okay.  Overruled.

10           THE WITNESS:  He passed away from cancer.

11   BY MR. GILMER-HILL:

12   Q.   And thank you, sir.  My first question was do you know.

13   And my next question was going to be -- how is it that you know

14   what happened to Smokey?

15   A.   I was talking to D one time about it on a trip that we

16   were going down to Arizona.  And he --

17           MR. JORDAN:  The same objection, your Honor.  I don't

18   believe -- this would be hearsay.  He's not going to any

19   conspiracy.  And also relevance as well, your Honor.

20           THE COURT:  Yeah.

21           MR. GILMER-HILL:  If I may respond, your Honor?

22           THE COURT:  Is this relevant to -- yeah.  Go ahead.

23   Respond.

24           MR. GILMER-HILL:  Coconspirator statement.

25           THE COURT:  Yes.

```
 1              MR. GILMER-HILL:  He's speaking to D and --
 2              THE COURT:  I understand that.  I just don't know if
 3    this goes to the heart of the issue here.  So I'll overrule it
 4    for now.  But we'll try to just keep focused and moving.
 5    BY MR. GILMER-HILL:
 6    Q.  Sir, I think you were saying or you said that you were
 7    speaking to D in relation to a trip to Arizona.  Was that a
 8    trip to Arizona for marijuana, once again?
 9    A.  Yes.
10              THE COURT:  Okay.  Then it's overruled.
11    BY MR. GILMER-HILL:
12    Q.  And so during this trip to Arizona for marijuana, what did
13    D tell you about his brother Smokey?
14    A.  That he wasn't going to make it down to Arizona because
15    his brother passed away and that Shoun would be down there
16    though.
17    Q.  And by -- when you say he wasn't going to make it, you
18    mean D was not going to make it to Arizona?
19    A.  Yes.  Because he would be in Detroit.
20    Q.  And approximately when was that that happened?
21    A.  I don't remember an exact date.  Probably sometime in
22    2009.
23    Q.  So besides Smokey's house, were there -- well, I'm sorry.
24    Let me try that again.  In Arizona where you transported the
25    money, were there particular locations that you and D and the
```

1    other individuals involved used?

2    A.    There were multiple locations.

3    Q.    And how about in metropolitan Detroit.  Were there

4    multiple occasions that you and D and Shoun and the other drug

5    traffickers used here in metropolitan Detroit as well?

6    A.    Yes, there were multiple.

7    Q.    Were those multiple locations you used to deliver the

8    marijuana?

9    A.    Yes.

10   Q.    And approximately how many trips, how many occasions

11   roughly did you transport sounds like bulk money to Arizona and

12   then return with bulk marijuana to Detroit?

13   A.    We would average -- we wouldn't do anything over the

14   summertime.  So we would do maybe nine trips, eight trips a

15   year for three, three and a half years.  So 20 plus trips.

16   Q.    And approximately how much marijuana did you bring back

17   per trip?

18   A.    It would vary.  But the least amount would be 1,200 pounds

19   because that's what the one compartment that we had would fit.

20   Q.    And what was the most?

21   A.    The most was actually when we got arrested.  And I believe

22   that was -- I don't remember exactly.  It was 25 or 2,800

23   pounds.

24   Q.    So that was the range, 1,200 to 2,800 pounds?

25   A.    Yeah.  That would be the most.  The average would probably

1   be I would say 1,800 to 2,000 would probably be more of an

2   average.

3   Q.  So the average was literally approximately a ton of

4   marijuana?

5   A.   Correct.

6   Q.  During this time of your drug trafficking with D, did you

7   learn how he was spending the money that he was making drug

8   trafficking?

9   A.  A lot of it was on clothes, vacations, cars.  Kind of

10  doing jewelry.  I guess what he really felt like doing.

11  Q.  Did you know D to have any legitimate employment, any

12  employment other than the drug trafficking he was engaged in

13  with you?

14  A.   No.

15  Q.  Were there occasions when you and Mr. Hale were approached

16  while you were traveling across country and individuals might

17  ask you what you guys were doing?

18  A.   Yes.

19          MR. JORDAN:  Objection as to relevance, your Honor.

20          THE COURT:  The question was?

21          MR. GILMER-HILL:  Were there occasions when Mr.

22  McWherter and Mr. Hale were traveling across country while --

23  instead of just repeating it, if I may just ask a slightly

24  more better detailed question.

25          THE COURT:  Okay.  Go right ahead.

1    BY MR. GILMER-HILL:

2    Q.   Were there occasions when you and Mr. Hale were traveling

3    across country hauling marijuana in your oversized fancy motor

4    home and extended trailer when people might inquire of you and

5    Mr. Hale as to what you were up to?

6              MR. JORDAN:   Objection as to relevance, your Honor.

7              THE COURT:   Overruled.

8              THE WITNESS:   Yes.

9    BY MR. GILMER-HILL:

10   Q.   And so when curiosity was aroused about you and Mr. Hale

11   based upon you having these expensive looking trappings, what

12   did you and Mr. Hale say to individuals or tell the individuals

13   --

14             THE COURT:   I think I'll sustain it.   I mean, who are

15   these individuals?   Who would ask you or be suspicious about

16   these vehicles?

17             THE WITNESS:   We did get questioned going into truck

18   stops to refuel.

19             THE COURT:   Okay.

20             THE WITNESS:   People see two younger guys getting out

21   of a motor coach and it was just the nature of curiosity.

22   People that are around us or in the truck stop say, oh, what

23   do you guys do for a living and stuff like that.

24             THE COURT:   Okay.

25             MR. JORDAN:   Again, your Honor, I renew my objection

1    as to relevance.

2            THE COURT:  I think we should move on.  I think

3    that's sustained as to relevance, what happened at the truck

4    stop.  So let's move on to the next question.

5            MR. GILMER-HILL:  I apologize.  May we approach?

6            THE COURT:  Sure.

7                    (Bench Conference)

8            THE COURT:  See, Mr. Gilmer-Hill, what I want to do

9    is keep the case moving and unless can you connect the

10   defendant to seeing these vehicles -- is that where you're

11   going?  She saw them?

12           MR. GILMER-HILL:  No, Your Honor.

13           THE COURT:  Okay.

14           MR. GILMER-HILL:  But inasmuch as the defense theory

15   that's been posited thus far relating to whether or not the

16   trappings of young people having very expensive items and

17   their responses, I believe that -- I'm laying the foundation

18   that there was a pattern.  Mr. McWherter and Mr. Hale had a

19   response that they provided.  And then I will inquire of him

20   to any patent responses that Mr. White provides when he is

21   asked about the trappings of these expensive -- or similar

22   expensive trappings.

23           MR. JORDAN:  My only position is how does that get

24   these jurors any closer to whether or not she laundered money?

25           THE COURT:  I think as I understand it, the

```
 1   Government's trying to say she should have known that any
 2   money she received --
 3           MR. JORDAN:  But even if that's the case, how does
 4   somebody asking this man where do you get into that car have
 5   anything to do with whether Tashun White laundered money?
 6   This could just be somebody saying I like that car or I'm
 7   curious about that car.  But it has nothing to do with Tashun
 8   White's knowledge.
 9           MR. GILMER-HILL:  -- developed on cross-examination.
10   But certainly every single piece doesn't have to be related to
11   --
12           THE COURT:  No.
13           MR. GILMER-HILL:  I mean, much like Mr. Jordan was
14   objecting to the idea of introducing yet other vehicles that
15   didn't have her name on it but ultimately were tied to Ms.
16   White through --
17           MR. JORDAN:  But I'm just saying relevance.  That's
18   all.  Still has to be relevant.
19           THE COURT:  It does have to be relevant.  So just go
20   directly to when people questioned what you did, what did you
21   tell them.  When people questioned how Derrick White had the
22   fancy, what did he tell them.
23           MR. GILMER-HILL:  Yes, your Honor.
24           THE COURT:  And then we'll move on.
25           MR. GILMER-HILL:  My initial question that Mr. Jordan
```

December 1, 2016

1    objected to, which I had to go back and try to lay the

2    foundation.  I'll be happy to try to streamline things.

3              THE COURT:  Let's just streamline here.

4              MR. JORDAN:  Help me here.  How does it get you any

5    closer?  Answers to people.  We had a patent answer to say

6    such and such.  Okay.  So what?  What does that do to get

7    these jurors any closer?

8              MR. GILMER-HILL:  If your Honor's ruled -- again, it

9    relates to refuting the defense theory that's been posited so

10   far that despite having lots of trappings, it's not unusual.

11   It doesn't cause anyone to raise eyebrows.  The ideal that --

12   I mean, this --

13             THE COURT:  But let's go --

14             MR. JORDAN:  But that was Mr. McWherter and I

15   specifically asked in that area of Atlanta is it uncommon.

16   This is something completely different.

17             THE COURT:  I know.

18             MR. JORDAN:  He's asking when you're driving a truck

19   do people ask you about your truck.  I haven't even

20   cross-examined -- let me finish, Carl.  I haven't even

21   cross-examined this man so he doesn't know if I'm going to get

22   into the truck.  Whether somebody said, that truck, I like it.

23   Their response has nothing to do with conspiracy.

24             THE COURT:  We've already been over that.  What I

25   think is actually relevant is D, because Ms. White is not

1    alleged to have seen the truck or been a part of that portion

2    of it.  Is she?

3              MR. GILMER-HILL:  No.  But the trappings of the --

4    and I apologize.  Because I don't want to continue with a

5    lengthy sidebar that would far extend the one or two questions

6    that I had to set up the direct inquiry as to D and to move

7    on.

8              THE COURT:  Let's just go directly to D.  Can we do

9    that?  Because I don't -- I just don't think this is helpful

10   to the case.  It's not relevant what people at a truck stop

11   said to Mr. McWherter if she never saw Mr. McWherter.

12             MR. GILMER-HILL:  I appreciate that, your Honor.  I

13   appreciate that.  I just had the single question to set up my

14   next one.  I will continue and try to streamline.

15             THE COURT:  Thank you.

16                      (Open Court)

17             THE COURT:  Thank you, all.  All right.  Go ahead,

18   Mr. Gilmer-Hill.

19   BY MR. GILMER-HILL:

20   Q.   I apologize, Mr. McWherter.  I'd forgotten where we were.

21   I know that we were discussing were there occasions when

22   because of the expensive trappings surrounding you, people

23   asked questions?

24   A.   Yes.

25   Q.   Did you and Mr. Hale have occasion to discuss with D

1    responses that you and Mr. Hale provide when people raise such

2    questions to you about having lots of expensive trappings?

3    A.   Yes.

4    Q.   Did D provide any statements to you about whether he had

5    similar encounters or similar occasions when people asked him

6    about having lots of expensive trappings?

7    A.   Yes, he did.

8    Q.   And did D tell you whether he, too, had a patent response?

9    A.   Yes.

10   Q.   And what was -- did D tell you what the patent response --

11   was it a single patent response or was it -- were they of a

12   nature?

13   A.   No.  He told us of what he would say.

14   Q.   And what was that?

15   A.   He would tell people that asked questions that he was in

16   the music business.

17   Q.   Thank you.  But D indicated that people did ask questions?

18   A.   Yes.

19   Q.   Thank you.  Now, I believe a couple of moments ago you had

20   suggested that D was spending a lot of his money on clothes,

21   cars, vacations and jewelry.  Can you describe for us some of

22   the cars that you know Derrick White to have spent some of his

23   drug trafficking money on?

24        MR. JORDAN:  Your Honor, I'm sorry to -- may we

25   approach briefly?

```
 1              THE COURT:  Sure.
 2                      (Bench Conference)
 3              MR. JORDAN:  Judge, I just want to let Mr.
 4    Gilmer-Hill know, of course he can try his case however he
 5    wants.  I'll stipulate to the cars, Judge.  We're going over
 6    stuff that's not even in dispute.  So I just want to let you
 7    know I know you want to streamline this.  Quite frankly, I'll
 8    stipulate to everything in that book having come from him and
 9    him being in it.
10              THE COURT:  Then let's let Mr. Gilmer-Hill do a
11    little bit of leading with --
12              MR. GILMER-HILL:  Thank you.  I would --
13              MR. JORDAN:  I'm letting him lead a lot already.  I
14    really am.
15              THE COURT:  You what?
16              MR. JORDAN:  I'm letting him lead a lot already.
17              THE COURT:  If what we want to do is streamline,
18    he'll say did you know him to drive the Lamborghini, the
19    Porsche, the Aston Martin.
20              MR. JORDAN:  Okay.  I got it.  Please, please,
21    please.
22                          (Open Court)
23              THE COURT:  Go right ahead, Mr. Gilmer-Hill.
24              MR. GILMER-HILL:  Thank you.
25    BY MR. GILMER-HILL:
```

1   Q.   Sir, I believe that you were about to list some of the

2   cars that you knew D to have spent his drug money on.  Let me

3   -- did you and D discuss cars?

4   A.   Yes, we did.

5   Q.   Did D tell you that he was spending his drug money on

6   cars?

7   A.   He did say he was buying cars.

8   Q.   Did he tell you about several different cars that he

9   purchased?

10  A.   Yes.  We actually talked about cars a lot.  We were both

11  pretty into cars.

12  Q.   You and D were both pretty into cars?

13  A.   Yes.

14  Q.   Did he tell you about a 1967 Chevy Camaro?

15  A.   Yes.

16  Q.   What did he tell you about the 1967 Chevy Camaro?

17  A.   That he originally bought the car, had it sent out to have

18  custom paint, a motor built for it, wheels.  Was leaving a bar,

19  a club I believe it was, and hit a curb, damaged a wheel.  He

20  then brought it to my shop that I had and we sent it out and

21  had the wheel fixed and also the motor had cracked and we also

22  had the motor redone in it.

23  Q.   Okay.  And so the 1967 Chevy Camaro that D told you that

24  he had had it sounds like completely restored was brought by D

25  to your shop?

December 1, 2016

1    A.   Yes.

2    Q.   Was that vehicle still in your shop when your shop was

3    searched following your arrest?

4    A.   Yes.  And actually it wasn't brought to my shop from D.  I

5    met D at another shop and we picked it up with a trailer,

6    because it had a blown motor, to bring to my shop.

7    Q.   Okay.  It was D's car?

8    A.   Yeah.  He was there to get the car at the place that it

9    was at.

10   Q.   So D's car was in your shop?  It was the 1967 Chevy

11   Camaro?

12   A.   Yes.

13   Q.   Thank you.  Did D tell you about a 2008 Dodge Challenger

14   that he spent his money on?

15   A.   Yes.

16   Q.   When did -- how did that conversation come up?

17   A.   Over the summertime, we didn't do a lot of work.  We kept

18   in little communication.  But as it was time to go back to

19   start the trafficking again, I was telling him that I just

20   bought a new 2008 Challenger.  And he's like, oh, yeah, I got

21   one of those.

22   Q.   So approximately when was this?

23   A.   It would have been probably around the fall of 2008.

24   Q.   So right when the cars first came out?

25   A.   Yes.

December 1, 2016

1    Q.   Anything special about the cars?

2    A.   They were a limited production.  They made 6,400 and they

3    were all SRT8 is the only way you could get it.

4    Q.   And SRT high performance?

5    A.   Yeah.  It's their highest end model.

6    Q.   And tough to obtain?

7    A.   To buy one of the cars when they first came out, they were

8    going for over sticker price.  You either had to go through a

9    car importer or find a dealership that was able to get you one.

10   Q.   Did D tell you where he kept the 2008 Challenger?

11   A.   Yes, he did.

12   Q.   Where did D keep the 2008 Challenger?

13   A.   Atlanta, Georgia.

14   Q.   Did D tell you whether the vehicle was in his name?

15   A.   He did not mention that.

16   Q.   Did D discuss with you how he obtained the vehicle?

17   A.   No.

18   Q.   Did he tell you what he did with the vehicle?

19   A.   I know he traded it.  He told me about trading it in

20   because the wheels that were on the vehicle were an expensive

21   set of wheels.  And I was interested in purchasing them.  So

22   the dealership didn't want the aftermarket wheels on it.  So

23   they were sent to my shop on a pallet so I could check out the

24   wheels and let him know if he wanted them.  And they had some

25   chips.  Because I fixed the wheels on the Camaro, I'd be able

December 1, 2016

```
 1   to fix those.
 2   Q.  Okay.  Okay.  And so you said that the dealership didn't
 3   want the customized wheels on the Challenger --
 4            MR. JORDAN:  Your Honor --
 5   BY MR. GILMER-HILL:
 6   Q.  Is that because the Challenger was being traded in?
 7   A.  Yes.
 8            MR. JORDAN:  Objection as to relevance, Judge.
 9            THE COURT:  Yeah.  Sustained.
10            MR. JORDAN:  I think we've established what --
11            THE COURT:  With respect to the wheels, let's move
12    on.
13            MR. GILMER-HILL:  I'm sorry?
14            THE COURT:  I don't think the wheels are relevant to
15    the allegations in this case.
16            MR. GILMER-HILL:  I don't believe there was a
17    question about the wheels.  Oh, let me --
18   BY MR. GILMER-HILL:
19   Q.  Did -- was Derrick trading in the 2008 Challenger for a
20   Porsche Panamera?
21   A.  Yes.
22   Q.  2010 Porsche Panamera?
23   A.  I'm not sure the year, but it was a Porsche Panamera.
24   Q.  D told you that?
25   A.  Yes.
```

1  Q.   Did D tell you about other occasions when he would trade

2  in a car to obtain a different car?

3  A.   Yes.

4  Q.   Did D mention whether he was paying for the cars he was

5  purchasing in cash?

6  A.   He did not mention.

7  Q.   Did he talk about the ease in which one can trade in a

8  vehicle as compared to cash?

9  A.   Yes.

10  Q.   What did D tell you about the ease with which one can

11  trade in a vehicle as compared to cash?

12  A.   We were talking one time about vehicles and if the

13  vehicles --

14          MR. JORDAN:  Your Honor, I'm going to object.  We may

15  need to have a sidebar.  But Judge --

16          THE COURT:  Well, just state the basis of your

17  objection.

18          MR. JORDAN:  Relevance, Judge.  They're talking about

19  cars.

20          THE COURT:  Overruled.

21          MR. JORDAN:  He just said talking about cars.

22          THE COURT:  Yes.

23          MR. JORDAN:  So anything that they talk about is

24  going to be a part of the conspiracy, Judge?  They're talking

25  about cars.

December 1, 2016

```
 1              THE COURT:  It's overruled.
 2              MR. JORDAN:  Thank you, Judge.
 3    BY MR. GILMER-HILL:
 4    Q.   Sir, what did D tell you about the greater ease of trading
 5    in vehicles rather than using cash to obtain another car?
 6    A.   Because you can trade in the vehicle and if the vehicle's
 7    paid for, you get that money off the vehicle.  So instead of
 8    having to put down the cash, you just put down the vehicle.
 9    Q.   Did D ever speak to you about transporting money to
10    Atlanta?
11    A.   He did ask me about it.
12    Q.   What did D say to you about transporting money to Atlanta?
13    A.   He asked about taking a trip to Atlanta to take some money
14    down there.
15    Q.   What type of money?
16    A.   Just some cash.  He was looking at buying some cars.  I
17    didn't end up doing it for him though.
18              MADAM COURT REPORTER:  You said you did or didn't?
19              THE WITNESS:  I did not do it.
20    BY MR. GILMER-HILL:
21    Q.   So when D was talking to you about taking just some money
22    to Atlanta, he was asking -- was he asking you to transport --
23              MR. JORDAN:  Objection, your Honor.  Leading.  We're
24    not talking about the cars now.
25              THE COURT:  Okay.
```

December 1, 2016                                     53

```
 1            MR. JORDAN:  This is leading.  It's leading.
 2            THE COURT:  Okay.  Sustained.
 3  BY MR. GILMER-HILL:
 4  Q.   For what purpose -- did D tell you what purpose he wanted
 5  the money transported to Atlanta for?
 6  A.   He was looking at buying some cars.
 7  Q.   Why -- did D tell you -- why was D asking you to transport
 8  the money rather than take it himself?
 9  A.   Because I was responsible for transporting the money to
10  Arizona and arrived safe.  I would --
11  Q.   So was it a sizable quantity of money that D was asking
12  you to transport to Atlanta?
13  A.   Me and him never got into the exact amount.
14  Q.   Do you know whether someone else took the money to Atlanta
15  for D?
16  A.   Yes.
17  Q.   How do you know that?
18  A.   Because it was talked about.
19  Q.   Between whom?
20  A.   Me and Mr. Hale.
21  Q.   What did Mr. Hale tell you?
22  A.   That he took the money to Atlanta for D.
23  Q.   The money that D was asking to be brought to Atlanta to
24  purchase cars?
25  A.   Correct.
```

```
 1              MR. GILMER-HILL:  No further questions, your Honor.
 2    Thank you.
 3              THE COURT:  Okay.  Fantastic.
 4              MR. JORDAN:  Do you want to go ahead --
 5              THE COURT:  If everyone can hang tight for a little
 6    bit longer, then we'll do this cross-examination and we can
 7    dismiss this --
 8              MR. JORDAN:  I don't think it will be 15 minutes,
 9    Judge.
10              THE COURT:  Okay.  Are you all right for 15 minutes,
11    members of the jury?  Okay.  So let's at least get 15 minutes
12    in.
13                        CROSS-EXAMINATION
14    BY MR. JORDAN:
15    Q.   Mr. McWherter, how old are you?
16    A.   I'm 39.
17    Q.   When did you start trafficking drugs?
18    A.   Back in '06, '07.
19    Q.   Come '06 or '07, did you say I want to start trafficking
20    drugs or was the opportunity posed to you?
21    A.   The opportunity was brought up to me.
22    Q.   And it was brought up to you by whom, Derrick?
23    A.   Originally by Ray and then Derrick.
24    Q.   Okay.  And who's this person Ray?
25    A.   Just an older gentleman.
```

December 1, 2016

1    Q.    Does he know Derrick?

2    A.    Yes.

3    Q.    How do you know that Ray knows Derrick?

4    A.    Because I did see him at one of the houses during one of

5    the drops of drugs.

6    Q.    So Ray was a person that first posed to you drug

7    trafficking?

8    A.    Yes.  That asked about it.

9    Q.    How did he say it?  Did he just come up to you and say do

10   you want to make some extra money or what did he say?

11   A.    Yeah, pretty much.  Do you want to make some extra money?

12   You ever consider driving?

13           MR. JORDAN:  Your Honor, may I approach the witness?

14   Because this book is there.

15           THE COURT:  Yes.  Certainly.

16           MR. JORDAN:  Excuse me, sir.

17   BY MR. JORDAN:

18   Q.    Do you know what made this person feel comfortable with

19   you to bring up the fact that he wanted you to possibly do some

20   illegal activity?

21   A.    That the compartment or concealed compartment that I was

22   building in the van.

23   Q.    Were you building that for -- for who were you building

24   that for?

25   A.    That was for D.

1   Q.   So D, even before you decided to start trafficking for D,

2   he asked you to build a compartment in his van?

3   A.   Yes.

4   Q.   Did you ask him why do you want this or it was kind of

5   implied, you knew?

6   A.   Yeah, it was something you knew but kind of in your head

7   if you didn't ask.

8   Q.   Okay.  And you weren't going to ask him what it was for,

9   right?

10  A.   Right.

11  Q.   At that point in time you simply wanted the business,

12  correct?

13  A.   Correct.

14  Q.   How well did you know Derrick at that time when he asked

15  for that secret compartment?

16  A.   I knew him a couple of years from coming into Top of the

17  Line Motoring and talking to him.

18  Q.   Oh, so your relationship with him, he would come into Top

19  of the Line Motoring and you had a relationship with him before

20  you ever started trafficking, correct?

21  A.   Correct.

22  Q.   So he was a car guy, right?

23  A.   Yes.

24  Q.   D liked cars, correct?

25  A.   Yes.

1    Q.   He liked clothes.  He liked cars.  He liked to take trips,

2    right?

3    A.   Yes.

4    Q.   But would it be fair to say he was not a flashy guy?  And

5    by that, I mean, he didn't walk around with a lot of gold

6    chains around his neck, did he?

7    A.   He did not have a lot, no.

8    Q.   What about a lot of rings and things like that?  Did he

9    have a lot of flashy stuff like that?

10   A.   He had watches.  Never noticed rings.

11   Q.   Okay.  But he wasn't the kind of guy that would say, hi,

12   I'm Derrick, and he'd be showing the watch, would he?

13   A.   No.

14   Q.   It would be fair to say that he had expensive tastes?  He

15   had a lot of money.  But he was low key.  Would that be fair to

16   say?

17   A.   Yeah, he definitely was a low key.

18   Q.   As a matter of fact, he tried to remain kind of private.

19   Would that also be fair to say?

20   A.   Yeah.  I don't think he had a lot of close friends.

21   Q.   Okay.  And he didn't walk around with a big entourage; is

22   that true?

23   A.   Correct.

24   Q.   Okay.  Now, do you think that you were approached because

25   you did not fit the profile of a drug trafficker?

December 1, 2016

1    A.   We actually talked about it.

2    Q.   I'm sure you did.  They discussed the fact that you don't

3    look like a drug trafficker, right?

4    A.   At all.

5    Q.   White guy, balding hair.  And they discussed the fact that

6    you would be good to be the person traveling back and forth,

7    right?

8    A.   Exactly.

9    Q.   Because again, they did not want to bring attention to

10   themselves, correct?

11   A.   Exactly.

12   Q.   Okay.  How much money did you make over the course of your

13   relationship with Derrick?  Over a million dollars?

14   A.   Yeah.  It was probably over a million.

15   Q.   More than 3 million?

16   A.   I don't believe it was more than 3 million.

17   Q.   Did you get involved in this with the intention of jumping

18   in, making some money, and getting out?

19   A.   That was the intention.

20   Q.   Like most people think they're going to do, correct?

21   A.   Correct.

22   Q.   But there was one point in time in your life when you made

23   a conscious decision to go into drug trafficking, correct?

24   A.   Correct.

25   Q.   Okay.  And you knew when you went into this drug

1    trafficking that you might get caught, correct?

2    A.   Yes.  That was something else that was --

3    Q.   Your wife was involved in it also?

4    A.   No, she was not.

5    Q.   Is your wife Kristie?

6    A.   Yes.

7    Q.   Okay.  Did Kristie have any involvement at all with this

8    drug trafficking?

9    A.   No, she didn't.

10   Q.   Didn't she plead guilty to some charges?

11   A.   Yes, she did.

12   Q.   What charges did she plead guilty to?

13   A.   I believe it was a money laundering charge.

14   Q.   So that's part of the drug trafficking, is it not?

15   A.   Yes.  It was for some checks that she signed.

16   Q.   But what you mean is she did not do any of the

17   transportation, correct?

18   A.   Correct.

19   Q.   She didn't touch any of the drugs, correct?

20   A.   She didn't touch, right.

21   Q.   But she knew that her -- you guys are boyfriend and

22   girlfriend?

23   A.   Husband and wife.

24   Q.   She knew that her husband was involved in drug

25   trafficking, correct?

1    A.    No, she did not.

2    Q.    So she did not know --

3    A.    No.

4    Q.    -- that you were getting the bulk of your money from

5    transporting drugs?

6    A.    No.

7    Q.    You were able to hide that from your own wife?

8    A.    Yes.  My wife was a housewife wife.  She -- that's what

9    she focused on.  Pregnant.

10   Q.    So she focused on her career, correct?

11   A.    Yes.

12   Q.    She focused on her family, correct?

13   A.    Yes.

14   Q.    And you went out there and did what you did and she

15   thought you were working where?

16   A.    Told her we had multiple businesses.  One was a deli.  One

17   was a shop that we, you know, would say we do car transporting.

18   Q.    Were these any -- were any of these businesses legitimate

19   or were they all fronts?

20   A.    The deli was.

21   Q.    The deli brought in about how much per year?  During your

22   period of drug trafficking?

23   A.    The deli was just starting.  So it wasn't a whole lot.

24   Maybe a hundred thousand a year, if I had to guess.

25   Q.    Okay.  And then your wife had her own job, right?

1    A.   She worked for my company working doing like payroll stuff

2    at the deli and then if I needed parts ordered or anything at

3    the shop.

4    Q.   But at some point in time didn't the shop cease to exist?

5    A.   Yeah.

6    Q.   And you kept running drugs though, right?

7    A.   Yes.

8    Q.   So what did your wife think you were doing when the shop

9    ceased to exist?

10   A.   We would still do small things on cars.  We did build

11   another spot for D to order materials, built them in our own

12   vehicles and had to buy materials.

13   Q.   So your wife thought you were still working on cars even

14   though the shop the closed, correct?

15   A.   Yeah.  She, at that time, like I said she was pregnant.

16   We had newborns.  Twin girls.  And she didn't come around a

17   lot.  So it was easy to hide things.

18   Q.   How long did you hide from her that you were trafficking

19   in drugs?  Did she not know until you got indicted?

20   A.   Yes.  Well, she knew when we were arrested and the agents

21   came to the house.

22   Q.   And what was her involvement with this?  About a check?

23   A.   Yeah.  She would -- I have horrible handwriting.  So from

24   even to this day, she writes all the checks and signs the

25   checks.  And that's what she did.  She signed some checks and

```
 1    made some bank deposits.
 2    Q.   And that was it?
 3    A.   Um-hum.
 4    Q.   So because of your trafficking -- because of your
 5    trafficking drugs, by my calculation, you're looking at about
 6    17 years, right?
 7    A.   Yes.
 8    Q.   And that's on the low end?
 9    A.   Yes.
10    Q.   And the high end is 20 years, correct?
11    A.   Yes, sir.
12    Q.   And after you found out that you were looking at this
13    amount of time -- well, let me backtrack.  You get stopped in
14    the van, correct?
15    A.   No.  We were in -- I was in my motor home.  And that's the
16    one I was stopped in.
17    Q.   Was Nicholas Hale with you?
18    A.   He was actually in another vehicle following the pickup
19    and trailer.
20    Q.   Now, weren't there two women with you guys?
21    A.   Yes.
22    Q.   Who were the two women?
23    A.   One was my girlfriend at the time and her friend.
24    Q.   So it wasn't your wife?
25    A.   No.
```

December 1, 2016

1    Q.   You kept that from your wife as well?

2    A.   Yes.

3    Q.   And Nicholas Hale, was he married at the time?

4    A.   No.  I believe he had a girlfriend at the time.

5    Q.   Was the girl with him on that time when you got stopped

6    his girlfriend?

7    A.   No.

8    Q.   So both of you guys kind of like leading double lives,

9    right?

10   A.   Exactly.

11   Q.   You're drug dealers and your wife doesn't know it, right?

12   And you're pretending to be legitimate businessmen, but, again,

13   you're drug dealers, correct?

14   A.   Correct.

15   Q.   And you're not letting anybody know this, correct?

16   A.   Correct.

17   Q.   Now, what are you doing with all this money you're making

18   and you're not letting your wife know that you're trafficking

19   drugs?  Does she think these are proceeds from the businesses?

20   A.   She wouldn't see the money.  It would get -- a lot of it

21   was hidden at the shop.  Some we had put in the safe at the

22   house in downstairs that she knew about the safe but never had

23   a combination to.

24   Q.   So she knew you were putting money in there but she didn't

25   --

December 1, 2016

```
 1   A.   Didn't know exactly what was in there.  I mean --
 2   Q.   Now, didn't you have in addition to your house like a
 3   swimming pool?
 4   A.   Yes, we had a swimming pool at the house.
 5   Q.   The swimming pool was about what, 120,000?
 6   A.   I don't remember exactly.  But probably around that.  That
 7   was the whole backyard.  It was an acre property.
 8   Q.   And how much money were you making at the time on paper to
 9   the IRS?  How much money were you making?
10   A.   I don't remember.
11   Q.   But certainly not -- were you making more than a hundred
12   thousand dollars on paper?
13   A.   It might have been right around there.
14   Q.   Okay.  But certainly you knew once the Government started
15   looking into the things that you were buying that there might
16   raise some red flags, the things that you had bought, correct?
17            MR. GILMER-HILL:  Objection.  Foundation.
18   Speculation.
19            THE COURT:  Overruled.  If you know.
20   BY MR. JORDAN:
21   Q.   We're talking about your case and the evidence against
22   you.  So you're intimately familiar with the evidence against
23   you, are you not?
24   A.   Yes.
25   Q.   So you know when the Government came looking at you, they
```

December 1, 2016

```
 1    were going to be looking to see how you spent this money,
 2    correct?
 3              MR. GILMER-HILL:  Objection, again, your Honor.
 4              MR. JORDAN:  Oh, I'll rephrase it.
 5              MR. GILMER-HILL:  Vague.
 6              THE COURT:  Just one person at a time.  Sustained.
 7              MR. JORDAN:  I'll rephrase it.
 8    BY MR. JORDAN:
 9    Q.   You bought an expensive addition to your home, correct?
10    A.   Correct.
11    Q.   Certainly you knew that that might raise some red flags
12    once you got caught, correct?
13    A.   I guess that wasn't what I was worried about when I got
14    caught.
15    Q.   What were you worried about?
16    A.   This.  The time and the --
17    Q.   Did you ever say to yourself I wish I hadn't gone down
18    this road of drug trafficking?
19    A.   Every day for the past seven years.
20    Q.   But again, you made this choice, did you not?
21    A.   I sure did.
22    Q.   And Nicholas Hale, he made the choice, too, did he not?
23    A.   Yes, he did.
24    Q.   Gregory Johnson, he made that choice, too, did he not?
25    A.   Yes.
```

December 1, 2016

1    Q.   Certainly Derrick made that choice, correct?

2    A.   Yes.

3    Q.   And who else amongst this group of people made that

4    choice?  Who were involved that you can say, yes, that person

5    was definitely trafficking?  Chilly before he died?  Or was

6    that the person that died, Chilly?

7    A.   No.  Chilly was a guy that was in Arizona.

8    Q.   So he certainly was involved, right?

9    A.   Right.

10   Q.   He signed up to do this.  Who else?

11   A.   Like you said, Greg.  Gregory.

12   Q.   What about Leshoun Byrd?

13   A.   Yes, Shoun.  D and myself and Nick Hale.

14   Q.   Now, I didn't hear you mention Tashun White.  As a matter

15   of fact, did you see Tashun White for the first time today in

16   person?

17   A.   Yes.

18   Q.   Throughout all this drug trafficking you never saw her,

19   did you?

20   A.   Never.

21   Q.   And when Derrick was talking about these cars, he never

22   said to you I'm going to get my sister to hide my drug money by

23   putting these cars in her name.  He never said that, did he?

24   A.   No.

25   Q.   As a matter of fact, he never even intimated to you that

December 1, 2016                                                          67

```
 1   he was trying to hide his drug money through these cars.  He
 2   just came across as a car aficionado; is that true?
 3   A.   Yeah.  We never talked about what names they were in.
 4            MR. JORDAN:  I have no further questions.
 5            THE COURT:  Okay.  Mr. Gilmer-Hill?  Any redirect?
 6            MR. GILMER-HILL:  No redirect, your Honor.  Thank
 7   you.
 8            THE COURT:  All right.  Well, Mr. McWherter, thank
 9   you, very much, for being here.  And you may step down.  And
10   you're free to leave.
11                (Excerpt of Proceedings Concluded)
12                    *           *           *
13                    -           -           -
14              CERTIFICATE OF OFFICIAL COURT REPORTER
15        I, Jeseca C. Eddington, Federal Official Court
16   Reporter, in and for the United States District Court Eastern
17   District of Michigan, appointed pursuant to provisions of Title
18   28, United States Code, Section 753, do hereby certify the
19   foregoing 67 pages are a true and correct transcript of the
20   proceedings had in the matter of UNITED STATES OF AMERICA
21   versus TASHUN YVONNE WHITE, Case No. 15-20040 held on December
22   1, 2016.
23
24   /s/ JESECA C. EDDINGTON                        2/18/2017
     Jeseca C. Eddington, RDR, RMR, CRR, FCRR       Date
25   Federal Official Court Reporter
```

USA v Tashun White - Case No. 15-20040