December 1, 2016                                    1

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF MICHIGAN
2                    SOUTHERN DIVISION

3    UNITED STATES OF AMERICA,

4                    Plaintiff,
        -v-                              Case No. 15-20040
5
     TASHUN YVONNE WHITE,
6
                     Defendant.
7    _____/

8                      JURY TRIAL
                        EXCERPT
9
             BEFORE THE HONORABLE JUDITH E. LEVY
10              UNITED STATES DISTRICT JUDGE

11                   DECEMBER 1, 2016

12
     APPEARANCES:
13
     For the Plaintiff:   Carl Gilmer-Hill
14                        United States Attorney's Office
                          211 West Fort Street, Suite 2001
15                        Detroit, Michigan 48226

16   For the Defendant:   Carl Jordan
                          26677 West Twelve Mile Road
17                        Southfield, Michigan 48034

18

19

20

21

22

23          To Obtain a Certified Transcript Contact:
               Jeseca C. Eddington, RDR, RMR, CRR, FCRR
24                Federal Official Court Reporter
                  United States District Court
25       200 East Liberty Street - Ann Arbor, Michigan 48104

December 1, 2016

1                           **I N D E X**

2    WITNESSES                                        PAGE

3         HAKIM BERRY
              Direct examination by Mr. Gilmer-Hill...3
4             Cross-examination by Mr. Jordan.........11

5

6    MISCELLANY

7         Proceedings..................................3
          Certificate.................................28
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

December 1, 2016

1          **E X C E R P T    O F    P R O C E E D I N G S**

2                                    *        *        *

3                                    -        -        -

4              MR. GILMER-HILL:  Yes, your Honor.  The Government

5      calls Nicholas Hale.

6              THE COURT:  Okay.

7              Thereupon,

8                          **N I C H O L A S     H A L E ,**

9      having been called as a witness and having been first duly

10     sworn testified as follows:

11             THE COURT:  Thank you.  Then you can have a seat

12      right in our witness box.

13                              DIRECT EXAMINATION

14     BY MR. GILMER-HILL:

15     Q.   Good afternoon.

16     A.   Good afternoon.

17     Q.   Could you please state your name and spell your last name?

18     A.   Nicholas Hale, H-A-L-E.

19     Q.   And Mr. Hale, do you know an individual who goes by the

20     nickname D?

21     A.   Yes.

22     Q.   And do you know his real name?

23     A.   Derrick.

24     Q.   Were you in -- how do you know D?

25     A.   As an acquaintance.

December 1, 2016

1    Q.   Were you involved in drug trafficking with Derrick?

2    A.   Yes.

3    Q.   And showing you what has previously been marked and

4    admitted as Government's Exhibit 1F1.  Can you tell us, please,

5    is the person depicted in 1F1 the Derrick, the person who you

6    knew as D or Derrick?

7    A.   Yes, it is.

8    Q.   This -- and you mentioned that you were, in fact, involved

9    in a drug trafficking conspiracy with D, correct?

10   A.   Correct.

11   Q.   And you were, in fact, charged with the drug trafficking

12   conspiracy, substantive count of drug trafficking, and a money

13   laundering conspiracy; isn't that correct?

14   A.   That's correct.

15   Q.   You were arrested originally in relation to those charges

16   back in February of 2010, correct?

17   A.   Correct.

18   Q.   At the time of your arrest, you provided a statement to

19   the officers on scene?

20   A.   I'm sorry.  Could you --

21   Q.   The day that you were arrested, did you talk to the police

22   officers who arrested you?

23   A.   Yes.

24   Q.   Did you later provide a more full statement with an

25   attorney present representing you during a meeting with law

December 1, 2016

1  enforcement agents and a representative from the Government, a
2  prosecutor, myself?
3  A.   Yes.
4  Q.   And that meeting, that was a debriefing, correct?
5  A.   Yeah.
6  Q.   And did you receive a letter agreement that governed that
7  meeting?
8  A.   Yes, I did.
9  Q.   And do you remember receiving that letter and going over
10 it with your attorney?
11 A.   Yes, I do.
12 Q.   And that letter agreement required -- provided you certain
13 protections with regard to what use would be made of the
14 information that you shared during the meeting as long as you
15 were honest, correct?
16 A.   Correct.
17 Q.   As long as you were honest during the meeting, then the
18 statements you made wouldn't be used to prosecute you further?
19 A.   Yes.
20 Q.   And at some later point in time, did you, in fact, plead
21 guilty to the drug conspiracy charges, the marijuana
22 conspiracy, and the money laundering conspiracy charges that
23 were against you in an indictment?
24 A.   Yes, I did.
25 Q.   And was that pursuant to a Rule 11 plea agreement?

December 1, 2016

1    A.   Yes.

2    Q.   And was that pursuant to a cooperation agreement?

3    A.   Yes.

4    Q.   And the Rule 11 plea agreement was an agreement that you

5    reviewed with your attorney?

6    A.   Yes, it was.

7    Q.   And your Rule 11 plea agreement and in fact at your plea

8    hearing itself, in each of those instances the maximum amount

9    of prison time that you could face was discussed?

10   A.   Correct.

11   Q.   And within your Rule 11 plea agreement there was also

12   reflected an agreed upon guideline range that the attorneys had

13   calculated as what your sentencing guideline recommendation

14   based upon the sentencing guidelines themselves would be?

15   A.   Yes.

16   Q.   Do you remember that?  Being told that the judge wouldn't

17   be bound by that, but that those would be the guidelines that

18   the attorneys agreed applied to you?

19   A.   Correct.

20   Q.   And your agreed upon guideline range was 87 to 108 months.

21   Do you remember that?

22   A.   Yes.

23   Q.   And in addition to pleading guilty pursuant to the Rule 11

24   plea agreement, you also had a cooperation agreement, didn't

25   you?

December 1, 2016

1    A.   Yes, I did.

2    Q.   The cooperation agreement essentially required you to be

3    willing to meet with law enforcement and Government agents to

4    discuss and interview further about your participation in the

5    drug trafficking conspiracy and the money laundering

6    conspiracy?

7    A.   Correct.

8    Q.   And the cooperation agreement also required you to be

9    willing to testify if called upon about your involvement in

10   those events --

11   A.   Yes.

12   Q.   In the drug conspiracy and the money laundering

13   conspiracy?

14   A.   Correct.

15   Q.   The cooperation agreement didn't require you to just help

16   convict somebody, did it?

17   A.   No.

18   Q.   Did the agreement require simply your honest and truthful

19   testimony regardless of outcome?

20   A.   Yes.

21   Q.   And that cooperation agreement basically said that if you

22   did those things, then the Government would take that in

23   consideration as to whether it might make a recommendation to

24   the judge to further take that into consideration and possibly

25   sentence you to something less than the range that was in your

1    plea agreement?

2    A.   Yes.

3    Q.   But there were no guarantees about that?

4    A.   Correct.

5    Q.   And there was a possibility that she wouldn't do that

6    regardless?

7    A.   Right.

8    Q.   So is that what you intend to do today, to testify

9    truthfully?

10   A.   Yes.

11   Q.   So let's talk a little bit further about some of your

12   interactions with D.  In relation to the drug trafficking that

13   you were doing, you and Mr. McWherter were essentially

14   transporting money and marijuana; is that correct?

15   A.   Yes.

16   Q.   Was there -- and for the most part you were transporting

17   the money from the Detroit area to Arizona near Phoenix and the

18   marijuana from that same area back to Detroit?

19   A.   Correct.

20   Q.   Was there ever an occasion where you were asked to

21   transport money to Atlanta?

22   A.   Yes, there was.

23   Q.   Who asked you to transport money to Atlanta?

24   A.   D.

25   Q.   When D asked you to transport the money to Atlanta, did D

December 1, 2016

```
1    tell you why he wanted you to transport the money to Atlanta?
2    A.   To purchase a couple of vehicles.  Specifically Mercedes
3    Benzes.
4    Q.   And did you transport money to D in Atlanta?
5    A.   Yes, I did.
6    Q.   So approximately when was it that D asked you to transport
7    the money to Atlanta?
8    A.   I believe November or December.
9    Q.   Had you made any trips to Arizona in proximity to D's
10   request for you to take money to Atlanta?
11   A.   Yes.  Prior to that.  I was -- we came back from Arizona.
12   Q.   Okay.  And do you remember approximately which year it was
13   when D in around November or December asked you to do this
14   after the transporting marijuana back from Arizona?
15   A.   I believe '08.
16   Q.   In relation to your arrest, do you have any recollection
17   as to how far prior to your arrest it was that you were asked
18   to transport money to Atlanta?
19   A.   Like within a year or something like that.
20   Q.   Okay.  The money that you transported to Atlanta and gave
21   to D, where did you -- where were you when you received the
22   money to transport to Atlanta?
23   A.   At my house.
24   Q.   In metropolitan Detroit?
25   A.   Yes.  Harrison Township, Michigan.
```

1    Q.    Who provided you the money to transport?

2    A.    D.

3    Q.    How was the money packaged that D gave you?  Well, first,

4    was the money packaged at all?

5    A.    Yeah.  He had it in a bag but it was -- the money was like

6    in an airtight bags, like Ziplock -- not Ziplock.  Airtight.

7    Q.    Airtight?

8    A.    Yeah.

9    Q.    Was it vacuum sealed?

10   A.    Vacuum sealed.  Thank you.

11   Q.    So when money was provided to you to transport to Arizona

12   to purchase marijuana, how was that money packaged?

13   A.    Similar vacuum seal or it was miscellaneous bills.  But

14   majority of time, vacuum sealed.

15   Q.    Who provided you the money to transport to Arizona on

16   those occasions?

17   A.    D.

18   Q.    And would you please tell the jurors what happened when

19   you transported the money to Atlanta to deliver to D?

20   A.    I just -- me and my girlfriend at the time went down to

21   Atlanta and got a room at the W casino or I'm sorry.  The W

22   hotel.  And at that time I made arrangements to meet with D.

23   He met me in the parking garage.  And at that time I

24   transferred the money in a bag to D at that time.

25   Q.    Okay.  And did you -- did D say anything about whether he

December 1, 2016

1    had any other vehicles in Atlanta?  Let me rephrase.  Do you

2    know whether D had any -- already had any vehicles in Atlanta

3    before asking you to bring the money for him to purchase the

4    Mercedes?

5    A.   Yeah.  He said he stored his vehicles in Atlanta.

6    Q.   Did D say how many vehicles he intended to buy with the

7    money that you were transporting?

8    A.   I believe he said two or three.

9    Q.   And do you know approximately how much money you

10   transported to D?

11   A.   No, not -- I don't know exactly how much.  A large sum,

12   but I don't know exactly what it was.

13   Q.   And how many vacuum sealed bags was it that you were given

14   to bring to D down in Atlanta?

15   A.   Again, there was multiple.  But I couldn't put a number on

16   it.

17   Q.   Multiple bags to purchase multiple vehicles in Atlanta?

18   A.   Right.  He had multiple vacuum sealed bags in one bag that

19   he gave me to purchase, you know, two to three Mercedes.

20   Q.   Thank you.

21          MR. GILMER-HILL:  No further questions for this

22    witness actually, your Honor.

23          THE COURT:  Oh, okay.  Mr. Jordan.

24          MR. JORDAN:  Thank you.

25                          CROSS-EXAMINATION

1    BY MR. JORDAN:

2    Q.   Mr. Hale, you worked for -- and when I say you worked for

3    D, would it be fair to say that D was kind of the head of this

4    drug trafficking enterprise?

5    A.   Yes.

6    Q.   You worked for D for about how many years, about two or

7    three?

8    A.   Yes.

9    Q.   During that period of time two to three years, you made

10   what about $2 million, $3 million?

11   A.   I'm sorry.  Who made that?

12   Q.   Did you make about $2 million during that period of time?

13   A.   No.  I don't know, but I didn't make that much, no.

14   Q.   But you made money each time you went from Michigan to

15   Arizona and came back from Arizona to Michigan, right?

16   A.   Correct.

17   Q.   How much money did you make on average?

18   A.   It varied.  About 40,000.

19   Q.   About 40,000.  Were you making the same amount as

20   McWherter?

21   A.   No.

22   Q.   He made more than you?

23   A.   Yes.

24   Q.   Is it any particular reason why he made more?

25   A.   He was doing it and knew everything about it and asked me

1  to -- if I would drive to and from Arizona to Michigan.

2  Q.  So did Derrick recruit you or did McWherter recruit you?

3  A.   McWherter.

4  Q.  So it wasn't Derrick that first came to you, it was

5  McWherter that came to you and said, hey, you want to make some

6  extra money?  Something like that?

7  A.   Yes.

8  Q.  And then how long after that before you met Derrick or had

9  you already met Derrick?

10  A.   No, I hadn't met Derrick until I met through jimmy.

11  Q.   Okay.  So Jimmy meets you first.  By the way did you and

12  Jimmy work together?

13  A.   Yes.

14  Q.   How many years?

15  A.   Months.  Before --

16  Q.   Just a couple of months?

17  A.   Yes.

18  Q.   But when he approached you, obviously he must have felt

19  comfortable, right?

20  A.   Correct.  I knew him prior as a friend.

21  Q.   Oh, you knew him as a friend prior to you and he ever

22  working together?

23  A.   Correct.

24  Q.   And where did you guys work together when you worked

25  together legitimately?  Did you have a job where you guys were

1   customizing or something?

2   A.   Yes.

3   Q.   What was that?

4   A.   Prototype.

5   Q.   So how does it happen?  Does he come to you one day and

6   say, hey, do you want to make some extra money?  What does he

7   say?

8   A.   Yes.  Something like that.  It was pretty much, like to

9   make some extra money.  This is what I do on the side.  You

10  wouldn't have to be involved.  He said driving at that time.  I

11  said okay.

12  Q.   You know, they tell me that I speak too fast and now I

13  know what that's like.  So slow down.  That's okay.  Just slow

14  down just a little bit.

15          What I want to know from you is when he came to you,

16  he being Mr. McWherter, and he posed this to you, do you

17  remember the exact words that he said?

18  A.   No.  Not exactly.  But in around about, you know, just

19  would you like to make extra money.  This is -- you know, I

20  transport marijuana from Arizona to Michigan.  Alls you have to

21  do is drive.

22  Q.   When he said all you had to do is drive, it sounded like a

23  pretty easy gig, right?

24  A.   I don't know about easy, but yeah.  I mean, I was willing

25  to do it.

December 1, 2016                                              15

1    Q.   Well, I mean by easy, he didn't say you had to tote any

2    guns or anything, right?

3    A.   Correct.

4    Q.   You didn't have to go selling marijuana on any corners or

5    anything?

6    A.   Never.

7    Q.   All you had to do was basically get in the car -- well,

8    load it and drive it, right?

9    A.   Correct.

10   Q.   Did you have any idea prior to McWherter asking you if you

11   wanted to do this that he was involved in it?

12   A.   You know he had nice vehicles and stuff, but I didn't

13   assume.

14   Q.   By the way, had he been doing any trafficking before he

15   asked your help?

16   A.   Correct.

17   Q.   Do you know who was involved with him prior to you getting

18   involved?

19   A.   No.

20   Q.   Well, you know Leshoun Byrd, right?  You know Leshoun

21   Byrd, right?

22   A.   I've heard of the name.  A lot of times we went by

23   nickname.  So if you said a nickname, I might know it.

24   Q.   Okay.  What about Kristie McWherter?

25   A.   Yes, I know.

1    Q.   Did she know what you guys were involved in?

2    A.   I don't know what her involvement was as far as knowing.

3    Q.   Well, you know that Jimmy McWherter was involved, correct?

4    A.   Correct.

5    Q.   When Jimmy was involved, was Kristie ever around the

6    drugs?

7    A.   No, I never seen her around the drugs.

8    Q.   Did you ever see her around large quantities of cash?

9    A.   I mean -- no.  I mean, between her and husband if that was

10   --

11   Q.   At any time whether it's her husband around, whether he's

12   not around, did you ever see her involved in any large

13   quantities of cash?

14   A.   A couple of times, yeah.

15   Q.   A couple of times.  When you say large quantities, about

16   how much would you say you saw her around?  Maybe 40,000,

17   50,000?

18   A.   Oh, I don't know about numbers.  Like maybe 5,000 or

19   something.

20   Q.   Okay.  But you've seen the pictures in this case involving

21   the vacuum sealed bags and the marijuana, correct?

22   A.   Correct.

23   Q.   You've seen the vacuum sealed bags and the money, correct?

24   A.   Correct.

25   Q.   Do you know if Kristie McWherter was ever around any of

1    that?

2    A.    No.

3    Q.    You don't know if she was?

4    A.    I don't believe she was.  I've never seen her around that.

5    Q.    Okay.  Do you know if Jimmy ever talked to his wife about

6    this?

7    A.    Being that they're married, I'm assuming.  But I don't

8    know their relationship and what they talk about.

9    Q.    Okay.  So Jimmy never came to you and said I'm keeping

10   this from my wife or I'm telling my wife.  He never talked to

11   you about his business, correct?

12   A.    Pretty much he was pretty --

13   Q.    You kept to yourself with regarding your involvement with

14   this organization.  Would that be fair to say?

15   A.    Yes.

16   Q.    Jimmy kept to himself regarding his involvement with this

17   organization; would that be fair to say?

18   A.    Yes.

19   Q.    Everybody pretty much stayed in their lane, correct?

20   A.    Correct.

21   Q.    And by stay in your lane, I mean everybody pretty much

22   knew their role.  And you didn't go asking him about other

23   people's business, did you?

24   A.    No.

25   Q.    By the way, at the time that you were involved, were you

1  married, yourself?

2  A.   No, I was not.

3  Q.   You had a girlfriend?

4  A.   Yes.

5  Q.   Was that the woman that was caught with you?

6  A.   No.

7  Q.   Because you were with a woman when you got caught,

8  correct?  When I say caught, I think it was back in February?

9  A.   Not in my vehicle though.  But there were a couple of

10  females that went along with us at the time.  They were with

11  Jimmy.

12  Q.   Well, explain that.  When you were actually caught, were

13  you with Jimmy?

14  A.   I was driving behind Jimmy.

15  Q.   What kind of car were you in?

16  A.   A truck.

17  Q.   Whose?

18  A.   My truck.

19  Q.   Who was in the truck with you?

20  A.   Nobody.

21  Q.   Who was in the truck that Jimmy was in?

22  A.   Stefania and I don't remember the other female's name.

23  Q.   Was Stefania Jimmy's girlfriend?

24  A.   Yeah.

25  Q.   So he had a wife and he had a girlfriend?

1    A.    Yep.

2    Q.    So it was three people in his truck?

3    A.    Yep.

4    Q.    Why wasn't somebody in your truck?

5    A.    Prior to that, like I said, I don't know the relationship.

6    I think they're family members of some sort.  A godmother,

7    aunt.  I don't know exactly.  But at one point, she did ride

8    with me on the way back for a while.  And then -- excuse me.

9    We stopped to get gas and she -- at that point in time she went

10   to the motor home.

11   Q.    Okay.  So she went to get in the truck with Jimmy?

12   A.    Correct.

13   Q.    Okay.  Now, let me ask you this question.  So you guys get

14   pulled over.  And at that point in time is your heart pounding?

15   A.    Yeah.

16   Q.    But it had not been the first time you'd been stopped,

17   correct?  And you know, I should lay a better foundation.  It

18   was not the first time you had been stopped when you were doing

19   something illegal as it relates to this enterprise, correct?

20   A.    I don't remember any time prior to that.

21   Q.    Didn't you and Jimmy have like some code word or something

22   you would say if you were stopped?  Like wouldn't you guys just

23   say you were going or where you were going?

24   A.    No.

25   Q.    What about if somebody had any question to you about the

December 1, 2016                                    20

1    vehicles you were in, like, hey, that's a nice truck?  Or did

2    you have any code words or anything like that you would say?

3    A.   No.

4    Q.   You would just play it by ear?

5    A.   Yeah.

6    Q.   Okay.  Well, with respect to the time that you were caught

7    that led to your being indicted, did you have any drugs in the

8    vehicle you were in?

9    A.   No.

10   Q.   Did you have any money?

11   A.   No.

12   Q.   So what was your purpose on that particular day?

13   A.   I was driving back and I had Jimmy's trailer.  And at that

14   point, I mean there was narcotics in that trailer.

15   Q.   Okay.

16   A.   Not in the truck.

17   Q.   Okay.  So you were pulling a trailer?

18   A.   Correct.

19   Q.   Okay.  So you were transporting drugs that day?

20   A.   Yes, correct.

21   Q.   Okay.  Got it.  So you get stopped.  And later on that day

22   law enforcement goes to the warehouse, correct?

23   A.   I believe so.

24   Q.   At some point in time after you got stopped they went to

25   the warehouse, right?

1    A.   Yes.

2    Q.   By the way, did you ever see this woman right here, Ms.

3    Tashun White at the warehouse?

4    A.   No, I did not.

5    Q.   Have you ever seen her prior to today?

6    A.   No.

7    Q.   Now, when you went down to Atlanta, you went down there --

8    that didn't have anything to do with drugs.  That just had to

9    do with you buying some cars, correct?

10   A.   It had nothing to do with the drugs.  It had everything to

11   do with him buying the cars.  Not me.

12   Q.   And when you went down there to buy cars, did you get paid

13   for taking the money down there?

14   A.   Yes.

15   Q.   As a matter of fact, you were in this not for the love.

16   It was for the money, correct?

17   A.   Pretty much, yes.

18   Q.   So how much did you get paid for going down to Atlanta?

19   A.   5,000 prior and 15,000 when I got down there after.

20   Q.   So you made $20,000 just for being a courier for the most

21   part?

22   A.   Yes.

23   Q.   Were you living high off the hog when you were making this

24   money or were you trying to be kind of under the radar, so to

25   speak?

December 1, 2016

1   A.   I was modest.

2   Q.   You were modest?

3   A.   But I mean it was good.  I was good.

4   Q.   So there was some times when you would splurge, correct?

5   A.   Correct.

6   Q.   What are some of the things you splurged on?

7   A.   Like snowmobiles, four wheelers, TV's, wood floors, stuff

8   for the house.

9   Q.   You said what kind of floors?

10  A.   Wood floors.

11  Q.   Wood floors.  You put in some renovations in your home?

12  A.   Correct.

13  Q.   During the course of your being involved with this

14  trafficking organization?

15  A.   Yes.

16  Q.   More than 20,000?

17  A.   Yes.

18  Q.   More than 50,000?

19  A.   Probably.

20  Q.   More than 70,000?

21  A.   I don't think.  Not that much.

22  Q.   But more than $50,000 worth of improvements?

23  A.   Yes.

24  Q.   Were you filing with the IRS at this time?

25  A.   I believe so.

1   Q.   So where did you tell the Government you were working on

2   your IRS forms?

3   A.   Prototype and -- I believe Prototype at the time.

4   Q.   Now, you're aware that during this period of time,

5   Prototype probably made probably all of 5 or $15,000, right?

6   A.   I don't know.

7   Q.   But you really weren't getting a paycheck from prototype;

8   is that correct?

9   A.   I had received a few but, no, not too much.

10  Q.   Okay.  Bottom line, Prototype was pretty much a front,

11  correct?

12  A.   Pretty much, correct.  Yes.

13  Q.   Your real employment, a real job would have been this

14  enterprise, correct?

15  A.   Correct.

16  Q.   So with respect to the enterprise, you talked about

17  McWherter.  He kind of recruited you, right?

18  A.   Yes.

19  Q.   And then you know that -- you know that Leshoun Byrd was

20  part of it, correct, at some point is that correct?

21  A.   Yeah.  I --

22  Q.   You're hesitating.  Did you not have any dealings with

23  Leshoun?

24  A.   Is his nickname Gucci?

25  Q.   Yes, I believe.

1    A.   Okay.  Yes.

2    Q.   You knew these -- when I say these.  You knew some of your

3    cohorts by nicknames?

4    A.   Correct.

5    Q.   What are their nicknames?

6    A.   Gucci.

7    Q.   Did you know any Chilly?

8    A.   Chilly, Hanky, and D.

9    Q.   Chilly, Hanky, and D.  Did you know these Gucci, Chilly,

10   Hanky, did you know their real names?

11   A.   No.

12   Q.   This is not the kind of operation where you'd say to

13   somebody, hey, give me your social security number, let me see

14   your ID.  You don't really try to delve into these people's

15   lives.  Is that fair to say?

16   A.   Oh, yeah.  Correct.

17   Q.   The fewer the questions the better, right?

18   A.   Yes.

19   Q.   But that's not to say you weren't friends with them.

20   Would that also be fair to say?

21   A.   I mean, acquaintance.  I wouldn't say friends.

22   Q.   Well, when you went down to Atlanta that time, where did

23   you stay?

24   A.   At the W.

25   Q.   Did you hang out with D down there?

1   A.   No.

2   Q.   So you didn't -- you knew that D had a place down there,

3   correct?

4   A.   No, I didn't.

5   Q.   So he didn't -- D didn't invite you over to his place or

6   take you out to eat or anything like that?

7   A.   No.

8   Q.   It was more business.  Bring the money.  Thank you.  You

9   handle your business and you go back, correct?

10  A.   Correct.

11  Q.   Now, at some point in time you -- it wasn't that you said

12  I'm not going to do this anymore.  You got caught, correct?

13  A.   Correct.

14  Q.   But you do remember when you decided to cross that line

15  and say I'm going to do this, correct?

16  A.   Yes.

17  Q.   You don't sign a form like you would a formal job

18  application.  You simply -- there's a meeting of the minds, an

19  agreement, correct?

20  A.   Yes.

21  Q.   You knew that there might come a point in time when you'd

22  be sitting in front of a -- in a courtroom, correct?

23  A.   Yes.

24  Q.   You assumed that risk, correct?

25  A.   Yep.

December 1, 2016

1   Q.   Did you talk to your cohorts about the fact that all of

2   you might be caught at one point in time?

3   A.   No.

4   Q.   So you guys didn't say we better stop now while we've got

5   some money and the going's good?  That didn't come up?

6   A.   Yeah.  Me and Jimmy talked about that.

7   Q.   Okay.  You and Jimmy talked about maybe we need to quit

8   now, right?

9   A.   Yes.

10  Q.   But the fact that you and Jimmy talked about maybe you

11  need to quit -- oh, wait, wait.  By the way, let me backtrack.

12  I asked you before whether or not you were married.  You said

13  you were not, correct?

14  A.   Correct.

15  Q.   Do you have any siblings?

16  A.   A brother.

17  Q.   Older or younger?

18  A.   Older.

19  Q.   Did you tell him what you were doing?

20  A.   No.  But he, you know, kind of assumed.

21  Q.   Okay.  You live with your brother?

22  A.   No.

23  Q.   And when you were doing this trafficking, you wouldn't

24  call him up and say, hey, bro, I'm about to make a run or

25  anything like that, correct?

1    A.   No.

2    Q.   I mean, you didn't want him to know necessarily, correct?

3    A.   No, not necessarily.

4    Q.   Did you want any family members to know?

5    A.   No.

6    Q.   What I'm getting at is it's not the kind of thing to brag

7    about, correct?

8    A.   Correct.

9    Q.   As you sit in that chair today, you're testifying

10   truthfully, correct?

11   A.   Yes.

12   Q.   As it relates to this drug trafficking, did you ever have

13   any dealings at all with Tashun White?

14   A.   Yes.

15   Q.   What was that?

16   A.   In Detroit.

17   Q.   You actually had dealings with her in terms of agreeing to

18   do what?

19   A.   Oh, no, no, no.  I'm sorry.  No, I have not.

20   Q.   I'm sorry.  This woman right here, Tashun.  Not Leshoun.

21   Tashun.

22   A.   No, I have not.

23   Q.   You've never had any dealings with her?

24   A.   No.

25   Q.   Thank you, sir.

December 1, 2016                                                    28

```
 1           THE COURT:  Mr. Gilmer-Hill.

 2           MR. GILMER-HILL:  No redirect, your Honor.  Thank

 3   you.

 4           THE COURT:  Okay.  All right.  Well, thank you, so

 5   much for being here.  You may step down and you're free to

 6   leave.

 7                (Excerpt of Proceedings Concluded)

 8                   *           *           *

 9                   -           -           -

10

11

12           CERTIFICATE OF OFFICIAL COURT REPORTER

13        I, Jeseca C. Eddington, Federal Official Court

14   Reporter, in and for the United States District Court Eastern

15   District of Michigan, appointed pursuant to provisions of Title

16   28, United States Code, Section 753, do hereby certify the

17   foregoing 28 pages are a true and correct transcript of the

18   proceedings had in the matter of UNITED STATES OF AMERICA

19   versus TASHUN YVONNE WHITE, Case No. 15-20040 held on December

20   1, 2016.

21

22   /s/ JESECA C. EDDINGTON                       2/18/2017
     Jeseca C. Eddington, RDR, RMR, CRR, FCRR       Date
23   Federal Official Court Reporter

24

25
```