```
 1 ║              UNITED STATES DISTRICT COURT
   ║              EASTERN DISTRICT OF MICHIGAN
 2 ║                    SOUTHERN DIVISION
   ║
 3 ║  UNITED STATES OF AMERICA,
   ║
 4 ║                    Plaintiff,
   ║     -v-                          Case No. 15-20040
 5 ║                                  Volume 2 (Morning)
   ║  TASHUN YVONNE WHITE,
 6 ║
   ║                    Defendant.
 7 ║  _____/
   ║
 8 ║                        JURY TRIAL
   ║
 9 ║
   ║         BEFORE THE HONORABLE JUDITH E. LEVY
10 ║              UNITED STATES DISTRICT JUDGE
   ║
11 ║                    NOVEMBER 29, 2016
   ║
12 ║
   ║  APPEARANCES:
13 ║
   ║  For the Plaintiff:   Carl D. Gilmer-Hill
14 ║                       United States Attorney's Office
   ║                       211 West Fort Street, Suite 2001
15 ║                       Detroit, Michigan 48226
   ║
16 ║  For the Defendant:   Carl Jordan
   ║                       26677 West Twelve Mile Road
17 ║                       Southfield, Michigan 48034
   ║
18 ║
   ║
19 ║
   ║
20 ║
   ║
21 ║
   ║
22 ║
   ║
23 ║        To Obtain a Certified Transcript Contact:
   ║        Jeseca C. Eddington, RDR, RMR, CRR, FCRR
24 ║              Federal Official Court Reporter
   ║               United States District Court
25 ║      200 East Liberty Street - Ann Arbor, Michigan 48104
```

1                          **I N D E X**

2      WITNESSES                                              PAGE

3        JEFFREY CAMPBELL
               Direct examination by Mr. Gilmer-Hill........6
4
       EXHIBITS
5

               Government's Exhibit 1E.1........................12
6              Government's Exhibit 1E.2........................20
               Government's Exhibit 1E.3........................12
7              Government's Exhibit 1E.5........................20
               Government's Exhibit 1E.6........................12
8              Government's Exhibit 1E.7........................20
               Government's Exhibit 1E.8........................12
9              Government's Exhibit 1E.9........................20
               Government's Exhibit 1E.10.......................12
10             Government's Exhibit 1E.11.......................20
               Government's Exhibit 1E.12.......................12
11             Government's Exhibit 1E.13.......................20
               Government's Exhibit 1E.14.......................12
12             Government's Exhibit 1E.15.......................20
               Government's Exhibit 1E.16.......................12
13             Government's Exhibit 1E.17.......................20
               Government's Exhibit 1E.18.......................12
14             Government's Exhibit 1E.19.......................20
               Government's Exhibit 1E.20.......................12
15             Government's Exhibit 1E.21.......................20

16     MISCELLANY

17             Proceedings.....................................31
               Opening Statement by Mr. Gilmer-Hill............49
18             Certificate.....................................99

19

20

21

22

23

24

25

| | **P R O C E E D I N G S** |
|---|---|

1               **P R O C E E D I N G S**

2         THE CLERK:  The Court calls case number 15-20040,

3 United States of America v Tashun Yvonne white.

4         THE COURT:  Thank you, Nina.  Could I have

5 appearances, please?

6         MR. GILMER-HILL:  Good morning, your Honor.  Carl

7 Gilmore-Hill with the U.S. Attorney's Office appearing on

8 behalf of the United States.

9         THE COURT:  Thank you.

10         MR. JORDAN:  Good morning, your Honor.  Carl Jordan

11 appearing on behalf of Ms. Tashun white.  Ms. White is present

12 as well.

13         THE COURT:  Okay.  Fantastic.  Please be seated.  All

14 of our jurors are here, which is fabulous.  So we are all set

15 to go unless there's anything that either of you have to bring

16 to my attention.

17         MR. GILMER-HILL:  Just for clarification, the

18 Government intends to have both Agent Campbell and Mr.

19 Scartozzi in the courtroom.  I've discussed with Mr. Jordan

20 the fact that I understand that the Government is limited

21 ordinarily to having a single case agent, if you will, at

22 counsel table.

23         THE COURT:  Yeah.  I've done some research on that in

24 another case.  And so do you have an objection, Mr. Jordan?

25         MR. JORDAN:  I believe that Mr. Gilmer-Hill said that

```
 1     he was going to have one agent while one testify.  After that
 2     agent testified, he was going to flip flop so there would
 3     always be one agent, or do you want to have two at the table?
 4          THE COURT:  I think what he's asking is are you
 5     seeking to have one of these agents sequestered and only one
 6     at counsel table?
 7          MR. JORDAN:  It doesn't matter, Judge.
 8          THE COURT:  Yeah.
 9          MR. JORDAN:  He can have two.  He can have three.  It
10     doesn't matter.  Not trying to be funny, but it doesn't
11     matter, your Honor.
12          THE COURT:  Yeah.
13          MR. GILMER-HILL:  Well, thank you.  That actually
14     makes it easier.  Agent Campbell will be our first witness, in
15     any event.
16          THE COURT:  Oh, fantastic.
17          MR. GILMER-HILL:  That hopefully will moot the point
18     since as a witness after he testifies he'd be allowed to be in
19     the courtroom in any event.
20          THE COURT:  Okay.
21          MR. GILMER-HILL:  So I just wanted to have that
22     clarified for the record.
23          THE COURT:  All right.  Thank you.  Also, Mr. Jordan?
24          MR. JORDAN:  Yes, your Honor.
25          THE COURT:  In terms of the jury instructions, the
```

November 29, 2016                                                    30

```
 1    deadline has come and gone for submitting your proposed
 2    instructions.
 3            MR. JORDAN:  When I looked at the instructions, I had
 4    no objection.
 5            THE COURT:  Okay.
 6            MR. JORDAN:  Sometimes as the case goes along there
 7    may be a jury instruction that I think is appropriate.
 8    Perhaps one I overlooked.  But at this point in time, I'm fine
 9    with the jury instructions, your Honor.
10            THE COURT:  Fantastic.  Then we will discuss at some
11    point how we're going to select the alternates.
12            MR. JORDAN:  Thank you, your Honor.
13            THE COURT:  Some sort of random selection seems
14    appropriate.  Okay.  Well, we will bring the jurors in.  Then
15    Mr. Gilmer-Hill, you anticipate 45 minutes or less?
16            MR. GILMER-HILL:  As I was mentioning this morning
17    before the judge took the bench, sometimes I am overly
18    optimistic in my head.  So I'll hope to be shorter.  But I may
19    run the whole 45 minutes.  Would the Court prefer I set up and
20    ready before the jury comes in at the podium?
21            THE COURT:  It's up to you.
22            MR. GILMER-HILL:  Oh.
23            THE COURT:  Okay.  Thank you, Nina.
24            THE CLERK:  All rise for the jury.
25                              (Jury In)
```

November 29, 2016                                                   31

```
 1            THE COURT:  Please be seated.  And welcome back to
 2    the jurors.  I got to say hello to you a moment earlier.  You
 3    might have heard Nina say all rise for the jury.  And I stand
 4    up also.  Because a lot of what we do in court is symbolic.
 5    And one of the things that symbolizes is that you are now the
 6    judges of the facts in this case.  I'm the judge with respect
 7    to the law.  But I just thought I'd explain to you why we do
 8    that.
 9            So what we'll do now is just what was described
10    yesterday, which is that the Government has an opportunity to
11    make an opening statement.  And Mr. Jordan has indicated he's
12    going to reserve the opportunity to do that until he starts
13    the defense of his case.
14            So Mr. Gilmer-Hill, are you ready?
15            MR. GILMER-HILL:  Yes, your Honor.
16            THE COURT:  Okay.
17                       OPENING STATEMENT
18            MR. GILMER-HILL:  Ladies and gentlemen, at the outset
19    of this case, the judge described to you the fact that this
20    was a case about several people who engaged in drug
21    trafficking and money laundering.  And that the defendant,
22    Tashun White is alleged to have agreed with one or more of
23    those individuals to engage in money laundering.
24            And that money laundering is the processing of the
25    proceeds of drug trafficking to disguise their illegal origin
```

1   or the ownership or control of the assets.

2           In a little bit more detail, I will tell you that

3   this case is about conspicuously large, enormous amounts of

4   drug money and the things it can be used to buy.  Expensive

5   clothes.  Jewelry.  Boats.  Motor homes.  Houses.  Apartments.

6   And seemingly people.  And cars.  Lots and lots and lots of

7   cars.  Cars are often equally conspicuous as the cash.  And

8   insurance.

9           The act of insuring those cars, which I believe

10  you'll hear towards the end of this case, is also a financial

11  transaction.  That's what this case is about.  Enormous

12  amounts of drug proceeds and things you can purchase with

13  them, including cars.  And the financial transactions

14  surrounding those cars.  Including purchasing over and over

15  again insurance for cars that were purchased with drug

16  proceeds.

17          In February of 2010, the Drug Enforcement

18  Administration and local law enforcement were acting on

19  information that they had received about a recreational

20  vehicle, an RV, that was coming back across country from

21  Arizona to Detroit carrying marijuana.  That's the information

22  they had.

23          Acting on that tip, law enforcement observed, was

24  even told that it would be two vehicles, two recreational

25  vehicles.  And acting on that tip, law enforcement observed

and stopped a high end motor home, a Showhauler, a fancy motor

home.  Not just your average.  One of those motor homes where

it's impressive in appearance and function.

        The motor home has a built in storage area or garage

area on the back with like a ramp, like a hydraulic ramp so

that they can have not only the motor home, this custom luxury

motor home, but also carry along their toys.  The ATVs, the

motorcycles.  And they have the hydraulic ramp.  They can load

them in.

        And the second vehicle was a Ford F250 truck pulling

a trailer.  Again, not just any trailer, a massive trailer.  A

Team Spirit Trailer, the type that NASCAR drivers or motor

cross drivers would use.  And law enforcement stopped the

vehicles, searched them, and found the marijuana.  Not just a

little bit of marijuana.

        Between the two vehicles, law enforcement found and

seized almost 3,000 pounds of marijuana.  Roughly 1,400 kilos

on this single occasion in February.  The drivers of the two

vehicles were Jimmy McWherter and Nicholas Hale.  You'll hear

that after they were arrested, within a few months they

decided to talk.  And they told law enforcement what was going

on.

        They told law enforcement how it came to be that they

were traveling back from Arizona in these two fancy huge

recreational vehicles carrying such a large quantity of

November 29, 2016                                    34

1    marijuana.  Marijuana, by the way, that had been concealed.

2    Not just in the back of the trailer.  But had been built into

3    the walls.

4         Jimmy McWherter and Nicholas Hale told law

5    enforcement about two drug traffickers from Detroit who had

6    employed them and who were running this whole operation.  Who

7    had employed McWherter and Hale, who had other workers in

8    Arizona.  And they described these two drug traffickers to law

9    enforcement, these two younger guys.

10        They described them as each of these two younger guys

11   running the show as always wearing noticeably expensive

12   clothes.  Even when they were down in the trenches sorting

13   through bales of marijuana.  And if I wasn't clear, the

14   marijuana that's in the walls, it's bales of marijuana.

15        And these two younger guys from Detroit dressed in

16   their expensive clothes, when they're sorting through the

17   bales of marijuana to select the quantity of marijuana that

18   they want to have brought back to Detroit, even then they're

19   dressed in their expensive clothes.  High end clothes, the

20   type that might be noticeable.  Almost like with actors and

21   movie stars.  True Religion jeans.  They notice -- they saw

22   True Religion jeans.  Those jeans cost hundreds and hundreds

23   of dollars.

24        They noticed Gucci and Louis Vuitton belts.  Belts

25   that cost four to 600 dollars.  They noticed these things

1    easily, the Gucci shirts.  They described these guys as casual

2    but very, very high end dressed.

3            And the younger of these two drug traffickers from

4    Detroit, who's name was D -- that's what they called him, D.

5    He was also known -- had nicknames, of course.  Black

6    Sunshine.  Baby D.  He, in addition to the expensive clothes

7    and 600 dollar belt and the expensive jeans, he had a penchant

8    for wearing expensive watches.  D had a habit of always

9    wearing exceptionally high end watches and jewelry.

10           One of the couriers, one of these two couriers, Mr.

11   McWherter, he, himself, dabbled.  When law enforcement at the

12   time of the seizure went and searched Mr. McWherter's house,

13   they found a $6,000 watch.  A $6,000 watch in Mr. McWherter's

14   belongings.  As Mr. McWherter dabbled, D jumped in noticeably,

15   conspicuously.

16           As Mr. McWherter explained, D had lots of watches.

17   Not just any watches.  D's watches were Rolexes.  And not just

18   Rolexes, Rolexes encrusted with diamonds, real diamonds.  His

19   watches were the type of watches that we may not even

20   recognize names of.  Audemar Piguet.  The Rolex President

21   watch.  Watches that cost $45,000, $50,000 at a retail at a

22   piece.

23           And D was known to always wear expensive watches.

24   Lots of different watches.  The type that people would notice.

25   D has a penchant for wearing jewelry as well, expensive

1   jewelry.  Mr. McWherter remembers one piece of jewelry that

2   stood out even.  I mean, there were lots of jewelry.  One

3   piece of jewelry was a micrometer, a gold plated micrometer,

4   kind of like calipers for measuring, fine measuring of small

5   items.

6        And within this gold plated caliper, it held a

7   diamond.  That's just a piece of jewelry for D.  The type of

8   things that Mr. McWherter noticed and the types of things that

9   D always wore.  When they talked about things, about being

10  noticed, when they talked about instances where Mr. McWherter

11  and Mr. Hale drove across country at stops, people noticed how

12  lavish their recreational vehicles were, that they would laugh

13  and make up things to tell strangers.

14        Oh, we're motor cross riders.  And with D, he would

15  laughingly tell -- talk to Mr. McWherter and Hale about what

16  he would tell people when they asked about -- when they

17  noticed him.  He would tell strangers that he was a music

18  producer.  That's what he told strangers, not the people who

19  knew him.

20        In addition to the jewelry and watches, D was also

21  known for owning nice cars.  High end cars and lots of them.

22  Porsches, plural.  Lamborghinis, plural.  Aston Martin,

23  Bentley, a restored classic Camaro.  And significantly, a 2010

24  Porsche Panamera Turbo.  And a high performance 2008 Dodge

25  Challenger.

1           You'll hear from Mr. McWherter.  He's kind of a car

2     aficionado himself and so he noticed the cars.  He talked to D

3     about the cars, about D's cars.  And D was known to have owned

4     all of these cars over just a handful of years.  As I believe

5     Mr. McWherter will explain to you, that's one of the ways that

6     D was able to hide and advance his money.  That's one of the

7     ways he laundered his money was by using tens of thousands of

8     dollars in cash, drug proceeds, sometimes more than a hundred

9     thousand dollars in cash in a single transaction to purchase a

10    car.

11          And then once the drug proceeds had been converted

12    into a seemingly legitimate tangible item, D would then use

13    those cars purchased with the drug proceeds to then buy other

14    things, often trading them in for additional cars at a

15    dealership and just putting a little more cash with it.

16    Because he'd be trading in a hundred thousand dollar car and

17    then putting 10,000, 20,000 cash with it to upgrade, which is

18    less likely to raise suspicion than walking in in a single

19    transaction with $140,000.  But as you'll hear, he did do that

20    once.

21          All of these cars.  It was D's affinity for cars, his

22    penchant for cars was how he and Mr. McWherter met.  Mr.

23    McWherter worked at a auto shop.  It was a specialty auto shop

24    specializing in customization of vehicles.  Audio upgrades.

25    Wheels, interiors, and car safes.  Some place where somebody

1       might stow a credit card or perhaps a cellphone that they
2       don't want to be caught talking to someone on.
3               And as Mr. McWherter will explain, at this
4       customization shop, everything they did was high end.  The
5       smallest jobs they performed on vehicles were $5,000 jobs.
6       Typically there were five to $10,000 jobs just to add
7       performance or to add a little bit of bling or shine to these
8       vehicles that are brought in, these high end vehicles were
9       being brought in.
10              And D was a regular customer who brought in several
11      different vehicles that he had owned for customization.  All
12      tricked out higher end.  Not at this point when they met, not
13      quite the extent of the Lamborghinis and Porsches.  But still,
14      cars that Mr. McWherter noticed.  Cars that D owned and
15      brought in.
16              In fact, among those was a blue Denali SUV and that's
17      how he got the nickname Baby D from this baby blue Denali.
18      And before you know it, after D had brought in several
19      vehicles, within a mere nine month period, D shortly
20      thereafter approaches Mr. McWherter and asked Mr. McWherter to
21      install a trap in D's minivan.  And now we're no longer
22      talking about the car safes, the small compartment in a
23      vehicle to throw a cellphone that you don't want to be caught
24      with or a credit card.
25              D asked Mr. McWherter to build him a trap, a larger

```
 1    trap in the floor of D's minivan.  D's minivan that is titled
 2    in the name of Alicia White, D's mother.  After a while, D
 3    next asks Mr. McWherter to not only -- after he had built this
 4    trap and not only to build traps for D but to actually
 5    transport money concealed in vehicles and to transport the
 6    money out west towards California.  Mr. McWherter does so.
 7          Again, before you know it, D asks Mr. McWherter to
 8    start transporting marijuana back from out west to Detroit.
 9    And Mr. McWherter -- and shortly thereafter, Mr. McWherter and
10    Mr. Hale, who's since joined Mr. McWherter working at Mr.
11    McWherter's own shop that Mr. McWherter has now, they start
12    transporting marijuana.
13          They transport the money from Detroit out to Arizona.
14    Marijuana in large quantities concealed within the vehicles,
15    within the RV, later RV and trailer, back from Arizona to
16    Detroit.  And at the outset, those first few trips when they
17    were bringing the marijuana back, beginning to bring it back,
18    D asked Mr. Marijuana to transport -- I'm sorry.  D asked Mr.
19    McWherter to transport the marijuana to a particular location
20    in Detroit to D's brother's house.
21          Mr. McWherter and Mr. Hale transport the marijuana to
22    D's brother's house a few times, two or three.  Not as many as
23    the overall conspiracy, but a few times.  Not only are they
24    transporting it to D's brother's house, his older brother, his
25    older brother who Mr. McWherter will describe to you had moles
```

1    on his face.  His older brother who was there who was present

2    and helped when Mr. McWherter and Mr. Hale dropped off the

3    marijuana.

4         And not only was D's brother there, Uncle Ray was

5    there.  On at least one of the occasions present when the

6    marijuana was being dropped off and unloaded.  Over time, the

7    location of the delivery of marijuana shifted.  It was no

8    longer being delivered to D's brother's house.  It was shifted

9    to a nondescript apartment, couple of other locations.  And

10   over time, the work became yet more consistent.  The

11   quantities increased and the money became more consistent and

12   increased.

13        Mr. McWherter will explain to you that the marijuana,

14   the money that he and Mr. Hale were receiving was based upon

15   the quantity of marijuana that was being transported.  Mr.

16   McWherter and Mr. Hale were receiving a hundred dollars a

17   pound for transportation from D and his partner from Detroit,

18   the other drug trafficker, Shoun.

19        And once they were now underway, Mr. McWherter will

20   explain, they made over 20 trips transporting money from

21   Detroit to Arizona and marijuana from Arizona back to Detroit

22   and on those more than 20 trips, the least amount of marijuana

23   that they transported was 1,200 pounds.  Many times, like the

24   time they were arrested, instead of just using a single

25   vehicle, a single RV and transporting 1,200 pounds, they

November 29, 2016

1    actually used two vehicles so they could transport more.  And
2    as you will hear, on those occasions transported up to almost
3    3,000 pounds of marijuana, like they were transporting at the
4    time of their arrest.

5              By roughly estimate, Mr. McWherter and Mr. Hale, as
6    the couriers in this roughly three-year period, made
7    approximately two and a half to three million dollars in cash
8    drug proceeds.  D and Shoun were making four times that.  Mr.
9    McWherter will explain to you how much they were paying for
10   the marijuana in Arizona.  Four hundred dollars.  And selling
11   it in Detroit for as much as a thousand dollars a pound.  D
12   and Shoun by rough estimate, made 10 to $12 million in cash in
13   this roughly three-year period.

14             That's how D, this 30-year-old, could afford his
15   lavish lifestyle of Porsches, Lamborghinis, Rolex watches to
16   wear and have all the time.  D was 30 years old when they were
17   stopped in 2010, when Mr. McWherter and Mr. Hale were stopped
18   in 2010.  He was 27 years old roughly when they began.  And
19   according to Mr. McWherter, D seemed to have already had
20   marijuana connections and at least some resources in place
21   before Mr. McWherter joined him.

22             Now, as I mentioned, this case is not just about how
23   Derrick White made all of these millions of dollars in drug
24   trafficking money by shipping marijuana from Arizona to
25   Detroit.  You'll hear about it so you'll be able to conclude

1    whether the money D was throwing around was drug proceeds.  So

2    you'll hear about that aspect, how he made these millions of

3    dollars and how fairly obvious he was.

4         But like I said, this case is not just about how

5    Derrick White made his drug trafficking money.  This case is

6    about how he laundered it.  At least part of it.  And

7    significantly out of the almost virtual avalanche of financial

8    activity that you'll hear about included a few specific known

9    and identifiable transactions.

10        Remember, we talked about the types of financial

11   transactions that this case is about.  Before we get to those,

12   before we get to all of the level of detail like talking about

13   the purchase of car insurance, let's use a few broad strokes

14   and paint the background with regard to some of the money

15   laundering.

16        Perhaps not surprisingly during this same timeframe,

17   2007 to 2010 when D was 27 to 30 years old of age and

18   thereafter making these millions of dollars in drug proceeds,

19   he and his family were accumulating assets.

20        In August of 2006, D purchased an Aston Martin from a

21   private seller, Gary Heraud.  Mr. Heraud had already, himself,

22   acquired the Aston Martin.  He purchased it the year before.

23   But D bought Mr. Heraud's Aston Martin from this private

24   seller by using cash.  He met with Mr. Heraud in a parking lot

25   along with another young woman and paid Mr. Heraud $60,000 in

1    cash for his Aston Martin.

2         Eighteen months later or so in May of 2008, D

3    purchased a 2008 Porsche Cayenne for $97,500, close to a

4    hundred thousand dollars.  And on this transaction, purchasing

5    the Porsche from a car dealership, D traded in the Aston

6    Martin.  And on this hundred thousand dollar Porsche he was

7    buying, received a $90,000 credit for the Aston Martin.  And

8    paid the additional balance in cash.  That was May 30th of

9    2008.

10        As you'll hear, on May 31st of 2008, Tashun White

11   added that Porsche to her insurance policy in her name.  She

12   told the insurance company that she was the driver of the

13   Porsche, single driver and that the Porsche was garaged at her

14   house.  She asked the insurance company to fax the

15   verification of insurance to Chris at the dealership.  She

16   told the insurance company that she needs to pick up the

17   vehicle at the dealer.  That's on May 31st, 2008.

18        Two, three months later in July 1st, 2008, D

19   purchases another car.  This time D purchases a $320,000

20   Lamborghini.  And Lamborghini Murcielago.  He purchases the

21   Lamborghini in the name of another sister, Sandria White.

22   Purchases it at a dealership in Indiana.  He trades in a

23   vehicle.  He trades in a Bentley.  Receives just shy of

24   $60,000 credit for his trading in the Bentley.  And then pays

25   this dealer $140,000 in cash for the Lamborghini Murcielago.

1          The following month, D purchases a Challenger, a high

2     performance 2008 Dodge Challenger.  He purchases the

3     Challenger in Tashun White's name.  The Challenger he

4     purchases for 50,000, a little bit over $50,000.  He paid

5     $45,000 in cash.

6          The following day, Tashun White adds the Challenger

7     to her insurance policy.  She tells the insurance company the

8     Challenger is mine.  The Challenger is garaged at my house.  I

9     am the sole driver of the Challenger.  She asked the insurance

10    company to fax the verification of insurance to Shawn at the

11    dealership on August 14th, 2008.

12         The following month, D's 2008 Porsche Cayenne that he

13    just purchased two months before, is traded in for another

14    vehicle, a more expensive vehicle.  A $140,000 2009, '09

15    Porsche Cayenne.  It's $140,000 vehicle.  He receives a

16    $90,000 credit for the Porsche Cayenne that he's traded in.

17    That same day or thereabout, the next day, Tashun White drops

18    the 2008 Cayenne off of her insurance policy and adds this

19    2009 Porsche Cayenne.

20         A few months later, Derrick buys another Porsche, a

21    2009 Porsche Turbo, not to be confused with the Porsche

22    Cayenne.  Derrick purchases a 2009 Porsche 911 for $133,000

23    and trades in the Porsche Cayenne and the Challenger that's in

24    Tashun White's name.  That D purchased in Tashun White's name.

25    You'll hear that from Shawn.  D purchased the Challenger, put

1    it in Tashun's name.  That's the car that she insured that he

2    now trades in for the 911 Turbo.

3         Two months later he buys a Lamborghini in the name of

4    Greg Johnson, another relative.  In fact, one of the relatives

5    who Mr. McWherter will tell us about as being one of the

6    relatives who was working in Arizona loading the marijuana

7    that Mr. McWherter and Mr. Hale were transporting.  I believe

8    a cousin.

9         You'll hear that Mr. Johnson, another relative,

10   that's the name in which Derrick purchased this second

11   Lamborghini.  This time for $168,000.  This is just a

12   Lamborghini Gallardo as opposed to the Murcielago.  And on

13   this Lamborghini, he trades in the 2009 Porsche 911.  He

14   receives $120,000 credit and pays another $48,000 in cash.

15        A few months later, Derrick purchases a 2010 Porsche

16   Panamera Turbo from a private seller like the Aston Martin for

17   $96,000.  That's what the paperwork says between the private

18   seller and Derrick.  That private seller had just in less than

19   a month before this transaction, Derrick purchased the

20   Panamera Turbo in January of 2010, January 1st of 2010 the

21   private seller had just purchased that Panamera Turbo from a

22   dealership, the same dealership as many of Derrick's other

23   Porsches on December 7th, three and a half weeks before for

24   $138,000.

25        During the course of our presentation of the case,

November 29, 2016

1    you'll have an opportunity to see some of the paperwork

2    associated with these transactions.  You'll see some of the

3    signatures on these transactions.  You'll see signatures that

4    purport to be Derrick White's.  You'll see signatures that

5    purport to be Tashun White's.

6         You'll also see items like bank records and insurance

7    records for Tashun White that also have her signature on it so

8    that you, yourselves, will be able to look at those

9    transactions where Derrick, according to the car dealership,

10   admittedly purchased a vehicle in Tashun White's name and

11   compare those to transactions in which Tashun White, herself,

12   titled the vehicles in Michigan at the Secretary of State.

13        This 2010 Porsche Panamera was such a vehicle.  In

14   June of 2011, the title for the 2010 Porsche Panamera

15   transferred to Tashun White at the Secretary of State, the

16   Michigan Secretary of State.  The application for the transfer

17   of title bore a signature for Tashun White.

18        The application on its face referenced the fact that

19   Tashun White was receiving the car, the title for the car from

20   her brother and, thus, was exempt from paying some taxes or

21   something on it because it was reflected as being sold for

22   zero dollars.  When it transferred on paper on title from

23   Derrick White to Tashun White at the Michigan Secretary of

24   State.

25        This vehicle was then sold the following year in

1    California.  To a hide bid trading company.  A high bid

2    trading company issued a cashiers check for this car, this

3    seemingly legitimate asset.  They issued a cashier's check

4    payable to Tashun White.  That cashier's check was deposited

5    in a Michigan First Credit Union account of Tashun White.  And

6    a couple of days later, a second -- oh.  For 82,500.  The car

7    was purchased in California by a high bid trading company for

8    $82,000.  Actually it was eighty-seven fifty.  They paid out

9    $5,000 in cash to the person who provided the car and wrote a

10    cashier's check to the title holder for 82,500.  That check

11    was deposited in Tashun's White credit union account.

12        Two, three days later, a few days later, another

13    cashier's check was drawn from Tashun's White Michigan First

14    Credit Union account.  The cashier's check for 82,500 payable

15    to Derrick White.

16        I see that my time just about up.

17        THE COURT:  Just take your time.  Just for the jury,

18    we generally try to estimate about how long an opening will

19    take, but there's some flexibility.

20        MR. GILMER-HILL:  Thank you.  I mentioned that you

21    may be hearing an avalanche of information about financial

22    activity.  Actually, you'll likely hear an avalanche of

23    information about an avalanche of marijuana.  An avalanche of

24    drug proceeds that came from that marijuana that led to this

25    avalanche of financial activity.

November 29, 2016

```
 1            You might not see Tashun White connected to each and
 2   every one of the financial transactions that you hear about.
 3   In some instances you'll hear that Sandria White's name was on
 4   a vehicle.  In other instances, you'll hear that it was Alicia
 5   White's name that's on a vehicle like that minivan that had
 6   the trap in it.  Like actually the restored Chevy Camaro that
 7   Derrick White was known to have.
 8            While Tashun White might not be on every financial
 9   transaction, she is on some very specific financial
10   transactions.  And while Tashun White might not have insured
11   every single one of the numerous vehicles that Derrick
12   purchased with drug proceeds, Tashun White insured several
13   specific vehicles that Derrick White purchased with drug
14   proceeds.
15            Upon the conclusion of the presentation of our case,
16   after you've heard the evidence of the avalanche and the
17   evidence about the specific transactions, we will ask you to
18   hold Tashun White accountable for her part helping Derrick
19   White launder his drug proceeds.  We will ask you to find
20   Tashun White guilty.  Thank you.
21            THE COURT:  Thank you, Mr. Gilmer-Hill.  What we'll
22   do right now is go into the first witness.  And then, let's
23   see, take a break in probably about a half hour.  Is that okay
24   with the jury?  Anybody want to raise your hand and say you
25   need a break now.  Okay.  No shame in that.  Good.  Mr.
```

1   Gilmer-Hill, you ready to call your first witness?

2           MR. GILMER-HILL:  Thank you, your Honor.  The

3   Government calls Special Agent Jeff Campbell.

4           Thereupon,

5           **J E F F R E Y   C A M P B E L L,**

6   having been called as a witness and having been first duly

7   sworn testified as follows:

8           THE COURT:  Now we always have a problem with the

9   podium.

10          MR. GILMER-HILL:  Would you like me to move it?

11          THE COURT:  Probably need to move it.  I just want to

12  make sure that I can see Mr. Jordan and that you can get back

13  and forth.  And please don't trip on the cord.  It's got

14  wheels.  Are you going to use it?  The problem is then I don't

15  want your back to the jury just in case -- so can you put it

16  between the two tables a little bit.

17          MR. GILMER-HILL:  Sure.  I see.

18          THE COURT:  Thank you.

19                  DIRECT EXAMINATION

20  BY MR. GILMER-HILL:

21  Q.  Good morning.

22  A.  Good morning.

23  Q.  Sir, could you please state your name?

24  A.  It's Jeffrey Campbell.

25  Q.  And how are you employed?

1    A.    With the Drug Enforcement Administration.

2    Q.    How long have you been employed with the Drug Enforcement

3    Administration?

4    A.    Since September of 2008.

5    Q.    And what is your current assignment?

6    A.    I'm assigned to the Detroit field division office in the

7    Financial Investigations Team group.

8    Q.    What do your duties with the Drug Enforcement

9    Administration entail?

10   A.    Investigations of Title 21 crimes, which are drug

11   trafficking and money laundering.

12   Q.    And are you part of a special team at the Drug Enforcement

13   Administration?

14   A.    Yes, I am.

15   Q.    What team is that?

16   A.    The FIT group, Financial Investigations Team.

17   Q.    And was that your assignment in approximately February of

18   2010?

19   A.    Yes, it was.

20   Q.    In the course of your assignment, did you become familiar

21   with and were you involved in an incident concerning Jimmy

22   McWherter and Nicholas Hale in February of 2010?

23   A.    Yes, I was.

24   Q.    Could you please tell us about what happened in February

25   of 2010?

```
 1    A.   February of 2010, we became aware --
 2              MR. JORDAN:  Your Honor, this is going to call for a
 3    narrative.  I would ask the prosecutor if he can narrow the
 4    question so it's not a narrative.
 5              THE COURT:  Okay.  That's sustained.  If you want to
 6    break up the story a little bit.
 7              MR. GILMER-HILL:  Certainly, your Honor.
 8    BY MR. GILMER-HILL:
 9    Q.   How did Mr. McWherter and Mr. Hale come to your attention
10    in February or around February 2010?
11    A.   We received information from a confidential source.
12    Q.   Okay.  And following from that information, what happened?
13    A.   Based on information received by that confidential source,
14    specifically a telephone number, we were able to identify a
15    commercial location utilized by Nicholas Hale and his
16    associate, Jimmy McWherter, and also track his cross-country
17    travels in February of 2010.
18    Q.   And had you received any information about Mr. Hale's
19    cross-country travels?
20    A.   Yes, we did.
21    Q.   What information had you received?
22    A.   Information was that it was involved --
23              MR. JORDAN:  Your Honor, I'm going to object on
24    hearsay unless it's not being offered for the truth of the
25    matter.
```

1          THE COURT:  Just --

2          MR. GILMER-HILL:  As it is not, your Honor.

3          THE COURT:  Okay.  Overruled.

4    BY MR. GILMER-HILL:

5    Q.   What information did you receive, please?

6    A.   Information indicating that Mr. Hale was involved in

7    cross-country drug trafficking activity.

8    Q.   And as a result of receiving that information, what did

9    you do?

10   A.   As we watched the movement of Mr. Hale's telephone, we

11   noticed he was coming into Michigan --

12          MR. JORDAN:  I'm sorry to object again.  But officer

13   Campbell has said as we.  He needs to testify as to his

14    observations.

15          THE COURT:  Okay.  That's overruled.  I think we know

16   it's him.  And why don't you ask him who else was involved in

17    the we.

18   BY MR. GILMER-HILL:

19   Q.   Agent Campbell, were there other Drug Enforcement

20   Administration agents involved?

21   A.   Yes, there were.

22   Q.   Were there other law enforcement agencies involved?

23   A.   Yes, there were.

24   Q.   Which law enforcement agencies?  Just some of them,

25   please.

1    A.   City of St. Clair Shores, City of Dearborn Heights --

2    excuse me, city of Dearborn and City of Taylor, Michigan.

3    Q.   And what happened once you observed that Mr. Hale's

4    telephone appeared to be traveling cross country?

5    A.   I assisted the group with obtaining surveillance on the

6    two vehicles previously identified as being associated with

7    Hale and McWherter as they came into Wayne County, Michigan.

8    Q.   What were those two vehicles?

9    A.   First one in line was a Showhauler recreational vehicle.

10   And the second line following the RV was a Ford F250 pickup

11   truck hauling a White enclosed trailer.

12   Q.   Did law enforcement stop the vehicles?

13   A.   Yes, they did.

14   Q.   What happened when you stopped the vehicles?

15   A.   Conflicting statements were provided by the drivers as to

16   their travel activities and their intentions during their trip.

17   Q.   During the stop, was there a search conducted?

18   A.   Yes, there was.

19   Q.   Which vehicle was searched?

20   A.   Both vehicles, the F250, the RV, and also the trailer

21   hauled by the F250.

22   Q.   Anything of note for this case discovered?

23   A.   Yes, there was.

24   Q.   What was discovered?

25   A.   Seized from the trailer was a bulk quantity of marijuana

1    located inside of a electronically controlled hidden

2    compartment.

3    Q.   Were there arrests made upon the discovery of the

4    marijuana?

5    A.   Yes, there was.

6    Q.   Who was arrested?

7    A.   Four individuals, Jimmy McWherter, Nicholas Hale, and two

8    female traveling companions.

9    Q.   Was there a later point in time when the -- you mentioned

10   that the marijuana was recovered from the trailer.  Was there a

11   later point in time when the recreational vehicle was more

12   thoroughly searched?

13   A.   Yes, there was.

14   Q.   What was discovered in the recreational vehicle?

15   A.   An additional bulk amount of marijuana also hidden inside

16   of a controlled -- electronically controlled hidden

17   compartment.

18   Q.   Can you described for the jury what you mean by

19   electronically controlled hidden compartment?

20   A.   There's a series of steps we discovered during the course

21   of investigating these hidden compartments to gain access into

22   these voids.  In the trailer, about two feet was used from the

23   front of the trailer where the front wall was pulled back about

24   two feet.  And access into that compartment was made through a

25   clothing closet.

1           The back of the closet was actually a door.  Appeared

2   to be a wall, but there was a door.  And to get that door to

3   open, what had to happen was you had to turn on an interior

4   light in the trailer.  Then there was a key fob.  And as you

5   depressed the button on the key fob, it would actually piston.

6   And that piston would slowly open the door to allow for access

7   into that compartment.

8           Much as the same on the RV.  It's a toy hauler, a

9   nature, so there's a garage on the back.  And that garage area

10  was shortened again by about two feet.  And again, a sequence

11  of steps allowed for access for a hidden door to open to allow

12  for access.

13  Q.  Fair to say that these were fairly sophisticated

14  compartments in which the marijuana was concealed?

15  A.  Very much so.  That's the reason for the delay in locating

16  in the RV the stash of marijuana.

17  Q.  Agent Campbell, drawing your attention to --

18          MR. GILMER-HILL:  May I approach, your Honor?

19          THE COURT:  Yes.

20  BY MR. GILMER-HILL:

21  Q.  Agent Campbell, I apologize if you have to do some

22  flipping.  But if you would draw your attention in the exhibit

23  book to what's previously been marked as Government's Exhibit

24  1E.1 and tell us if you recognize what's depicted in that

25  photograph.

1   A.   I do.

2   Q.   What is depicted in that photograph?

3   A.   That's the RV driven by Jimmy McWherter where a quantity

4   of marijuana was seized.

5           MR. GILMER-HILL:  Your Honor, the Government would

6   move to admit and publish.

7           THE COURT:  Did you say 1A1?

8           MR. GILMER-HILL:  I'm sorry.  1E.1.

9           THE COURT:  Oh, okay.  Do you have any objection?

10          MR. JORDAN:  I do, your Honor.  My objection is

11  relevance.  That's all.

12          THE COURT:  That's overruled.

13          MR. JORDAN:  Thank you, your Honor.

14          THE COURT:  And you may publish it.  We call it

15  publishing.  We use very strange words in the legal

16  profession.  So when we show an exhibit, we call it publishing

17  to the jury.

18                          (Government Exhibit No. 1E.1

19                           Admitted Into Evidence)

20          MR. JORDAN:  Your Honor, I have an objection to the

21  admissibility of the exhibits.  But I think I know which way

22  the Court's going to rule.  So what I would --

23          THE COURT:  Just state the nature of your objection.

24          MR. JORDAN:  Just relevance, your Honor.

25          THE COURT:  Okay.  And that's already been overruled.

```
 1              MR. JORDAN:  Okay.  Thank you.

 2              MR. GILMER-HILL:  I believe we were about to speak to

 3    a stipulation, your Honor.  It wasn't a speaking objection.

 4    But I think that Mr. Jordan's about to speak to a proposed

 5    stipulation.

 6              THE COURT:  Well, why don't we deal with that on the

 7    break.  If there's no objection to showing this exhibit other

 8    than relevance, that's overruled.

 9              MR. JORDAN:  Very well, your Honor.  Thank you.

10    BY MR. GILMER-HILL:

11    Q.   Agent Campbell, what's depicted in 1E.1, you said that is

12    the Showhauler trailer that Mr. McWherter was stopped in?

13    A.   Showhauler RV.

14    Q.   RV.  And likewise, drawing your attention to 1E.2, can you

15    tell us do you recognize what's depicted in that?

16    A.   I do.

17    Q.   What is it?

18    A.   That's the F250 four-door driven by Mr. Hale.  Then the

19    triple axle trailer that he was hauling with the seized

20    marijuana from that trailer pictured in the back stacked up.

21              MR. GILMER-HILL:  Move to admit and publish, your

22    Honor.

23              THE COURT:  Is there any objection?

24              MR. JORDAN:  Other than my previous objection, your

25    Honor.
```

November 29, 2016                                                          58

```
 1              THE COURT:  Okay.  Relevance is overruled.  You may
 2    publish it.
 3                              (Government's Exhibit No. 1E.2
 4                               Admitted Into Evidence)
 5              MR. GILMER-HILL:  Thank you.
 6    BY MR. GILMER-HILL:
 7    Q.   And you've mentioned the discovery of marijuana within a
 8    concealed compartment.  Would you, Agent Campbell, please draw
 9    your attention to what's previously been marked as Exhibit 1E.3
10    and tell us do you recognize what's depicted in that exhibit?
11    A.   Yes, sir.
12    Q.   And what is it?
13    A.   That's going to be the picture of the wall in the RV with
14    the door removed.  And you can see the stacks of bulk marijuana
15    packed inside that void.
16              MR. GILMER-HILL:  Move to admit and publish, your
17    Honor.
18              MR. JORDAN:  The same objection, your Honor.  And
19    your Honor, I don't believe that it's coinciding with what he
20    is referring to.
21              THE COURT:  He's not putting them on the screen until
22    they're received and permission is granted to publish to the
23    jury.
24              MR. JORDAN:  Very well.
25              THE COURT:  So that's the last one.
```

```
 1              MR. JORDAN:  1E.1?
 2              THE COURT:  1E.2.  And now we're on 1E.3 which will
 3    be received.
 4                          (Government's Exhibit No. 1E.3
 5                           Admitted Into Evidence)
 6              MR. JORDAN:  And I just have a standing objection as
 7    to relevance with all of these.  Thank you, your Honor.
 8              THE COURT:  Okay.
 9    BY MR. GILMER-HILL:
10    Q.  What was the approximate total quantity of marijuana that
11    was seized from the recreational vehicle and the trailer?
12    A.  Approximately 2,700 pounds.
13    Q.  Were there assets seized following the arrest?
14    A.  Yes, there were.
15    Q.  And were they assets that were seized based upon the
16    discovery of the marijuana?
17    A.  Yes.
18    Q.  From what locations were -- were they assets that were
19    seized as well pursuant to search warrants?
20    A.  Yes, they were.
21    Q.  From what locations were the assets seized?
22    A.  We conducted search warrants and seized assets from two
23    residential locations affiliated with Jimmy McWherter.  One
24    residential location affiliated with Nicholas Hale.  And a
25    commercial location affiliated with Jimmy McWherter.
```

November 29, 2016                                                          60

1    Q.  And what were some of the types of assets that were

2    seized?

3    A.  We seized jewelry, bulk cash, fitness equipment, vehicles,

4    snowmobiles, all-terrain vehicles.

5    Q.  Thank you.  And so for completeness, first let me draw

6    your attention to Government's Exhibit 1E.5.  Can you tell us

7    do you recognize what's depicted in that exhibit?

8    A.  Yes, I do.

9    Q.  Does it include -- is it a picture that depicts the

10   trailer as well as one of the assets that was seized?

11   A.  Yes, it does.

12   Q.  Can you describe for the jury what's depicted in 1E.5?

13   A.  1E.5 is a picture of the White enclosed trailer hauled by

14   Nicholas Hale.  Stacked at the back of that trailer is the bulk

15   marijuana seized from that trailer.  And also stored inside of

16   that trailer while it was being towed was a four wheeler, which

17   is to the left of the trailer.

18          MR. GILMER-HILL:  Move to admit and publish, your

19    Honor.

20          THE COURT:  Okay.  You may do so.

21                          (Government's Exhibit No. 1E.5

22                           Admitted Into Evidence)

23   BY MR. GILMER-HILL:

24   Q.  And you mentioned vehicles that were seized as assets.

25   Did those vehicles include boats?

1    A.   Yes, they did.

2    Q.   Did they include motorcycles?

3    A.   Yes, they did.

4    Q.   Did they include four wheelers or ATV's?

5    A.   Yes, they did.

6    Q.   Did they include snowmobiles?

7    A.   Yes, they did.

8    Q.   Did they include trucks?

9    A.   Yes, sir.

10   Q.   Cars?

11   A.   Yes, sir.

12   Q.   Trailers comparable to the trailer that Mr. Hale was

13   driving?

14   A.   Yes, sir.

15   Q.   Other large trailers; is that correct?

16   A.   Yes, sir.

17   Q.   So drawing your attention to 1E.6, please, can you tell us

18   what's depicted in that?

19   A.   In this picture is the quantity of marijuana that was

20   seized from the hidden compartment in the RV.  The RV's on the

21   left side of the picture.  And then behind the marijuana is a

22   speed boat that was seized.

23   Q.   And let's do this, Agent Campbell, if you would, please,

24   take a glimpse at 1E.7, 1E.8, 1E.9, 10, 11, 12, 13, 14, and 15

25   and tell us are -- do each of those exhibits depict exhibits --

```
 1    I'm sorry, assets that were seized in relation to the seizure
 2    of the marijuana?
 3    A.   Yes, sir.
 4    Q.   Do you recognize what's depicted in each of those
 5    exhibits?
 6    A.   I do.
 7            MR. GILMER-HILL:  Move to admit and publish, your
 8     Honor.
 9            MR. JORDAN:  Other than over my standing objection.
10            THE COURT:  Okay.  Which is overruled.  So you may
11     publish them.
12                            (Government's Exhibit Nos. 1E.6,
13                             1E.7, 1E.8, 1E.9, 1E.10, 1E.11,
14                             1E.12, 1E.13, 1E.14, and 1E.15
15                             Admitted Into Evidence)
16    BY MR. GILMER-HILL:
17    Q.   Sir, let's talk about 1E.6.  This is what you were
18    describing, I believe.
19    A.   Yes, sir.
20    Q.   You can also reference now the image on the screen on the
21    wall if you like, Agent.  So you made reference to the
22    recreational vehicle being depicted in the image?
23    A.   Yes, sir.
24    Q.   Where is it in the image?
25    A.   It's going to be on the left side.  That's the rear of the
```

1    RV.  That's the garage area, toy hauler area of the RV.  And

2    the investigator is standing on the hydraulic lift which was

3    used by McWherter to lift motorcycles for storage into that

4    garage area.

5    Q.  And you mentioned a boat being depicted in 1E.6, I

6    believe?

7    A.  Yes, sir.

8    Q.  And is that if -- where's the boat depicted in 1E.6?

9    A.  Right side of the screen behind the marijuana.

10   Q.  And drawing your attention to then 1E.7, is that the same

11   boat?

12   A.  Yes, it is.

13   Q.  And 1E.8, that's the motorcycle that was seized?

14   A.  Yes, sir.

15   Q.  Tell us about 1E.9.

16   A.  1E.9 is a second motorcycle seized.

17   Q.  1E.10?

18   A.  Third and fourth motorcycles seized.

19   Q.  1E.11?

20   A.  Speed boat seized.

21   Q.  1E.12?

22   A.  It's an F650 that was seized.

23   Q.  1E.13?

24   A.  The driver's side of the F650 that was seized.

25   Q.  1E.14?

November 29, 2016                                                    64

1    A.   It's going to be the F250 that was operated by Nick Hale.

2    Q.   1E.15?

3    A.   It's going to be a two-story car hauler white enclosed

4    trailer with hidden compartments at the front that was seized.

5    Q.   This is a different trailer than the one that Mr. Hale was

6    driving on the day of his arrest?

7    A.   Yes, sir.

8    Q.   You referred to it as a, would you say two-story trailer?

9    A.   Yes, sir.

10   Q.   How is it a two-story trailer?

11   A.   If you can tell, there's a second floor in there which can

12   be lowered.  Then you would drive a car on to that, lift that

13   floor and it's lifted in this picture in place.  And then you

14   would drive additional vehicles or items underneath for

15   additional transportation.

16   Q.   And it hasn't been admitted or published yet.  So would

17   you draw your next, Agent Campbell, to what's been marked as

18   Government's Exhibit 1E.16?

19   A.   Yes, sir.

20   Q.   Do you recognize what's depicted in that image?

21   A.   I do.

22   Q.   What is it?

23   A.   That's the front wall of this trailer from the inside.

24   And it's -- the wall is pulled out.  It's made for an

25   additional hidden compartment at the nose, the front of this

```
 1   trailer.
 2            MR. GILMER-HILL:  Move to admit and publish, your
 3    Honor.
 4            MR. JORDAN:  Over my other objection.
 5            THE COURT:  Okay.  It's received.
 6                         (Government's Exhibit No. 1E.16
 7                          Admitted Into Evidence)
 8   BY MR. GILMER-HILL:
 9   Q.  So again, Agent Campbell, if you would, please, for
10   expediency sake, would you take a look at 1E.17, 18, 19, 20,
11   and 21?  Do the items depicted in each of those images reflect
12   assets that were seized in relation to the marijuana?
13   A.  Yes, sir.
14   Q.  Let's go through these quickly, please.
15            MR. GILMER-HILL:  Your Honor, I would move to admit
16    and publish 1E.17 through 21.
17            THE COURT:  Over the same objection, they are
18    received.
19                         (Government's Exhibit No. 1E.17,
20                          1E.18, 1E.19, 1E.20, and 1E.21
21                          Admitted Into Evidence)
22            MR. GILMER-HILL:  Thank you.
23   BY MR. GILMER-HILL:
24   Q.  Would you tell us about 1E.17, please?
25   A.  Yeah.  1E.17, this is the inside of the trailer that was
```

1    being towed by Mr. Hale.  We're looking towards the front.

2    There's two four wheelers that were hauled in this trailer.

3    And beyond those, you can see the framing of cabinetry in the

4    wall, that was the wall that you observed and we had to break

5    through that wall to locate and seize the bulk marijuana.

6    Q.   And Exhibit 1E.18, please, would you tell us about that?

7    A.   Another picture of the same.

8    Q.   Depicting the additional four wheeled vehicles?

9    A.   It is.  Inside the trailer towed by Mr. Hale.  Then the

10   false compartment at the front.

11   Q.   Assets that were seized, correct?

12   A.   Yes, sir.

13   Q.   And 1E.19?

14   A.   Same four wheelers.  Just another picture of the four

15   wheelers in the trailer hauled by Mr. Hale.

16   Q.   And 1E.20?

17   A.   1E.20 are snowmobiles that were seized in relation to the

18   marijuana seizure.

19   Q.   1E.21?

20   A.   Just a small sampling of fitness equipment seized in

21   relation to the marijuana.

22   Q.   Now, I believe you mentioned some of the locations where

23   the search warrants were executed.  Which location was the boat

24   seized?

25   A.   Both boats were seized from a commercial warehouse in

1    Macomb Township.

2    Q.   And could you tell us again what were the various

3    locations where the items were seized?

4    A.   The primary residence of Jimmy McWherter, a vacation home

5    of Jimmy McWherter.

6    Q.   That vacation home, was it on a lake or near a lake?

7    A.   Near a lake.

8    Q.   Continue, please.

9    A.   Commercial property in operation by Nicholas Hale and

10   Jimmy McWherter and commercial property, primary residence for

11   Nicholas Hale.

12   Q.   And when you refer to commercial property that was

13   utilized by Nicholas Hale and Jimmy McWherter, are you

14   essentially referring to a warehouse type facility?

15   A.   Yes, sir.

16   Q.   And during the course of your investigation, did you learn

17   of the business associated with that warehouse?

18   A.   Yes, sir.

19   Q.   What business is that?

20   A.   Prototype Engineering and Da Vinci Motors.

21   Q.   Whose companies are those?

22   A.   Jimmy McWherter.

23        THE COURT:  Mr. Gilmer-Hill, we're going to take a

24    short break if this is an okay time to.

25        MR. GILMER-HILL:  Certainly, your Honor.

```
 1            THE COURT:  So what we'll do for the members of the
 2    jury is we'll take about a five to ten minute break to give
 3    you an opportunity to stretch and maybe have some coffee or
 4    something to drink.  And then we'll -- Nina will come in and
 5    get you and we'll get started again.
 6            And let me remind you, because this is the first
 7    break you've taken since the opening statements and the
 8    testimony is that you're not to talk about the case, even
 9    among yourselves, until all of the evidence is in and the
10    closing arguments are done.  So you can talk with each other
11    about other things, but just not the case.  So please rise for
12    the jury.
13                         (Jury Out)
14            THE COURT:  Okay.  We'll take a -- yes.
15            MR. JORDAN:  Judge, if I may be heard, I know that
16    you did not want open objections.  But so I can place my
17    objection on the record just to make it clear.
18            THE COURT:  Certainly.
19            MR. JORDAN:  Obviously this is a money laundering
20    case.  Obviously they have to show that the proceeds of my
21    client is alleged to have laundered came from drugs.  So the
22    relevance is, of course, they have to show that these are drug
23    proceeds.  But my objection is that I do not believe that they
24    have shown or will be able to show a tie between these
25    exhibits and this testimony and my client.
```

November 29, 2016

1          So that's simply my objection based on relevance

2    until they can tie this in to Ms. White herself.

3          THE COURT:  Okay.  And it's overruled based on what I

4    heard in the opening statement and I have read in the

5    indictment is that this was -- this is a conspiracy case as

6    opposed to just your client on her own.  And if I understand

7    what's going on is we're now learning about where the proceeds

8    came from.  And apparently these bales and avalanche and all

9    of this of marijuana led to money which then was laundered

10   allegedly through your client's conduct.

11         So for that reason, I do think that it is relevant to

12   establish that.  So your objection is overruled, but you can

13   maintain it throughout.  And we'll take it from there.

14         MR. JORDAN:  Thank you, your Honor.

15         THE COURT:  Okay.  Thank you.

16                     (Brief Recess)

17         THE COURT:  Mr. Gilmer-Hill?

18         MR. GILMER-HILL:  Yes, your Honor.  I've had a chance

19   to speak with Mr. Jordan and I think that we may be able to

20   help streamline things a little bit.

21         THE COURT:  That would be great.

22         MR. GILMER-HILL:  By stipulation.  Understanding that

23   Mr. Jordan would like to maintain the objection he has in

24   place.  But I believe that he may now be willing to stipulate

25   at least with regard to the remainder of Exhibit 1, the items

1     that we actually speak to, being admissible.

2          THE COURT:  Okay.

3          MR. JORDAN:  Just over my objection, the Court's

4     ruled, so I think we can just streamline it and go forward.

5          THE COURT:  All right.  So what we'll do is they will

6     all be received with the understanding that you have a

7     relevance objection and that the Court has overruled that

8     objection.

9          Let me ask you, Mr. Gilmer-Hill, did you offer

10    Exhibit 1E.4?

11         MR. GILMER-HILL:  I don't believe so, your Honor.

12         THE COURT:  That's fine.  No need to belabor it.  I

13    just wanted to know because I didn't mark it as received.

14         MR. GILMER-HILL:  And I believe that there's another

15    1E.22 I think it is.  It's also -- I don't expect to elicit

16    testimony from Agent Campbell on 22 either.

17         THE COURT:  Okay.  Well, then we'll get the jury.

18         MR. GILMER-HILL:  For other exhibits, Mr. Jordan has

19    indicated a willingness as well prior to those witnesses

20    taking the stand.  I'm not sure how the Court would prefer to

21    address those potential stipulations in terms of streamlining

22    those testimonies.

23         THE COURT:  I think just like this.  If you can let

24    me know then I want to indicate in front of the jury that

25    they're received.  So once you have Agent Campbell identify

November 29, 2016

```
 1    these, I'll indicate to the jury they've all been received.
 2    So let me know ahead of time for the following witness, and
 3    I'll still let the jury know that they're received as
 4    evidence.
 5               MR. GILMER-HILL:  Thank you.
 6                         (Jury In)
 7               THE COURT:  Okay.  Please be seated.  And Agent
 8    Campbell, you're still under oath.
 9               THE WITNESS:  Yes, your Honor.
10               THE COURT:  So Mr. Gilmer-Hill, you may proceed.
11    BY MR. GILMER-HILL:
12    Q.  Agent Campbell, we were just talking about several of the
13    assets that had been seized, I believe.  And I think we had
14    also spoken about some of the different locations that had been
15    searched.  Correct?
16    A.  Yes, sir.
17    Q.  Let's circle back for a moment.  I would like you to take
18    a glance at 1E.4 and tell us if you recognize what's depicted
19    in that.
20    A.  Yes, I do.
21               MR. GILMER-HILL:  And pursuant to stipulation, may we
22    publish?
23               THE COURT:  Certainly.  And what that means for the
24    jury is that these exhibits have been -- will be received as
25    evidence.  And we were just discussing that while you were
```

 1   back in the jury room.  So we can move things along a little

 2   bit more quickly.  So go right ahead.

 3          MR. GILMER-HILL:   Thank you.

 4   BY MR. GILMER-HILL:

 5   Q.   Agent Campbell, will you please tell us what's depicted in

 6   1E.4?

 7   A.   So in this picture, it's taken from inside one of the

 8   hidden compartments in a trailer.  You're looking down towards

 9   the floor.  And on the left side, that's a piston.  And as you

10   actuate that piston with power, it slowly opens the door.  And

11   the method to open it further would be to acuate the piston

12   until you could get your hand through.  And then you would pull

13   a pin to release the piston from the door, which is going to be

14   on the left.  And then you can just take it off the track and

15   you're in.

16   Q.   Thank you.  Now if you would, please, take a look at 1E.22

17   and tell us what's depicted in this.  It's published as well.

18   I'm sorry.  1E.23.  I'm looking at an error of mine.  1E.23,

19   yes.

20   A.   1E.23, this is a picture taken from an elevated loft in

21   the commercial warehouse that's utilized by Nicholas Hale and

22   Jimmy McWherter.  On the left side of that beam you'll see a

23   black door.  That's the black door that's the two-story white

24   enclosed vehicle hauler.  And then three additional vehicles

25   inside, some furniture, some tools.

November 29, 2016

1  Q.   So am I correct, is that a white van that's in the rear of

2  the picture?

3  A.   Yes, sir.

4  Q.   And the two vehicles, what are those two vehicles?

5  A.   Both of those are Camaros.

6  Q.   Is one an older Camaro, one's a newer one?

7  A.   Yes, sir.  The silver one is a 1967.  The black one maybe

8  approximately a 2010.

9  Q.   As to that 1967 Camaro, was it seized?

10  A.   It was.

11  Q.   What condition was the vehicle in?

12  A.   Very nice.  Significantly restored.  The final step it was

13  at right now was to have the interior of the vehicle, which was

14  still in good condition, to be further customized.

15  Q.   Did you learn whose name the vehicle was titled in?

16  A.   Yes, I did.

17  Q.   Whose name was the vehicle titled?

18  A.   Alicia White.

19  Q.   Who's Alicia White?

20  A.   Alicia White is Derrick White's mother.

21  Q.   And drawing your attention to 1E.24, the same restored

22  Camaro?

23  A.   Yes, sir.

24  Q.   Customized?

25  A.   Very much so.

1    Q.   1E.25, does that depict the rear of the same Camaro with

2    the license plate information?

3    A.   Yes, sir.

4    Q.   Is that how you were able to identify it as well via

5    registration connected to Alicia White?

6    A.   Yes, sir.

7    Q.   And could you tell us about what's depicted in 1E.26?

8    A.   1E.26 is a 2008 Dodge Challenger.

9    Q.   And is that the same vehicle depicted in 1E.27?

10   A.   Yes, sir.

11   Q.   And 1E.28?

12   A.   Yes, sir.

13   Q.   And for this Dodge Challenger, you said it's a 2008?

14   A.   It is.

15   Q.   Do you know who owns this Dodge Challenger?

16   A.   Yes, sir.

17   Q.   Who owns it?

18   A.   Jimmy McWherter.

19   Q.   Was it seized?

20   A.   Yes, it was.

21   Q.   And drawing your attention then to 1E.29, what's depicted

22   in 1E.29?

23   A.   It's a completely empty filing cabinet in the commercial

24   warehouse utilized by McWherter and Hale.

25   Q.   Did you search the commercial warehouse for indications of

1    work being conducted and billed and invoiced out?

2    A.   Yes, sir.

3    Q.   Did you find indications of such things?

4    A.   Nothing.

5    Q.   Drawing your attention to 1E.30.  What is that?

6    A.   That's a hard case for a Makita drill.

7    Q.   Was that item seized?

8    A.   The box was not, but the contents were.

9    Q.   And from where were the contents seized?  What location is

10   this we're looking at?

11   A.   This is the warehouse area of the warehouse utilized by

12   McWherter and Hale.

13   Q.   Prototype?

14   A.   Yes, sir.  Prototype Engineering.

15   Q.   Was the warehouse searched on more than one occasion?

16   A.   It was.

17   Q.   Approximately when was the first search in relation to the

18   arrest of Mr. McWherter and Mr. Hale?

19   A.   That day.  February 3rd, 2010.

20   Q.   And approximately just in rough terms, when was the second

21   search?

22   A.   A few days later, two or three days later.

23   Q.   What was found inside the Makita box?

24   A.   Bulk cash.

25   Q.   Showing you what's depicted as 1E.31.  Could you tell us

1    what's depicted there?

2    A.   Yes.  That would be the box is now open.  You can kind of

3    see the box underneath.  But contained within that box was the

4    cash.

5    Q.   And 1E.32?

6    A.   The cash, again, just removed from the plastic bag which

7    is at the bottom of the picture.

8    Q.   And this followed from a second search at the warehouse a

9    few days after the arrest on February 3rd?

10   A.   Yes, sir.

11   Q.   So let's circle back to that day of arrest, February 3rd,

12   2010.  Did Mr. McWherter and Mr. Hale make any statements at

13   the time of their arrests?

14   A.   Yes, they did.

15   Q.   Did they make any statements inculpating themselves in

16   regard to drug trafficking?

17   A.   Initially, no.

18   Q.   And those initial statements by Mr. McWherter and Mr. Hale

19   in which they did not initially make any statements about being

20   involved in drug trafficking, do those statements occur before

21   or after the additional marijuana was found in the motor home?

22   A.   Before.

23   Q.   Were those statements made before or after the second

24   search of the warehouse and the seizure of that money?

25   A.   Before.

November 29, 2016                                                77

1    Q.   Did there come a point in time after the seizure of

2    marijuana from the motor home and the seizure of the money in

3    the Makita box when Mr. McWherter and Mr. Hale made additional

4    statements to law enforcement?

5    A.   Yes, sir.

6    Q.   In general terms, when were those statements made?

7    A.   We met approximately six weeks after the day of arrest.

8    Mid March 2010.

9    Q.   And in March -- in approximately March of 2010, were Mr.

10   McWherter and Mr. Hale interviewed separately?

11   A.   Yes, they were.

12   Q.   They each provided -- did they each provide entirely

13   independent statements?

14   A.   Yes.

15   Q.   And following from the statements and information that you

16   received from Mr. McWherter and Mr. Hale independently, did you

17   further your investigation?

18   A.   Yes.

19   Q.   And based upon the statements and information provided by

20   Mr. McWherter and Mr. Hale, were you able to further your

21   investigation with regard to the source of the marijuana that

22   was seized?

23   A.   Yes, sir.

24   Q.   Were you able to further your investigation with regard to

25   the identities of any other individuals involved?

1   A.   Yes, sir.

2   Q.   Would you summarize for us what information did Mr.

3   McWherter and Mr. Hale tell you about the identity of some of

4   the other individuals involved with the marijuana that was

5   seized?

6   A.   Initially able to provide nicknames, telephone numbers,

7   vehicles, residential locations affiliated with those

8   individuals.

9   Q.   And did they provide physical descriptions?

10  A.   Yes, they did.

11  Q.   Did they provide information with regard to approximate

12  ages?

13  A.   Yes, they did.

14  Q.   What information did they provide about the approximate

15  ages of the individuals they were involved with?

16  A.   At that time in their approximate 30's.

17  Q.   What information did Mr. McWherter and Mr. Hale provide

18  about the nicknames of some of the individuals they were

19  involved with?

20  A.   Derrick White was referred to them as D, Black Sunshine.

21  Leshoun Byrd was addressed as Shoun or Gucci.

22  Q.   And a moment ago I think you may have said referred to

23  them.  Are these the nicknames by which Mr. McWherter and Mr.

24  Hale referred to the individuals that they were involved in

25  drug trafficking with?

1   A.   Yes, sir.

2   Q.   One individual was nicknamed D or Black Sunshine?

3   A.   Yes, sir.

4   Q.   And another individual was nicknamed Shoun or Gucci?

5   A.   Yes, sir.

6   Q.   Did Mr. McWherter or Mr. Hale provide you any information

7   about individuals in Arizona who were involved in the marijuana

8   that was seized from them?

9   A.   Yes, sir.

10  Q.   Did though provide any nicknames about the individuals in

11  Arizona with whom Mr. McWherter and Mr. Hale were dealing with?

12  A.   Yes, sir.

13  Q.   What were the names that Mr. McWherter and Mr. Hale

14  shared?

15  A.   One individual referred to as Hanky.  One individual

16  referred to as Chilly.  Source of the marijuana referred to as

17  Cowboy.

18  Q.   Did Mr. McWherter and Mr. Hale tell you about the role or

19  roles that Hanky and Chilly played?

20  A.   Yes, sir.

21  Q.   What did Mr. McWherter and Mr. Hale tell you about the

22  roles that Hanky and Chilly played?

23  A.   Hanky and Chilly operated a vehicle between their

24  residential location utilized by McWherter and Hale and the

25  source of the marijuana.  In this vehicle they would transport

1    the bulk cash to the marijuana source and then the bulk

2    marijuana back to the residential location utilized by

3    McWherter and Hale.

4    Q.   I believe you indicated that Mr. McWherter and Mr. Hale

5    provided you some information about locations; is that correct?

6    A.   Yes, sir.

7    Q.   At that time were you referring to locations in Detroit?

8    A.   Throughout the country.

9    Q.   Okay.  And so did Mr. McWherter and Mr. Hale provide you

10   information about a location associated with Hanky and Chilly?

11   A.   Yes, sir.

12   Q.   And was there anything -- the vehicle that you described

13   that was used to transport the marijuana, did Mr. McWherter and

14   Mr. Hale tell you what type of vehicle it was?

15   A.   Yes, sir.

16   Q.   What type of vehicle did they say it was?

17   A.   F250 pickup truck.

18   Q.   Did they describe for you any special characteristics of

19   the F250 pickup truck?

20   A.   Yes.

21   Q.   What did they tell you?

22   A.   Had a unique feature of a metal tunnel cover which covered

23   the back and covered the handle on the tailgate to secure the

24   contents of the pickup truck bed.  This cover was controlled by

25   hydraulic lift.

November 29, 2016                                                     81

1   Q.  Was the vehicle described as being such that you could not

2   get into the bed of the truck without lifting that hydraulic

3   cover?

4   A.  Yes, sir.

5   Q.  So did Mr. McWherter and Mr. Hale describe that vehicle as

6   being a especially secure because of the cover?

7   A.  Yes.

8   Q.  And based upon the information that Mr. McWherter and Mr.

9   Hale provided about the location associated with Hanky and

10  Chilly and about this truck, were you able to identify the

11  truck?

12  A.  Yes.

13  Q.  To whom was the -- and were you able to identify

14  information about the truck relative to Hanky and Chilly?

15  A.  Yes, sir.

16  Q.  Was the truck registered to either of those individuals?

17  A.  It was.

18  Q.  So you were able to identify those individuals by

19  something other than nickname?

20  A.  Yes, sir.

21  Q.  To whom was the truck registered?

22  A.  Gregory Johnson.

23  Q.  Who's Gregory Johnson?

24  A.  The cousin to Derrick White.

25  Q.  And which of the individuals, Hanky and Chilly, which of

1   those individuals is Greg Johnson?

2   A.   Gregory Johnson is Hanky.

3   Q.   Did you, upon learning of the -- or after learning of the

4   association of Gregory Johnson to this vehicle at the location

5   that Mr. McWherter and Mr. Hale described, did you have an

6   occasion to show Mr. McWherter and Mr. Hale any photographs?

7   A.   Yes.

8   Q.   Did you show them a photograph of Gregory Johnson?

9   A.   Yes.

10  Q.   Were they able to identify Gregory Johnson?

11  A.   Yes, sir.

12  Q.   Did they identify him as Hanky?

13  A.   Yes.

14  Q.   The person that you'd been describing as going by the

15  nickname Hanky?

16  A.   Yes.

17  Q.   And that truck that was used to transport the marijuana in

18  Arizona, did Mr. McWherter and Mr. Hale provide any information

19  to you about what they knew as to how that truck was acquired?

20  A.   Yes, sir.

21  Q.   What did Mr. McWherter and Mr. Hale tell you about how the

22  truck was acquired?

23  A.   They understood that the organization had been looking for

24  one.  And Derrick White was able to acquire the pickup truck.

25  Q.   You used the language Derrick White was able to acquire

```
 1    the pickup truck.  Did Mr. McWherter describe any instance to
 2    you of his first observation of the pickup truck?
 3    A.   Yes.
 4    Q.   What did Mr. McWherter describe?
 5    A.   He was home at their home in Phoenix and Greg Johnson
 6    drove the truck into the driveway followed by Derrick White and
 7    Leshoun Byrd in a separate vehicle.
 8    Q.   And did Mr. McWherter share with you whether any
 9    statements were made on the occasion of his first seeing the
10    truck?
11    A.   He did.
12             MR. JORDAN:  Judge, I'm trying to give Mr.
13     Gilmer-Hill some leeway.
14             THE COURT:  Just the nature of your objection.
15             MR. JORDAN:  It's hearsay, your Honor.
16             THE COURT:  It's overruled.
17             MR. JORDAN:  Your Honor, I believe that the argument
18     will be that this is in furtherance of the conspiracy.  But
19     this testimony is not in furtherance of anything.
20             THE COURT:  Let's have a short sidebar.
21             MR. JORDAN:  Thank you, your Honor.
22                        (Bench Conference)
23             MR. JORDAN:  I'm sorry.  It's weird because I'm
24     trying not to make my objection in front of the jury.  But my
25     objection, your Honor, is that this is not testimony that's
```

November 29, 2016

1        about furtherance of --

2              THE COURT:  Remind me of the question you just asked.

3              MR. JORDAN:  Why he wants to get a new car or --

4              MR. GILMER-HILL:  Thank you.  That related to

5        statements that Derrick White made at the time that Mr.

6        McWherter first saw this vehicle.  I believe the information

7        that's about to come is consistent with what's paraphrased

8        about D obtaining the vehicle.

9              THE COURT:  And you think it's admissible because

10       these are statements of coconspirators?

11             MR. GILMER-HILL:  Correct.

12             MR. JORDAN:  But it has to be in furtherance of the

13       conspiracy, doesn't it?  It can't just be statements.

14             THE COURT:  How is it in furtherance of the

15       conspiracy?

16             MR. GILMER-HILL:  Well, it's a truck that Derrick

17       acquired, gave to Greg Johnson and that Greg Johnson then

18       later sold in Detroit.

19             THE COURT:  In order to launder the money?

20             MR. GILMER-HILL:  Well, yes --

21             THE COURT:  I have to hear what's illegal here.

22             MR. GILMER-HILL:  Drug proceeds were used to purchase

23       the truck which was utilized in furtherance of the conspiracy.

24       And then a gift of it to Greg Johnson was to influence him

25       with regard to participation in the conspiracy.

```
 1            MR. JORDAN:  I think the question was he wanted to

 2   upgrade the car or something like that.

 3            MR. GILMER-HILL:  No.

 4            MR. JORDAN:  Or he wanted to do something about that.

 5            MR. GILMER-HILL:  It had to do with the acquisition

 6   of a vehicle by Derrick White.

 7            THE COURT:  As long as that's the question, then your

 8   objection is overruled.

 9            MR. JORDAN:  Very well.

10            THE COURT:  Thanks for coming to the sidebar.

11                         (Open Court)

12            THE COURT:  Thank you, jurors for your patience.

13   Ordinarily we would turn on that horrible noise but the

14   machine won't let me turn it on now.  So we're spared of that.

15   You may proceed, Mr. Gilmer-Hill.

16            MR. GILMER-HILL:  Thank you.

17   BY MR. GILMER-HILL:

18   Q.  Agent Campbell, did Mr. McWherter share any information

19   with you about any statements made by the people he was

20   involved in the drug trafficking with about the acquisition of

21   this truck?

22   A.  Yes.

23   Q.  What did Mr. McWherter tell you that those people said?

24   A.  He was advised that the truck was purchased by Derrick;

25   however, registered in the name of Greg Johnson to avoid
```

1    suspicion by authorities and identification of Derrick.

2    Q.   When you say he was advised, did Mr. McWherter tell you

3    about statements that Derrick White and Greg Johnson made?

4    A.   Yes.

5    Q.   And what were the statements by Greg Johnson and Derrick

6    White about acquiring the truck?

7    A.   Specific to the registration that Greg Johnson had to

8    apply for and acquire a State of Arizona driver's license.

9    Q.   And did Mr. McWherter tell you whether Derrick White and

10   Greg Johnson and Shoun made any statements about who had

11   acquired -- who had paid for the truck?

12   A.   Yes, they did.

13   Q.   And who paid for the truck?  Whom did Mr. McWherter tell

14   you that those individuals said had paid for the truck?

15   A.   Derrick White.

16   Q.   Do you know what happened to that truck?

17   A.   I do.

18   Q.   What -- was there a point in time when that truck was

19   ultimately sold?

20   A.   Yes.

21   Q.   Where was it sold?

22   A.   Well, it was sold -- it was transferred between states,

23   the title.  And has ultimately be sold to an unrelated party.

24   Q.   And so in relation to these events that you were

25   describing, Mr. McWherter spoke of seeing the truck at this

1    location in Arizona that he had described to law enforcement;

2    is that correct?

3    A.   Yes.

4    Q.   What city was the truck in when it was sold in terms of

5    which you just referenced by being transferred between the

6    states?

7    A.   In Arizona, it was located in the City of Glendale.

8    Q.   Okay.  Do you know whether there came a point in time when

9    the truck was sold to someone who was not among the individuals

10   involved in the drug trafficking?  So not Hanky, not Chilly,

11   not Greg Johnson.  Was there a point this time when the truck

12   was sold to an innocent purchaser?

13   A.   Yes, sir.

14   Q.   And you're talking not a transfer of title among people

15   but you're talking about a sell of the truck?

16   A.   Yes, sir.

17   Q.   Where was the truck when it was sold?

18   A.   In Michigan.

19   Q.   Was it in the metropolitan Detroit area?

20   A.   Yes, sir.

21   Q.   In whose name was the truck titled when it was sold to an

22   innocent purchaser?

23   A.   It was in the name of William Herring.

24   Q.   Who's William Herring?

25   A.   William Herring is the brother to Greg Johnson.

November 29, 2016

1    Q.   Was there a point in time when the truck was transferred

2    into the name of Greg Johnson's father?

3    A.   Yes.

4    Q.   What's Greg Johnson's father name?

5    A.   They share the same name, Greg Johnson, Senior.

6    Q.   And so when the truck was sold it was sold by -- was it

7    sold by Greg Johnson and the brother?

8    A.   That's the understanding.

9    Q.   Now you mentioned other locations that Mr. McWherter and

10   Mr. Hale told you about nationwide.

11   A.   Yes, sir.

12   Q.   Were some of those locations in Detroit?

13   A.   Yes, sir.

14   Q.   What did they tell you about the locations in Detroit and

15   how those locations or whether those locations were associated

16   to the drug trafficking that Mr. McWherter and Mr. Hale were

17   involved in?

18   A.   Locations described in Detroit were --

19             MR. JORDAN:   Your Honor, the question was what did

20   they tell you.  I need to know whether he's talking to Hale or

21   McWherter.

22             THE COURT:   Okay.  Thank you.

23   BY MR. GILMER-HILL:

24   Q.   Did Mr. McWherter and Mr. Hale each independently describe

25   locations to you in Detroit that were associated with their

1    drug trafficking?

2    A.   Yes, sir.

3    Q.   Did they each identify locations to you?

4    A.   Yes, sir.

5    Q.   How did they identify the locations to you?

6    A.   Descriptions of the house as you look at it from the

7    street.  Roads they were located on.  And also searched

8    together during the interview on Google Maps satellite view.

9    Q.   Was there an occasion when you drove with either Mr.

10   McWherter or Mr. Hale to identify locations?

11   A.   Both, yes.

12   Q.   So you -- did you drive with them together or

13   independently?

14   A.   In the same car.

15   Q.   And was that before or after they had provided the

16   information through interview?

17   A.   After.

18   Q.   And was it before or after you had looked on Google Map

19   and other sources to identify the location?

20   A.   After.

21   Q.   And did they -- you indicated they identified a house to

22   you?

23   A.   At least two.

24   Q.   Okay.  Tell -- what did Mr. McWherter and Mr. Hale tell

25   you about these two houses?

1  A.   After they get back into Michigan with the bulk of

2  marijuana, they would travel to these locations to then deliver

3  the marijuana to White and/or Byrd, Derrick White or Leshoun

4  Byrd.

5  Q.   I think you just mentioned the name Byrd for the first

6  time.  Who is Byrd?

7  A.   Leshoun Byrd was identified as the nickname Gucci.

8  Q.   And is that the person who is also in reference by the

9  nickname Shoun?

10  A.   Yes, sir.

11  Q.   Did Mr. McWherter and Mr. Hale identify a photograph of

12  Shoun to law enforcement?

13  A.   Yes.

14  Q.   And was that, in fact, a photograph of Leshoun Byrd?

15  A.   It was.

16  Q.   So as to these two locations as to which Mr. McWherter and

17  Mr. Hale would deliver the marijuana in Detroit, where were

18  they?

19  A.   One, the address I recall is on Brighton Street, 8227

20  Brighton.

21  Q.   Did you further investigate that address?

22  A.   Yes, we did.

23  Q.   What did you learn about that address?

24  A.   Through its affiliation, we came to find it was associated

25  with an individual with the last name of White.

```
1    Q.   Whose house was it?

2    A.   It was a residence of that brother, I believe it was

3    Lamont White.

4    Q.   What did Mr. McWherter and Mr. Hale tell you about Lamont

5    White's house?

6    A.   It was a corner house, a two-family unit.

7    Q.   What did Mr. McWherter and Mr. Hale tell you about the

8    house in relation to their drug trafficking?

9    A.   That was used on a few occasions when they would, again,

10   return home with the marijuana.  They would travel to that

11   home, offload the marijuana from what it was being hauled in at

12   the time.  It would be carried into the home.

13   Q.   Did either Mr. McWherter or Mr. Hale -- actually, strike

14   that.  All right.  So Mr. McWherter and Mr. Hale have

15   identified locations to you.  They've identified locations to

16   you in Detroit.  You -- and there's law enforcement that have

17   gone to locations and found the name of the person who owns the

18   house.  Did you utilize that information to do something?

19   A.   Yes.

20   Q.   What did you utilize that information to do?

21   A.   Just query associates tied to that house.  And then

22   further beyond that, associated individual with the suspected

23   occupant of the home.

24   Q.   And was it through that process that you were able to

25   identify Derrick White?
```

1    A.   In part, yes.

2    Q.   And that's how you identified him as being D because he

3    was associated with the brother who owned the house on

4    Brighton?

5    A.   In part, yes.

6    Q.   How else did you identify D?

7    A.   Through telephone information provided by McWherter and

8    Hale and just residential affiliations.

9    Q.   Showing you what's been marked as Government's Exhibit

10   1F.1, can you tell us who was depicted in 1F.1?

11   A.   Derrick White.

12   Q.   So this is the person Mr. McWherter and Mr. Hale talked to

13   you about?

14   A.   Yes.

15   Q.   And based on the information that Mr. McWherter and Hale

16   provided, were you able to identify additional locations in

17   Arizona?

18   A.   Yes, sir.

19   Q.   What locations in Arizona were you able to identify?

20   A.   Two residential locations and the pickup spot for the

21   marijuana.

22   Q.   Drawing your attention to what's been previously marked as

23   Exhibit 1A.1.  What's depicted in 1A.1?

24   A.   This is a small building in a large vacant yard referred

25   to by McWherter and Hale as a palette yard.

November 29, 2016                                    93

1    Q.   Is that one of the locations were they obtained marijuana?

2    A.   Yes, sir.

3    Q.   And did Mr. McWherter and Mr. Hale indicate whether they

4    were obtaining the marijuana at that location pursuant to

5    directions from Mr. White?

6    A.   Yes, sir.

7    Q.   Were you able to identify other locations?

8    A.   Yes, we were.

9    Q.   Can you take a look at Exhibit 1A.2?  What's depicted in

10   1A.2?

11   A.   This is a house on Mariposa Street in the Phoenix area.

12   It's another location where they picked up marijuana at the

13   direction of Derrick White and Leshoun Byrd.

14   Q.   Did they describe occasions when they had meetings with D

15   and Shoun in Arizona?

16   A.   Yes, sir.

17   Q.   Did they describe having more than one meeting with D and

18   Shoun in Arizona?

19   A.   Yes.

20   Q.   What were some of the locations of the meetings that Mr.

21   McWherter and Mr. Hale had with D and Shoun in Arizona?

22   A.   Other residential locations.  Their own home.

23   Restaurants.

24   Q.   So when you say their own home, to what are you referring?

25   A.   McWherter and Hale were renting a home in the Phoenix area

1    as well.

2    Q.   What street was that home on?

3    A.   Maddock.

4    Q.   Based upon the information that Mr. McWherter and Hale

5    provided, were you able to identify that location?

6    A.   Yes, sir.

7    Q.   What did they tell you happened at that location?

8    A.   At the Maddock Street house, they would keep their

9    vehicles there typically with the bulk cash until it was picked

10   up by Mr. Herring and Mr. Johnson, Hanky or Chilly, and wait

11   there.  And the same individuals would bring the bulk marijuana

12   back to that house to be loaded into the hidden compartments.

13   Q.   And during these interviews of Mr. McWherter and Mr. Hale

14   when they provided this information shortly after the arrest,

15   this is roughly six weeks after the arrest, correct?

16   A.   Yes, sir.

17   Q.   Did they describe a meeting that occurred at a restaurant?

18   A.   Yes.

19   Q.   What restaurant did they describe?

20   A.   Ruby Tuesday.

21   Q.   Did they describe the approximate location of the Ruby

22   Tuesday?

23   A.   Yes, they did.

24   Q.   Did they describe its relevance in relation to where

25   anything concerning Mr. White and Shoun, where they were

1   staying in Arizona?

2   A.   Yes, sir.

3   Q.   What did they tell you?

4   A.   Ruby Tuesday's was located off a main roadway just off the

5   road.  But in addition to that, it was within walking distance

6   to an adjoining hotel.

7   Q.   And what was the pertinence of that hotel?

8   A.   Following their meeting at the restaurant during a meal,

9   Derrick White and Leshoun Byrd left the restaurant and

10  McWherter and Hale observed them walking and entering the

11  hotel.

12          THE COURT:  Mr. Gilmer-Hill, we're going to take a

13  very short break.  For the members of the jury, you may have

14  noticed that my spectacular court reporter, Jeseca, is

15  expecting a baby soon.  So we're taking a few more quick

16  restroom breaks than we might otherwise.  So I appreciate

17  everyone's patience with that.  So if the jury, you want to

18  just go back to the jury room for a moment, we'll come and get

19  you very soon.  So please rise for the jury.

20                      (Jury Out)

21                      (Brief Recess)

22          THE CLERK:  All rise for the jury.

23                      (Jury In)

24          THE COURT:  Please be seated.  Thank you.

25  BY MR. GILMER-HILL:

96

1    Q.   Agent Campbell, I think that you had described a hotel

2    that Mr. McWherter and Mr. Hale said that they saw D and Shoun

3    walking toward after their meeting at the Ruby Tuesday; is that

4    correct?

5    A.   Yes, sir.

6    Q.   And drawing your attention to 1B.1, can you tell us what's

7    depicted in 1B.1?

8    A.   I took this picture while standing in the parking lot of

9    the Ruby Tuesday.  And that is the hotel which we discovered

10   through documents provided by the hotel that Leshoun Byrd

11   stayed on at least two occasions at.

12   Q.   And you also described a house on Maddock?

13   A.   Yes, sir.

14   Q.   As I believe you said it was a location where the

15   marijuana was delivered?

16   A.   Yes, sir.

17   Q.   Can you take a look at Exhibit 1D.1, please?

18   A.   Yes, sir.

19   Q.   And 1D.2.  In fact, 1D.1 and 1D.2 appear to be a

20   continuation of the same house?

21   A.   Yes, sir.

22   Q.   What is that location?

23   A.   This was a residential location that was leased for a

24   12-month period in the name of Jimmy McWherter and Nicholas

25   Hale.

November 29, 2016

1    Q.   Is that the house on West Maddock?

2    A.   It is.

3    Q.   And so during these interviews when were collecting

4    information from Mr. McWherter and Mr. Hale to further your

5    investigation, did they say whether they had made more than one

6    trip to Arizona?

7    A.   Yes, sir.

8    Q.   Did they say how many trips they made to Arizona

9    transporting -- excuse me.  Did they say approximately how many

10   trips they made to Arizona?

11   A.   They both approximated 20.

12   Q.   And what did Mr. McWherter say that they did in relation

13   to those trips?

14   A.   During their off time, you mean?

15   Q.   No, actually.  So let me ask a better question.  So how

16   did -- did Mr. McWherter say how the trips to Arizona began?

17   A.   Yes, he did.

18   Q.   So at the outset of a trip to Arizona, what did Mr.

19   McWherter describe happening?

20   A.   Typically he would receive a call from Derrick White to

21   begin the planning of an upcoming trip just to think of

22   logistics, availability, when they'd be able to depart.

23   Q.   Okay.  And after that discussion, what did Mr. McWherter

24   say happened to kick start the beginning of the trip?

25   A.   Once a departure date was agreed upon, he would meet with

November 29, 2016

1    Derrick and/or Leshoun at his commercial warehouse in Macomb
2    Township.  At that time, Derrick and/or Leshoun would deliver
3    bulk cash to McWherter and/or Hale.  And that cash would then
4    be put inside of a hidden compartment of one of the vehicles.
5    Q.  And once they -- once Mr. McWherter and Hale received the
6    -- so did Mr. McWherter and Mr. Hale describe how the bulk cash
7    was packaged when they received it?
8    A.  Yes.  Contained inside of a black 30 gallon garbage bag.
9    And further contained inside of that was the cash which was
10   contained inside of multiple heat sealed vacuumed clear bags.
11   Q.  And what did Mr. McWherter and Mr. Hale do after receiving
12   the money?
13   A.  Hidden inside the compartment and that day or the day
14   after they would depart with or without their travel companions
15   for Arizona.
16   Q.  And did Mr. McWherter and Mr. Hale tell you approximately
17   how many such trips they made?
18   A.  Approximately 20.
19   Q.  And once they arrived in Arizona, what did they say
20   happened?
21   A.  Upon crossing the state line into Arizona, they would
22   update Derrick and/or Leshoun of their location and drive
23   directly to their Maddock residence.
24   Q.  Okay.  And once they were in Arizona, did they receive
25   marijuana?

1  A.   Yes.

2  Q.   How did that happen?

3  A.   Travel to the Maddock house and they would wait there.

4  And then Derrick, Leshoun, Johnson, or Herring would arrive to

5  receive the bulk cash and depart with that and return sometime

6  later with bulk marijuana.

7  Q.   And after that Mr. McWherter and Mr. Hale would then load

8  their vehicles and return to Detroit?

9  A.   Yes, sir.

10 Q.   And then deliver it to the locations that you described

11 earlier?

12 A.   Yes, sir.

13 Q.   And so the return trips with the marijuana, was that also

14 approximately 20 trips or more?

15 A.   Yes, sir.

16 Q.   Over what timeframe did Mr. McWherter and Mr. Hale

17 describe these trips occurring?

18 A.   McWherter started in 2007 and then Hale shortly thereafter

19 on the second or third trip continuing through their arrest in

20 February of 2010.

21 Q.   And so for themselves, I believe you described them, Mr.

22 McWherter and Mr. Hale, driving these vehicles to Arizona; is

23 that correct?

24 A.   Yes, sir.

25 Q.   Did Mr. McWherter and Mr. Hale provide you any information

1   as to how D and Shoun would get to Arizona?

2   A.   Through commercial air.

3   Q.   They flew?

4   A.   Yes, sir.

5   Q.   And in furtherance of your investigation, did you also

6   follow-up on this information that Mr. McWherter and Mr. Hale

7   provided?

8   A.   Yes.

9   Q.   Were you able to utilize this information to corroborate

10   any aspects of what Mr. McWherter and Mr. Hale were telling

11   you?

12   A.   Yes.

13   Q.   How did you corroborate the information that Mr. McWherter

14   and Mr. Hale told you?

15   A.   Their independent statements give us an idea of the dates

16   that they took trips in conjunction with airline tickets.  We

17   had rental car leases, financial transactions from gas

18   stations, speeding tickets, things of that nature.

19   Q.   Okay.  So let's still try and move quickly, but let's go

20   through this in a little bit more detail.  When you say airline

21   tickets, what do you mean?  What information were you able to

22   obtain that corroborated what Mr. McWherter and Mr. Hale were

23   telling you.  Airline tickets for whom?

24   A.   Derrick White and Leshoun Byrd.

25   Q.   And how did finding airline tickets for Derrick White and

1    Mr. Hale corroborate with information that gave you?

2    A.   It was in conjunction with trips they said they took on

3    specific dates.  And would also fall in line with other

4    information that was received, such as through rental cars,

5    speeding tickets, etcetera.

6    Q.   And so tell us a little bit more information about the

7    rental cars, for instance.  Rental cars rented by whom?

8    A.   Derrick White and Leshoun Byrd.

9    Q.   And what area -- for what area did you find that Derrick

10   White and Leshoun Byrd had rented cars?

11   A.   Well, McWherter and Hale said that they'd fly often into

12   Las Vegas or Los Angeles and that was consistent with where the

13   rental cars would be leased from.

14   Q.   Consistent with?  Is that where the rental cars that you

15   identified as having been rented by Derrick White and Leshoun

16   Byrd rented?  Is that where the cars actually did come from?

17   A.   Yes.

18   Q.   Okay.  So not just consistent with, that's where they

19   rented their cars?

20   A.   Yes, sir.

21   Q.   And the timeframe for the rental records that you

22   discovered, how did that relate to the information that Mr.

23   McWherter and Mr. Hale provided you?

24   A.   Short over the stated duration of the trip.  And then

25   they'd also fall in line with departing airfare tickets from

November 29, 2016

1    those adjoining airports, Los Angeles or Las Vegas, back to

2    most commonly Detroit.

3    Q.   And I believe you mentioned receipts.  Or did you mention

4    receipts?

5    A.   I did.

6    Q.   What information in relation to receipts did you use to

7    corroborate the information that Mr. McWherter and Mr. Hale

8    provided?

9    A.   To corroborate their own statements and put them there, we

10   would find receipts in their vehicles, on this person, in their

11   homes that were consistent with trips kind of leading them

12   cross-country and in the Phoenix area.

13   Q.   And did you obtain the bank records for Mr. McWherter and

14   Mr. Hale?

15   A.   Yes, I did.

16   Q.   And within their bank records, were you also able to

17   observe expenditures consistent with their travel cross-country

18   such as debit expenditures?

19   A.   Yes, sir.

20   Q.   I believe you've already told us about the hotel folios or

21   hotel records.  Was the timing of the stay by Mr. Byrd at that

22   hotel on two occasions that you told us about, was the timing

23   of that consistent with the other corroborative evidence you've

24   been mentioning?

25   A.   Yes, sir.

November 29, 2016

1    Q.   And you mentioned speeding tickets.  Would you take a

2    moment and tell the jurors what you found in relation to

3    speeding tickets?

4    A.   Yes.  We found speeding tickets in the Phoenix area for

5    both Derrick White and Leshoun Byrd.  One notably was issued to

6    Leshoun Byrd while he was operating a vehicle that was rented

7    by Derrick White.

8    Q.   Fair to say you found some -- well, obviously several

9    different items that -- and pieces of evidence that

10   corroborated with what Mr. McWherter and Mr. Hale were telling

11   you?

12   A.   Yes, sir.

13   Q.   And you identified locations that were consistent with

14   what they had told you?

15   A.   Yes, sir.

16   Q.   And you were able to identify -- it sounded like you said

17   that you knew that the house on Maddock was leased to Mr.

18   McWherter and Hale?

19   A.   Yes, sir.

20   Q.   Did you obtain the lease documents for that house?

21   A.   I did.

22   Q.   The location that you spoke to us about earlier where

23   Hanky and Chilly were residing, that location in which the

24   truck with the cover had pulled up into the driveway that you

25   described for us, did you obtain information as to that house?

November 29, 2016

1   A.   Yes, sir.

2   Q.   What type of information did you obtain as to that house?

3   Well, first, let me ask you this, what street was that house

4   on?

5   A.   West Keim.

6   Q.   So as to the West Keim house, were you able to obtain

7   either purchase or lease documents?

8   A.   Yes.  Lease.  Sorry.  Lease documents.

9   Q.   Okay.  What did Mr. McWherter and Hale say about the West

10  Keim house?  Who stayed there?

11  A.   For a period of time, they thought that it may have been

12  occupied by Mr. Johnson but was just more so used by the

13  organization as opposed to a full time residence.

14  Q.   In whose name was the house leased?

15  A.   Michelle Posey.

16  Q.   Not Derrick White?

17  A.   No.

18  Q.   Not Leshoun Byrd?

19  A.   No, sir.

20  Q.   Not Greg Johnson?

21  A.   No, sir.

22  Q.   So you were able to follow up on a lot of the information

23  that they provided you?

24  A.   Yes, sir.

25  Q.   Did -- and Mr. McWherter and Mr. Hale said that there were

1    about 20 trips, correct?

2    A.   Yes, sir.

3    Q.   Did they tell you -- did Mr. McWherter and Mr. Hale tell

4    you whether they were being compensated for taking these trips?

5    A.   They did.

6    Q.   Did they tell you how much they were being paid?

7    A.   One hundred dollars per pound of marijuana that was

8    transported.

9    Q.   Did Mr. McWherter and Mr. Hale each tell you that?

10   A.   They did.

11   Q.   Did Mr. McWherter and Mr. Hale describe approximately how

12   much marijuana they transported on those 20 plus trips?

13   A.   Yes, they did.

14   Q.   Approximately how much marijuana did they say they

15   transported?

16   A.   They approximated the lowest amount was about 1,200

17   pounds.  Towards the tail end, maybe the last eight trips or

18   so, they were using a two-vehicle configuration which would

19   have doubled that and is consistent with our seizure of 2,700

20   pounds.

21   Q.   And so math-wise, that would have been a range from

22   $120,000 per trip to -- well, how many pounds did you say it

23   was?

24   A.   1,200 was the lowest.

25   Q.   Okay.  Up to 2,700 pounds?

1   A.   Yes, sir.

2   Q.   And was that information as to how much money they made --

3   so that's anywhere from 120,000 on a given trip to $270,000 on

4   a trip, correct?

5   A.   Approximately.

6   Q.   Times 20 trips?

7   A.   Yes, sir.  They accounted for 20.  We've identified 22.

8   Q.   When you say you've identified 22, what do you mean?

9   A.   Through the receipts, statements, speeding tickets,

10  airlines, things of that nature.

11  Q.   So you've identified more than 20 trips?

12  A.   Yes, sir.

13  Q.   So even at 20 trips, you're talking about 2.4 million for

14  that lesser amount of 120,000?  Okay.  Is that correct?

15  A.   Yes, sir.

16  Q.   So this information that Mr. McWherter and Mr. Hale

17  provided about the approximate number of trips and

18  approximately how much they were paid, was that information

19  consistent with the assets that were seized from Mr. McWherter

20  and Mr. Hale?

21  A.   Yes, sir.

22  Q.   Some of the assets that we've already had testimony about

23  that were seized from the warehouse?

24  A.   Yes, sir.

25  Q.   And was that rough estimate of how much they earned

1    consistent with information independently learned about their

2    bank accounts?

3    A.    Yes.

4    Q.    Was Jimmy McWherter married at the time of these events?

5    A.    He was.

6    Q.    To whom was he married?

7    A.    Christie McWherter.

8    Q.    Did they have joint bank accounts?

9    A.    Yes, they did.

10   Q.    And did Mr. McWherter also have bank accounts for

11   Prototype Engineering?

12   A.    Yes, he did.

13   Q.    So he had both business accounts and personal accounts?

14   A.    Yes.

15   Q.    And were the bank accounts of Jimmy McWherter and Christie

16   McWherter identified, the particular bank accounts for the

17   Prototype Engineering and for them personally?

18   A.    Yes, sir.

19   Q.    Was there financial information subpoenaed?

20   A.    Yes, there was.

21   Q.    Reviewed?

22   A.    Yes, sir.

23   Q.    Can you provide us a rough approximation of how much cash,

24   how much in cash deposits during this timeframe was traced

25   through their bank accounts?

November 29, 2016

1   A.   Yes, sir.  Cash deposits into their account alone

2   surpassed $900,000.

3   Q.   Additional separate cash expenditures identified?

4   A.   Yes, sir.

5   Q.   What type of items did the McWherters directly spend cash

6   on?

7   A.   In the picture, there was the boat.  That would be one of

8   them.  Some of the toys.  The snowmobiles.  Four wheelers.

9   Q.   What about the boat was a cash expenditure?

10  A.   Yeah.  The boat, the long orange boat, it was -- it cost

11  over $700,000.  And that was primarily made in cash, the

12  payments.

13  Q.   Many of the assets that we've spoken about and displayed

14  for the jury came from Mr. McWherter and Mrs. McWherter; is

15  that correct?

16  A.   Yes, sir.

17  Q.   Were there assets seized as well from Mr. Hale?

18  A.   Yes, sir.

19  Q.   Trailers?

20  A.   Yes, sir.

21  Q.   A truck?

22  A.   Yes, sir.

23  Q.   A Camaro?

24  A.   Yes, sir.

25  Q.   In fact, that black Camaro that was depicted alongside the

November 29, 2016

1   restored 1967 Camaro, the silver Camaro registered to Alicia

2   White, that black Camaro, was that Camaro titled to Mr. Hale?

3   A.   It was.

4   Q.   And seized?

5   A.   Yes.

6   Q.   Did Mr. McWherter and Mr. Hale describe D and Shoun as

7   having any significant assets?

8   A.   Yes, sir.

9   Q.   Cars?

10  A.   Yes.

11  Q.   Residences?

12  A.   Yes.

13  Q.   Where, in approximately what cities, did Mr. McWherter and

14  Mr. Hale describe D as having residences?

15  A.   D was associated per their statements with Detroit,

16  Michigan; Phoenix, Arizona; Los Angeles, California; and

17  Atlanta, Georgia.

18  Q.   And from the information that Mr. McWherter and Hale

19  provided about D and Shoun having cars as significant assets,

20  where or in approximately what cities did Mr. McWherter and Mr.

21  Hale describe D as having his cars?

22  A.   Detroit, Los Angeles, and Atlanta.

23  Q.   Did the investigation bear that out?

24  A.   It did.

25  Q.   Through the investigation, did you identify a Lamborghini

November 29, 2016

1   Murcielago purchased in Indiana associated with D?

2   A.   Yes, sir.

3   Q.   Approximately how much do they cost?

4   A.   Lamborghini Murcielago $320,000.

5   Q.   Whose name was it purchased?

6   A.   Sandria White.

7   Q.   When Mr. McWherter and Mr. Hale were describing particular

8   assets associated with D, was that one of the vehicles they

9   described?

10  A.   It was.

11  Q.   Do you remember what they said about that vehicle?

12  A.   They were very much impressed.  It's one of the higher end

13  Lamborghini models.

14  Q.   Did they say what happened to that Lamborghini?

15  A.   That Lamborghini was totaled as a result of an accident.

16  Q.   That's what Mr. McWherter and Mr. Hale told you?

17  A.   Yes, sir.

18  Q.   Did they give you an idea of where that occurred?

19            MR. JORDAN:  Your Honor --

20            THE COURT:  Yes.

21            MR. JORDAN:  Objection.  Relevance.  Again, I don't

22   believe any of this is --

23            THE COURT:  Yeah.  I think that's sustained.

24  BY MR. GILMER-HILL:

25  Q.   Through your investigation, did you identify another

November 29, 2016

1    Lamborghini purchased by D?

2    A.   Yes, sir.

3    Q.   Where was that purchased?

4    A.   Car dealership in Atlanta, Georgia.

5    Q.   And whose name was it purchased?

6    A.   Greg Johnson.

7    Q.   Did you obtain the records of these cars from the

8    respective dealerships?

9    A.   Yes, sir.

10   Q.   And the respective sales people from those dealerships?

11   A.   Yes, sir.

12   Q.   What's the first name of the salesperson at the Indiana

13   dealership from which the Lamborghini Murcielago was purchased?

14   A.   It's Shadi, S-H-A-D-I.

15   Q.   Does he have a nickname?

16   A.   Shawn.

17         THE COURT:  What was it?  I'm sorry.

18         THE WITNESS:  Shawn.

19   BY MR. GILMER-HILL:

20   Q.   What about the name of the salesman at the dealership in

21   Atlanta?

22   A.   Chris.

23   Q.   Was a 2008 Porsche Cayenne one of the cars owned by D that

24   was identified through the investigation?

25   A.   Yes, sir.

1    Q.   A 2009 Porsche Cayenne?

2    A.   Yes, sir.

3    Q.   A 2009 Porsche 911 Turbo?

4    A.   Yes, sir.

5    Q.   Do you know from where those three vehicles were

6    purchased?

7    A.   I believe those were all the Jim Ellis Atlanta based

8    Porsche dealership.

9    Q.   Same salesman?

10   A.   Yes, sir.

11   Q.   What about a 2010 Porsche Panamera Turbo?  Did you

12   discover information about a 2010 Porsche Panamera Turbo that

13   was associated with D?

14   A.   Yes, sir.

15   Q.   Is that a vehicle that Mr. McWherter or Mr. Hale provided

16   specific information about?

17   A.   Yes, sir.

18   Q.   They remembered that car being associated with D?

19   A.   Yes.

20   Q.   From where was that car purchased by D?

21   A.   I believe that was Jim Ellis.

22   Q.   What about a restored high performance 1967 Chevy Camaro?

23   Did Mr. McWherter and Mr. Hale provide any statements

24   associating that vehicle with D?

25   A.   Yes.

November 29, 2016

1    Q.   What did they say?

2    A.   D had mentioned it to them.  It needed some engine work,

3    some bodywork, and then some customization and he asked for

4    their assistance in making that all happen.

5    Q.   Did Mr. McWherter and Mr. Hale indicate whether that was

6    why the 1967 Camaro that was seized from their shop was, in

7    fact, in their shop?

8    A.   Yes, sir.

9    Q.   And what about a high performance 2008 Dodge Challenger?

10   Was such a vehicle found to be associated with D?

11   A.   Yes, sir.

12   Q.   Where was that vehicle purchased?

13   A.   Dupont Motors.

14   Q.   And where is Dupont motors?

15   A.   Marysville, Indiana.

16   Q.   Is that the same dealership in Indiana we were talking

17   about before?

18   A.   Yes, sir.

19   Q.   Salesman by the nickname of Shawn?

20   A.   Shawn, yes, sir.

21   Q.   How about a Town and Country minivan?  Did you find a Town

22   and Country minivan that was associated with D?

23   A.   Yes, sir.

24   Q.   Let me back up a step.  That 2008 Dodge Challenger that

25   was associated with D and purchased from Dupont Motors, in

November 29, 2016

1    whose name was it purchased?

2    A.   Tashun White.

3    Q.   Was that vehicle titled?

4    A.   Yes, it was.

5    Q.   In what state was it titled?

6    A.   I have to review that for accuracy.  I believe Michigan.

7    Q.   The Chevy Camaro you've already spoken about in terms of

8    its title, that minivan you were just talking about, the Town

9    and Country minivan --

10   A.   Yes.

11   Q.   Was that vehicle titled in Michigan?

12   A.   It was.

13   Q.   In whose name was that vehicle titled?

14   A.   Gwendolyn White.

15   Q.   Who's Gwendolyn White?

16   A.   Cousin to Derrick.

17   Q.   What about a 1994 Ford Windstar, was such a vehicle found

18   to be associated with Derrick?

19   A.   Yes.

20   Q.   Did Mr. McWherter and Mr. Hale provide you specific

21   information about that vehicle and how it was associated with

22   Derrick?

23   A.   Yes, sir.

24   Q.   Which -- did they both provide the information or one of

25   them?

1    A.    McWherter told us about the Windstar.

2    Q.    What did Mr. McWherter tell you about the Windstar?

3    A.    Early on when he got to know White, White brought that to

4    him and asked that a hidden compartment be installed in the

5    vehicle.

6    Q.    Based upon the information that Mr. McWherter provided,

7    were you able to identify the vehicle sufficiently to track

8    down its title history?

9    A.    Yes, sir.

10   Q.    In whose name was that vehicle registered?

11   A.    Alicia White.

12   Q.    How were you able to track down that vehicle?

13   A.    Query in a State of Michigan database for vehicles

14   registered to and that was discovered as a result of the

15   search.

16   Q.    Do you know what happened to that vehicle?

17   A.    Yes.

18   Q.    What happened to that vehicle?

19   A.    It's since been scrapped, salvaged.

20   Q.    So in addition to Derrick, at least one of his family

21   members was associated with many, if not each of these

22   vehicles?

23   A.    Yes, sir.

24   Q.    That was the case as to the Lamborghini?

25   A.    Yes, sir.

1    Q.    The Town and Country we just spoke about?

2    A.    Yes, sir.

3    Q.    That Town and Country, you've already mentioned that Mr.

4    McWherter had said that he was asked by D to put a trap in that

5    vehicle.  Did Mr. McWherter say whether he had done so?

6    A.    He did not mention the Town and Country as being a vehicle

7    --

8    Q.    I'm sorry.  I misspoke.  The -- not the Town and Country.

9    The --

10    A.    Windstar.

11    Q.    Yes.  The Windstar that Mr. McWherter I've mentioned to

12    you as being a vehicle that he was asked by D to put the trap

13    into, did Mr. McWherter indicate whether he did so?

14    A.    He did.

15    Q.    The Town and Country minivan in the name of Gwendolyn

16    White, did you have an opportunity to search that vehicle?

17    A.    I did.

18    Q.    Did you find anything of significance in your search of

19    that vehicle?

20    A.    It also had a hidden compartment.

21    Q.    How did you come to locate and search that vehicle?

22    A.    That vehicle was seized pursuant to a search warrant at

23    Derrick White's residence October 2015.

24    Q.    And where was the vehicle at that time?

25    A.    It was parked in the assigned parking space for Derrick's

November 29, 2016

```
 1   apartment within his building.
 2   Q.   As to the remaining four vehicles from what we talked
 3   about, you mentioned that the Lamborghini Gallardo was titled
 4   in the name of Hanky, Greg Johnson, correct?
 5   A.   Yes, sir.
 6   Q.   The minivan was titled in the name of Gwendolyn White?
 7   A.   Yes, sir.
 8   Q.   The Ford Windstar and the Chevy Camaro were both titled in
 9   the name of Alicia White?
10   A.   Yes, sir.
11   Q.   Approximately how old is Alicia White, if you know?
12   A.   I'd put her in her late 60's.
13   Q.   So setting those aside, as to the remaining vehicles that
14   we talked about as being specifically associated with Mr. White
15   by McWherter and Hale, one of those was the Porsche Panamera?
16   A.   Yes, sir.
17   Q.   And that Dodge Challenger, did Mr. McWherter or Mr. Hale
18   make any statements to you directly associating the Dodge
19   Challenger with Derrick?
20   A.   Yes, sir.
21   Q.   So as to the Porsche Panamera, the Dodge Challenger, in
22   the course of your investigation, did you discover whether they
23   had been insured?
24   A.   Yes, sir.
25   Q.   Were they insured in Michigan?
```

1    A.   Yes, sir.

2    Q.   In addition to the Porsche Panamera and the Dodge

3    Challenger, was there a 2008 Porsche Cayenne that was

4    associated with Derrick White through your investigation?

5    A.   Yes, sir.

6    Q.   Was there a 2009 Porsche Cayenne associated with Derrick

7    White through your investigation?

8    A.   Yes, sir.

9    Q.   As to all four of those vehicles, were all four of those

10   insured?  Were all four of those insured?

11   A.   Yes, sir.

12   Q.   Who insured them?

13   A.   Under Tashun White.

14   Q.   Did you obtain the insurance records from those vehicles?

15   A.   Yes, sir.

16   Q.   From what company were they insured?

17   A.   Ameriprise.

18   Q.   Let me back up for just one hot moment.  That Chevy

19   Camaro, the 1967 Chevy Camaro that we talked about titled in

20   the name of Alicia White.

21   A.   Yes, sir.

22   Q.   When it was seized by law enforcement, were there any

23   notices provided?

24   A.   There were.

25   Q.   And what type of notices were provided?

1    A.   As with any seizure, we're required to notify anyone that

2    may have an interest in the property.  For a vehicle, for

3    instance, it could be the driver at the time, the registered

4    owner, maybe other occupants or people that claim to have an

5    interest.

6    Q.   And so to whom was the notice about the seizure provided?

7    A.   Through certified mail.  It would have been to Derrick

8    White and also the registered owner, Alicia White.

9    Q.   And was the seizure of the restored classic Camaro

10   contested?

11   A.   It was not.

12   Q.   No claims were filed?

13   A.   None.

14   Q.   None by Derrick White or Alicia White?

15   A.   No.

16   Q.   So following from your investigation following up on the

17   information provided by Mr. McWherter and Mr. Hale, did you

18   obtain an indictment?

19   A.   Yes, sir.

20   Q.   Did you obtain an indictment for several people?

21   A.   Yes, sir.

22   Q.   Did you obtain a -- well, one of those people being

23   Derrick White?

24   A.   Yes, sir.

25   Q.   Did you obtain arrest warrants?

November 29, 2016

1   A.   I did.

2   Q.   Did you obtain an arrest warrant for Derrick White?

3   A.   Yes, sir.

4   Q.   And did you obtain search warrants?

5   A.   Yes, sir.

6   Q.   Did you obtain search warrants for locations associated

7   with Derrick White?

8   A.   Yes, sir.

9   Q.   Was one of those locations an apartment?

10  A.   Yes, sir.

11  Q.   And the other location -- was there a second location

12  associated with Derrick White for which you obtained the search

13  warrant?

14  A.   Three financial locations, safe deposit boxes.

15  Q.   Was there a search for a house on Caledonia?

16  A.   Yes, sir.

17  Q.   Was that house on Caledonia associated with Derrick White?

18  A.   It was.

19  Q.   Who lived at the house on Caledonia associated with

20  Derrick White?

21  A.   His mother, Alicia White.

22  Q.   In the course of your investigation, did you review the

23  financial background as to the house on Caledonia?

24  A.   I did.

25  Q.   In the course of your investigation, did you review how

November 29, 2016

1    the house on Caledonia was purchased?

2    A.   Yes, sir.

3    Q.   How was the house on Caledonia purchased?

4    A.   It was purchased with a cashier's check.

5    Q.   Who purchased the house on Caledonia?

6    A.   Sandria White.

7    Q.   Who's Sandria White?

8    A.   Derrick's sister.

9    Q.   Did you review banking records associated with that

10   cashier's check?

11   A.   Yes, sir.

12   Q.   Have there been any cash deposits made in the account --

13   let me strike that.  Let me back up.  So Alicia White purchased

14   the house.  How did it -- was the house -- I'm sorry.  Sandria

15   White, I believe you testified, purchased the house?

16   A.   Yes, sir.

17   Q.   And utilized a cashier's check?

18   A.   Yes, sir.

19   Q.   At approximately -- do you remember approximately what

20   year it was that the house was purchased?

21   A.   2009.

22   Q.   And when you executed the search warrant of the house, was

23   it still titled to Sandria White?

24   A.   It was not.

25   Q.   To whom was it titled at that time?

```
 1   A.   It was titled to Alicia White.

 2   Q.   How did it come to be -- can you summarize for us the

 3   transfer to Alicia White?

 4   A.   Sure.  Early 2009, Sandria acquired Caledonia for a little

 5   over $30,000.  Late 2011, it was deeded to Alicia White for

 6   $100.

 7   Q.   Going back to the apartment that you mentioned associated

 8   with Derrick White that had a search warrant, that apartment

 9   was searched?

10   A.   It was.

11   Q.   And was Derrick White arrested at the time of the

12   execution of that search warrant?

13   A.   Yes, sir.

14   Q.   I believe you mentioned earlier that was in October?

15   A.   Yes, sir.  2015.

16   Q.   October 2015?

17   A.   Yes, sir.

18            THE COURT:  Mr. Gilmer-Hill, I don't know if this is

19   a good time to take a break, but we're going to need to stop

20   in a minute or two anyway.  Is this -- are you close to

21   finishing this section?

22            MR. GILMER-HILL:  Yes.  Literally a minute or two or

23   five minutes?

24            THE COURT:  You know, we better -- maybe we just

25   better stop here.  For the jury, we're going to take a little
```

November 29, 2016

```
 1    bit longer of a break.  I have a matter at one o'clock that
 2    will take about 45 minutes.  If for any reason some of the
 3    lawyers are running late, we'll just try to get started -- you
 4    all need a break.  Never mind.
 5         If they're running -- I'll be in touch with you.  But
 6    it will be -- let's assume that you've got a lunch break for
 7    an hour and a half today.  We're going to try to avoid that.
 8    But I can't see a way around it for today.  So if I'm done
 9    early, I'll get you as soon as I'm done after the one o'clock
10    hearing.  Okay.  All right.  Sorry to interrupt your flow
11    there.  All right.  So please rise for the jury.
12                        (Jury Out)
13         THE COURT:  So let's assume 1:45.
14         MR. GILMER-HILL:  Do we need for the --
15         THE COURT:  If you can just move things to the side
16    but otherwise you'll be here.
17                      (Brief Recess)
18              (Morning Proceedings Concluded)
19                -         -         -
20
21
22
23
24
25
```

November 29, 2016

1        <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2             I, Jeseca C. Eddington, Federal Official Court

3    Reporter, in and for the United States District Court Eastern

4    District of Michigan, appointed pursuant to provisions of Title

5    28, United States Code, Section 753, do hereby certify the

6    foregoing 99 pages are a true and correct transcript of the

7    proceedings had in the matter of UNITED STATES OF AMERICA

8    versus TASHUN YVONNE WHITE, Case No. 15-20040 held on November

9    29, 2016.

10

11   <u>/s/ JESECA C. EDDINGTON</u>                      <u>5/10/2016</u>
     Jeseca C. Eddington, RDR, RMR, CRR, FCRR          Date
12   Federal Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25