UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                        SOUTHERN DIVISION

UNITED STATES OF AMERICA

                    Government.

        v.                          Case No. 15-20040


TASHUN WHITE,


                    Defendant.

_____/

        JURY TRIAL PROCEEDINGS - AFTERNOON SESSION

                        VOLUME 2

            BEFORE the HONORABLE JUDITH E. LEVY
                United States District Judge
            110 US Courthouse & Federal Building
                    200 W. Liberty Street
                  Ann Arbor, Michigan 48104
                  Thursday, November 29, 2016


APPEARANCES:

        CARL GILMER-HILL
        Assistant United States Attorney
        211 W. Fort Street
        Detroit, MI 48226
        On behalf of the Government.

        CARL L. JORDAN
        26677 W. 12 Mile Road
        Southfield, MI 48034
        On behalf of the Defendant.



To Obtained a Certified Transcript:
Carol S. Sapala, RMR, FCRR
313.671.7945
www.transcriptorders.com

                    Usa v White  15-20040

C O N T E N T S

_____

IDENTIFICATION                                    PAGE


WITNESSES

JEFFREY CAMPBELL  (continuing)

Direct Examination by Mr. Gilmer-Hill        128
Cross Examination by Mr. Jordan              144


SEPARATE RECORD                              208

IN CAMERA SEALED RECORD (in separate volume)


Certificate of Court Reporter               227

Jury Trial 11-29-16

E X H I B I T S

_____

IDENTIFICATION                    MARKED      RECEIVED

None Marked, Offered or Received

Jeffrey Campbell-Direct Exam/Mr.Gilmer-Hill (cont.)

1           Detroit, Michigan

2           November 29, 2016

3           2:05 p.m.

4

5           (Whereupon the jury was brought out

6            in the courtroom at 2:05 p.m.)

7

8           THE COURT:  Thank you, members of the jury.  I

9  apologize for the break lasting longer then I thought.

10     We have Agent Campbell on the witness stand, he's

11  still under oath from before.

12           THE WITNESS:  Yes, Your Honor.

13           DIRECT EXAMINATION (continuing)

14  BY MR. GILMER-HILL:

15  Q    Thank you.

16     Agent Campbell, I believe just before the break you

17  had begun to comment on the execution of an arrest

18  warrant and search warrant with regard to Derrick White

19  at an apartment.  Is that correct?

20  A    Yes, sir.

21  Q    And where was the apartment located?

22  A    432 South Washington, Royal Oak, Michigan,

23  Apartment 1302.

24  Q    And I believe you also indicated the date we're

25  talking about was the arrest on October 3, 2015?

Usa v White  15-20040

Jeffrey Campbell-Direct Exam/Mr.Gilmer-Hill (cont.)

1   A     Yes, sir.

2   Q     And that was the date of Derrick White's arrest?

3   A     Yes, sir.

4   Q     And on that date, when you searched Derrick White's

5   apartment, could you tell us, give us an idea what did

6   you find?

7   A     Derrick White was located and arrested in the

8   apartment detailed search of the apartment led to a

9   seizure of bulk cash and high end assets to include

10  jewelry, keys to three different vehicles, two vehicles.

11  Q     So with regard to the jewelry, do you have an idea

12  as to the approximate value of the jewelry you seized

13  from Derrick White's apartment?

14  A     The jewelry, just from his apartment, was appraised

15  over numerous hundreds of thousands of dollars in value.

16  Q     And did you -- you mentioned some keys.

17        You mentioned some vehicle, keys?

18  A     Yes, sir.

19  Q     Were there any other keys that were found at the

20  apartment?

21  A     Keys to a safe deposit box were found hidden in

22  couch cushions.

23  Q     And so -- along with executing the search warrant

24  on the apartment was there a search done of that safety

25  deposit box?

Jeffrey Campbell-Direct Exam/Mr.Gilmer-Hill (cont.)

1    A    There was.

2    Q    Were there other safety deposit boxes that were

3    associated with Mr. White?

4    A    Yes, sir.

5    Q    Did you search those as well?

6    A    We did.

7    Q    Where were the -- what states were the safe deposit

8    boxes located?

9    A    Two were in Michigan one was in California.

10   Q    And, approximately, where in California?

11   A    Los Angeles.

12   Q    The Los Angeles area, metropolitan Los Angeles?

13   A    Yes, sir.

14   Q    So between the safety deposit boxes in Michigan and

15   Derrick White's apartment -- well, what was found in the

16   safety deposit boxes in Michigan?

17   A    First one was still in his name still paid for

18   up-to-date, it was found to be empty.

19        The second one which was searched pursuant to a

20   search warrant after locating the keys hidden in the

21   couch we seized jewelry, high end jewelry, which

22   appraised around $500,000.

23   Q    Was that in combination with the jewelry taken from

24   the house?

25

Jeffrey Campbell-Direct Exam/Mr.Gilmer-Hill (cont.)

1    A    Separately.

2    Q    Did the jewelry that was seized from Mr. White

3    include watches?

4    A    Yes, sir.

5    Q    Did it include necklaces?

6    A    Yes, sir.

7    Q    Pendents?

8    A    Yes.

9    Q    You indicated that there were keys seized, keys to

10   automobiles that were seized from Derrick White's

11   apartment.

12       Could you tell us was one of the -- were there keys

13   for the vehicle you described earlier in your testimony

14   as being parked in a parking space for Derrick White's

15   apartment?

16   A    Yes, sir, the town and country.

17   Q    That was the vehicle that had a trap in it?

18   A    Yes, sir.

19   Q    You mentioned bulk cash.

20   A    Yes.

21   Q    Approximately, how much money in cash was seized

22   from Derrick White's apartment?

23   A    Approximately, $2.6 million.

24   Q    Did you also seize any real estate paperwork?

25

Jeffrey Campbell–Direct Exam/Mr.Gilmer–Hill (cont.)

1    A    Yes, sir.

2    Q    What was the nature of the real estate paperwork

3    that was seized from Derrick White's apartment?

4    A    It was in the name of Ace Five Properties, a

5    business that Derrick had started and totaled,

6    approximately, 20 what appeared to be investment

7    properties throughout the Detroit Metropolitan area.

8    Q    Were you able to ascertain -- well, beyond the

9    paperwork, did you follow up with regard -- did you

10   further investigate the information referenced in the

11   paperwork referencing these properties in the Detroit

12   area?

13   A    Yes, sir.

14   Q    And through your investigation, were you able to

15   ascertain, approximately, when Derrick White's company

16   is five investments had acquired these properties?

17   A    I believe it was, approximately, one month before

18   the search warrant which was in October 2015.

19   Q    So a month before sometime around September?

20   A    Yes, sir.

21   Q    Sir, if you would please draw your attention to the

22   exhibit book, I'd like to quickly run us through some of

23   the images depicted in the exhibit book.

24        MR. GILMER-HILL:  I believe, Your Honor, these

25   items have already been admitted; is that correct?

Jeffrey Campbell-Direct Exam/Mr.Gilmer-Hill (cont.)

1          THE COURT:  Yes.

2    BY MR. GILMER-HILL:

3    Q    So publishing -- drawing your attention first to

4    Exhibit 1C1.

5          Could you tell us is that an item seized from

6    Derrick White's apartment?

7    A    Yes, sir.

8    Q    What is it?

9    A    It's material used to package narcotics or drug

10   proceeds, it's rubber bands, vacuum seal bags in the

11   heat-sealed vacuum sealer machine.

12   Q    What's C2?  Show us what's depicted there.

13   A    Here we're standing in the kitchen of Derrick's

14   apartment and the white cabinets are the face of the

15   kitchen island.

16        Underneath the bottom of the picture you'll see a

17   black boot directly in front of that it's a silver bar

18   that's the toe kick which was affixed to the island.

19        We had a canine alert positive to the odor of

20   narcotics on that island and we removed the kick plate

21   and removed from underneath the island which stood on

22   about four-inch legs were those bundles and boxes and

23   bags ahead of that toe kick.

24   Q    Those items being -- looks like a green bag, a

25   white bag, a not container wrapped?

Jeffrey Campbell-Direct Exam/Mr.Gilmer-Hill (cont.)

1   A     It's actually a like blue fleece container.

2   Q     And what was contained within those containers?

3   A     Approximately, $400,000 cash.

4   Q     Draw your attention to 1C3.

5         What's depicted in 1C3?

6   A     This is packaging being removed from the cash as it

7   sits on top of the kitchen island.

8   Q     Okay.  These packages you indicate were removed

9   from underneath the island where they were concealed?

10  A     Yes, sir.

11  Q     Correct?

12        Did you discover currency in plain view in the

13  apartment?

14  A     Yes, sir.

15  Q     Drawing your attention to 1C4, could you tell us

16  what's depicted in 1C4?

17  A     Cash, Cayenne watch, numerous telephones.

18        This is on an ottoman in the living room.

19  Q     And when you say "cash", you're referring to looks

20  like three separate bundle or wads of cash?

21  A     Yes, sir.

22  Q     And at least as to the center bundle, could you

23  tell us -- well, looks like it was bundle of $100 bills?

24  A     Well, the first one's at least a hundred.

25

Jeffrey Campbell-Direct Exam/Mr.Gilmer-Hill (cont.)

1   Q     Good enough.   1C5.

2   A     Bag located in the apartment containing cash.

3   Q     1C6?

4   A     In the ottoman, a paper bag containing cash.

5   Q     1C7?

6   A     Excuse me, not the ottoman.  This is a couch in the

7   living room.  Flip the armrest, cash inside.

8   Q     And 1C8?

9   A     This is going to be the accumulation of cash that

10  we seized from his apartment on that day, approximately,

11  $2.6 million in evidence bags.

12  Q     Keep going then 1C9?

13  A     This will be the night stand in his bedroom next to

14  the bed where he was located when we executed the search

15  warrant it's a high end watch his primary telephone and

16  a necklace with a gold pendent.

17  Q   1C10, is that a closer up view, picture, of that

18  same watch?

19  A     Yes, sir.

20  Q     And on the -- what's that on the front -- on the

21  front of the watch face of the watch circling the watch?

22  A     Appears to be diamonds surrounding the face of the

23  watch.

24  Q     1C11.

25

Jeffrey Campbell-Direct Exam/Mr.Gilmer-Hill (cont.)

1    A    It's going to be from the night stand as well

2    that's the solid gold chain necklace pendent.

3    Q    1C12?

4    A    Diamond encrusted pendent found in the apartment.

5    Q    1C13, these additional items seized from the

6    apartment?

7    A    Yes, sir.

8    Q    Yet different watches?

9    A    Each different, yes.

10   Q    And, yet, different from the earlier watch that we

11   were just discussing in 1C10, correct?

12   A    Yes, sir.  This is the first time we're seeing any

13   of these items.

14   Q    1C14?

15   A    That's going to be the safe deposit box.

16        Keys were located inside of this Fifth Third Bank

17   bank envelope between the couch cushions which the

18   envelope is sitting on.

19   Q    Backing up a step as to the watches and jewelry.

20        Were any of those items found in just out in the

21   open plain view in the apartment?

22   A    Some were, yes.

23   Q    More than just that first single watch?

24   A    Yes, sir.

25

Jeffrey Campbell-Direct Exam/Mr.Gilmer-Hill (cont.)

1   Q    1C15?

2   A    So this is the contents of the bag that was

3   recovered from the couch.

4   Q    And what's -- what were contents of the envelope --

5   you say "bag."

6        Are you referring to the Fifth Third envelope?

7   A    Yes, sir.

8        Two identical safe deposit box keys.  The one on

9   the left is stamped 420.  It was a safe deposit box 420

10  at Fifth Third bank in Royal Oak.

11  Q    Is that -- was that one of the safe deposit boxes

12  that were searched?

13  A    Yes, sir.

14  Q    1C16?

15  A    This is packaging that contained the jewelry, some

16  jewelry.

17  Q    1C17.  I'm sorry.  1C18.

18  A    So, yes.  Contents of the safe deposit box

19  utilizing the box 420 key.

20  Q    And?

21  A    More of the same box 420.

22  Q    That's 1C18.  And 1C19.

23  A    More of the same.

24  Q    Let's, let's move ahead a bit.

25

Jeffrey Campbell-Direct Exam/Mr.Gilmer-Hill (cont.)

1        How about 1C22.

2   A    Gold chain and pendent from Box 420.

3   Q    And 1C24?

4   A    I don't know if that's gold, but precious minerals

5   chain and pendent.

6   Q    Was that a piece of jewelry that came out of the

7   safe deposit box?

8   A    Box 420.  Yes, sir.

9   Q    And do you see a date and information that's

10  inscribed on that pendent?

11  A    Yes, sir.

12  Q    What does it says?

13  A    It's date -- two dates are on it followed by RIP in

14  the bottom with religious cross in the middle.

15  Q    Dates, 10-2-70 and the bottom is 2-10-10.  1C25.

16  A    Previous ones on the left and then one we've seen

17  for the first time on the right.

18  Q    More jewelry from the safe deposit box?

19  A    Yes, sir.  Box 420.

20  Q    1C27 does that fairly depict the number of watches

21  and pendent that came from the safety deposit box?

22  A    Yes, sir.

23  Q    And those are separate from the watches and jewelry

24  that came from the apartment, correct?

25

Jeffrey Campbell-Direct Exam/Mr.Gilmer-Hill (cont.)

1    A    Yes, sir.

2    Q    You mentioned earlier we talked about watches,

3    jewelry, necklaces, keys, anyways -- I believe -- in

4    fact, one of the earlier pictures you mentioned a

5    personal telephone or primary cell phone of Derrick

6    White?

7    A    Yes, sir.

8    Q    Were there any other cell phones seized from

9    Derrick White's apartment?

10   A    Yes, sir.

11   Q    More than one?

12   A    Oh, yes.

13   Q    Draw your attention to 1C28.

14   A    This is one evidence exhibit and also just a

15   portion of the cell phones that were seized from his

16   apartment.  This is out of one drawer in the kitchen.

17   Q    1C29.

18   A    That's affixed to the back of one of the telephones

19   and appears to what would have been telephone number

20   associated with that device.

21   Q    When you say that's affixed, are you referring to a

22   label with telephone number written on it?

23   A    Yes, sir.

24   Q    Have you encountered instances like this in the

25   course of your experience investigating drug offenses?

Jeffrey Campbell-Direct Exam/Mr.Gilmer-Hill (cont.)

1  A    Yes, sir.

2  Q    Turning your attention to 1C30.

3       What's depicted there?

4  A    That's a security save in the walk in closet to

5  Derrick White's apartment.

6  Q    So is that when you say in a closet, is that in a

7  bedroom?

8  A    Yes.  It was a one bedroom unit and Derrick

9  utilized that bedroom.  This is the attached to the

10 walk-in closet.

11 Q    And a safe inside of the walk-in closet?

12 A    Yes, sir.

13 Q    Were you able to access the safe?

14 A    Yes.

15 Q    What came out of the safe?

16 A    Approximately, $2.2 million in cash.

17 Q    A portion of was a portion of that what was

18 depicted in the earlier exhibit that we looked at with

19 the items that came from underneath the kitchen island

20 and from other points in the apartment 1C8?

21 A    Yes.  This would have been combined with one of

22 those cumulative photos one we showed from all the money

23 seized from the apartment.  Yes, sir.

24 Q    Okay.  So 1C8.

25

Jeffrey Campbell-Direct Exam/Mr.Gilmer-Hill (cont.)

1      1C8 is an accumulation of all cash came from the

2    apartment?

3    A    Yes, sir.

4    Q    So as to that save were you -- was there -- well,

5    what's depicted in 1C31?

6    A    It wasn't found like this when we opened the door.

7         But upon removing the 2.2 million approximate cash

8    we found a receipt located at the bottom of the safe

9    underneath all of the cash.

10   Q    And, sir, obviously, the safe is depicted in this

11   exhibit is -- does not contain the cash, correct?

12   A    Correct.

13   Q    When -- did you see the safe when it did contain

14   the cash that came out of it?

15   A    Photograph of the safe once the door's initially

16   opened.

17   Q    Can you describe what the safe looked like when it

18   was filled with cash?

19   A    Yes.  It was described as being so full that you

20   couldn't fit another bill in there because it was

21   stuffed and packed and it was difficult to initially

22   start to remove the cash to get your fingers in there to

23   be able to pull it out.

24   Q    And drawing your attention to 1C32.

25

Jeffrey Campbell-Direct Exam/Mr.Gilmer-Hill (cont.)

1       Is that a copy of the receipt that came out of the

2   bottom of the safe?

3   A    It is.

4   Q    Does it indicate a name on the -- what does it

5   appear to be a receipt for?

6   A    Purchase of the safe $1995 delivery 225 and maybe

7   the upgrade of an electronic lock.

8   Q    So that information from the receipt $2500 safe?

9   A    Yes, sir.  I think it's 2420 with taxes included on

10  that.

11  Q    Does the safe indicate whose save it is?

12  A    Upper left says D which is D White.

13  Q    D White.  Save D White's money who?

14  A    Yes, sir.

15  Q    Turn your attention to 1C33.

16       Are those the car keys -- are those car keys and

17  receipt?

18  A    A portion of it, yes.

19  Q    And you earlier mentioned a Town and Country

20  minivan, correct?

21  A    Yes, sir.

22  Q    Turn your attention to 1C35, please.

23       Is that the van?

24  A    It is.

25

Jeffrey Campbell-Direct Exam/Mr.Gilmer-Hill (cont.)

1  Q    And 1C36.  Is that the license for the van?

2  A    It is.

3  Q    What do images in 1C37 and 138 and 1C39 depict?

4  A    So I'm using a scope camera here.

5       It's a device we use to look into tight areas to

6  handheld display unit.

7       It's affixed to make like an 18-inch cord.

8       At the end of it, it's got a small camera.

9       What I did is, we followed a power cord back to the

10  rear bumper, x-rayed the vehicle and determined that

11  there was some kind of void and suspicious compartment

12  in that area.

13      To view it better, we used a scope camera.  The one

14  on the left depicts in that monitor a long shot view of

15  that trap, the hidden compartment, and the one on the

16  right depicts the piston much as before we looked at the

17  actuator gain access in to the void.

18      When you found the safe and opened its content

19  phoned it actually -- let me back up.

20  Q    Did Derrick White -- was Derrick White present when

21  most of these seizures occurred?

22  A    Yes.

23  Q    Did he react to the cash and jewelry and cell

24  phones and car keys being seized from his apartment?

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   A     He did.

2   Q     How did he react?

3   A     The cash and the safe.  Initially he claimed he

4   didn't even know the safe was in there.

5       Cash underneath the island claimed to have no

6   knowledge, disappointed that he missed it when he moved

7   on because the previous tenant left it there.

8       The car keys; he accounted for those vehicles as

9   being his.

10      Phones were his, but couldn't explain why he had so

11  many.

12  Q   Did you -- did you inquire of Mr. White about the

13  location of any other vehicles?

14  A     Yes, sir.

15  Q     Did Mr. White provide information that allowed you

16  to locate any other vehicles?

17  A     Did not.

18          MR. GILMER-HILL:  No further questions at this

19  time, Your Honor.

20          THE COURT:  Okay.  Mr. Jordan, do you have any

21  cross examination?

22          MR. JORDAN:  Thank you, Your Honor.

23                  CROSS     EXAMINATION

24  BY MR. JORDAN:

25  Q   Good afternoon, Agent Campbell.

Usa v White  15-20040

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   A     Good afternoon, sir.

2   Q     Agent Campbell, how long have you been an officer?

3   A     With the DEA?

4   Q     Just an officer in general.

5   A     I've been in law enforcement since 2002.

6   Q     So about 14 years?

7   A     Yes, sir.

8   Q     And have you always been with the Drug Enforcement

9   Agency?

10  A     Have not.

11  Q     Who were you with prior?

12  A     City of Wixom Police Department.

13  Q     Did you, as a City of Wixom Police Officer, did you

14  investigate drug crimes there as well?

15  A     Yes.

16  Q     Okay.  Probably nothing as big as this case,

17  though, right?

18  A     No, sir.

19  Q     When did you go to DEA?

20  A     September 2008.

21  Q     So you've been with the DEA now for about eight

22  years?

23  A     Yes, sir.

24  Q     And when your investigation of Derrick White

25  started, that would have been what year?

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1    A    2010.

2    Q    And all of this started with the stop of McWherter

3    and Hale?

4    A    No, sir.

5    Q    Well, with some information about McWherter and

6    Hale, correct?

7    A    Yes, sir.

8    Q    Then that led to their being stopped and

9    essentially that got the ball rolling; would that be

10   fair to say?

11   A    Yes, sir.

12   Q    Now when you went to work for the DEA, obviously,

13   you'd already had some law enforcement experience or

14   training, but they probably sent you to do some more

15   training.  Correct?

16   A    Yes, sir.

17   Q    And so you learned how to investigate drug

18   trafficking and high level drug dealing; would that be

19   fair to say?

20   A    Yes, sir.

21   Q    And as far as sophistication of this particular

22   operation involving Mr. White, it would be pretty

23   sophisticated; would that be fair to say?

24   A    Yes.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1  Q     How many people were actually involved with this

2  operation?

3  A     From the onset?

4  Q     Yes.

5        There was Mr. White himself, correct?

6  A     I see.  I thought you meant on the investigative

7  side as far as their organization.

8  Q     I'll go through it.

9        Mr. White, McWherter, Hale, Leshoun.

10       And Leshoun is a man, correct?

11 A     Yes, sir.

12 Q     LaShawn White?

13 A     Leshoun Byrd.

14 Q     And who else?

15 A     From 2010 to what point?  How far ahead?

16 Q     Up until they were indicted, up until the

17 indictments.

18 A     Countless people.  If you want --

19 Q     Let's talk about the people that were on this

20 indictment.

21       Can we talking about the ones on this indictment?

22 Who was on this indictment?

23 A     I'm sorry.  If I can start over?

24 Q     Please do.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   A    Derrick White, Leshoun Byrd, Tashun White, Christi

2   McWherter --

3   Q    I'm sorry.  Christi?

4   A    Christi McWherter, Jimmy McWherter, Nicholas Hale

5   and Gregory Johnson.

6   Q    All of those were on the indictment that Ms. White

7   was on, correct?

8   A    Yes, sir.

9   Q    Now Derrick White's role would it be fair to say

10  was probably the head of this organization?

11  A    Yes, sir.

12  Q    By the way, did this organization have some kind of

13  name?  Did they name themselves something?

14       Sometimes drug traffickers will have, like, I don't

15  know Cheddar Boys or something like that, correct?

16  A    That is correct.

17       And in this instance, nothing was kind of common

18  throughout, though.

19  Q    No formal, okay.

20       So Derrick White was -- would it be fair to say he

21  was probably the head, correct?

22  A    Yes, sir.

23  Q    Who was LaShawn's role?

24  A    Derrick White's right-hand man if you would.  Very

25  close working tightly with Derrick.

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1    Q      Do you ever watch The Sopranos?

2    A      Just parts.

3    Q      They had Tony and they had the right-hand man who

4    was Christopher.

5           In any event, would have been his right-hand man,

6    correct?

7    A      Yes, sir.

8    Q      Then what about Christi McWherter?

9    A      Her role?

10   Q      Yeah.  Is she married to Jimmy McWherter?

11   A      Yes, sir.

12   Q      So was her role kind of along with Jimmy?  She did

13   things along with him?

14   A      Well, she was involved with the money side.

15   Q      Okay.  Be specific.

16          What did she do with the money?  Did she actually

17   transport it to Arizona?

18   A      No, sir.  From memory, I don't know if she left

19   Michigan ever, but located in Michigan, she would handle

20   the drug proceeds.

21   Q      And by the way, you know this from talking to her

22   husband or she admitted this to you herself?

23   A      Both.

24   Q      So Christi would handle the money.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1          What about Jimmy McWherter?

2    A    Jimmy McWherter was in charge of everything.  He

3    had a part in everything; traveling cross country to

4    transport bulk, cash bulk, marijuana, purchase assets.

5    Q    So he was pretty central to this organization;

6    would it be fair to say?

7    A    Yes, sir.

8    Q    Because he actually moved some of the product and

9    he also handled some of the profit, correct?

10   A    Yes, sir.

11   Q    Some of the money.

12   A    Yes, sir.

13   Q    By the way, Christi and Jimmy McWherter, their,

14   their ability to live was based on the proceeds from

15   this operation; wouldn't it be fair to say?

16   A    Yes, sir.

17   Q    Because during that period of time although they

18   had some business -- what was it called P and what

19   engineering?

20   A    They had Prototype Engineering, DeVinci Motors.

21   Q    Prototype and DeVinci Motors, both, would it be

22   fair to say were a front so they could do what they were

23   doing with Derrick, correct?

24   A    Yes, sir.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   Q    As a matter of fact, I think I saw on your

2   transcript that somewhere where the company either, one

3   of them, the most they probably made was what five to

4   $15,000?

5   A    As minimal.  Yes, sir.

6   Q    So let's move on to Nicholas Hale.

7        What was Nicholas Hale's role?

8   A    I would maybe classify him as a right-hand man to

9   Jimmy who did much in the same as Jimmy but not of a

10  significant role as Jimmy.

11  Q    Do you know if Nicholas took direction from Jimmy

12  or did he take direction from Derrick, Leshoun or all

13  three?

14  A    All three.

15  Q    Okay. Nicholas and you described some of his

16  actions.

17       He would leave the state as well, correct?

18  A    Yes, sir.

19  Q    And when he left the state sometimes it would be

20  with either drugs or with money?

21  A    Yes, sir.

22  Q    What about Gregory Johnson, his role?

23  A    He would assist in the Phoenix, Arizona area with

24  obtaining the marijuana and handling the cash for the

25  marijuana in that area.

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1    Q    By the way, Nicholas' role that came directly from

2    Nicholas' mouth.

3         He told you what he had done, correct?

4    A    Among others, yes.

5    Q    Greg Johnson, did he talk about his role as well or

6    did all of his information come from others?

7    A    He didn't sparingly, but primarily others.

8    Q    Now all of these people except for Tashun have

9    plead guilty, correct?

10   A    Yes, sir.

11   Q    When they plead guilty, did they sit down, do like

12   a debriefing, give you even more information what they

13   had done?

14   A    Yeah.  I'm reluctant on one of those to say yes,

15   but they did meet with us.

16   Q    Why are you reluctant on one of those to say yes?

17   Did one not want to talk to you?

18   A    When you say "information," information was

19   provided but it was, again, sparingly.

20   Q    Which person was that?

21   A    Greg Johnson.

22   Q    But, nevertheless, Greg Johnson has plead, correct?

23   A    Yes, sir.

24   Q    All these people that have plead, have they been

25   sentenced or awaiting sentence?

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   A    All awaiting sentencing.

2   Q    Any of these people awaiting sentencing, are any of

3   their sentences going to be based on whether or not they

4   come and cooperate here in court?

5   A    There's a cooperation letter.

6   Q    With who?

7   A    I know for sure Jimmy McWherter and Nicholas Hale.

8   Q    And these cooperation agreements you know how they

9   work based on your experience.

10       If you give cooperating --

11          THE COURT:  Mr. Jordan, just a second.

12       We have somebody who joined us.  We're a court of

13   public record, everyone's welcome to be here.

14       If you're a witness in this case, then we'd ask

15   you -- that you -- okay.  That's all I needed to know,

16   sir.  Go ahead.

17       But Mr. Gilmer-Hill, did you stand up for another

18   reason?

19          MR. GILMER-HILL:  Yes, to object, Your Honor.

20   Objection, speculation and foundation.

21          THE COURT:  Let's see how much he knows about

22   this.  I don't know how much the agent is going to know

23   about this portion of it.

24   BY MR. JORDAN:

25   Q    Agent Campbell, you are the -- are you the primary

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1  agent on this case?

2  A    Yes, sir.

3  Q    So, obviously, you work in tandem with the

4  prosecutor when you are dealing with defendants,

5  correct?

6  A    Yes, sir.

7  Q    Including when it comes time for a defendant to

8  plead guilty if they choose to do so.

9       You still work with the prosecutor, right --

10 A    Yes.

11 Q    -- in terms of sitting down and debrief or getting

12 whatever information, right?

13 A    Yes, sir.

14 Q    You don't want someone to come to court, plead

15 guilty, but lie about what they did, correct?

16 A    Correct.

17 Q    With respect to all of the defendants, all of them

18 are awaiting sentencing, correct?

19 A    Yes, sir.

20 Q    Have all of them sat down and debriefed with you or

21 with somebody from your office?

22 A    Again to an extent, yes.

23 Q    Now in doing these debriefings, did Ms. White's

24 name ever come up with respect to Derrick White when.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   you talked to him?

2   A    I believe it was mentioned by one of the

3   individuals.

4   Q    Which one?

5   A    Greg Johnson.

6   Q    Okay.  And did Greg tell you he ever told

7   Ms. Tashun White to do anything as relates to this

8   enterprise?

9   A    He never indicated that.

10  Q    As a matter of fact, none of these people ever

11  mentioned that they told Tashun White to do anything; is

12  that correct?

13  A    Correct.

14  Q    Now you executed a search warrant at Derrick

15  White's residence, correct?

16  A    Correct.

17  Q    When you execute that search warrant, you don't

18  give somebody a phone call so that they know you're

19  coming.

20       You knock on the door, go in, right?

21  A    Yes, sir.

22  Q    That's what you did here, correct?

23  A    Here for what?

24  Q    When you executed the search warrant for Derrick.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1  A    Yes, sir.

2  Q    In Royal Oak?

3  A    Yes, sir.

4  Q    What time of day or flight was it you went there?

5  A    Approximately, 6:30 a.m.

6  Q    Okay.  Is there a tactical advantage to going that

7  early?

8       You kind of want to catch somebody off guard, don't

9  you?

10  A    Yes, sir.

11  Q    You want to do that for your safety as well as

12  because you don't want that person to hide anything,

13  correct?

14  A    Yes, sir.

15  Q    You also executed a search warrant or perhaps it

16  wasn't a search warrant, but it -- you did go to Tashun

17  White's residence did you not?

18  A    Yes, sir.

19  Q    When you went to Tashun White's residence, did you

20  let her or anybody at that residence know you were

21  coming?

22  A    Before arriving to the house?

23  Q    Yes, sir.

24  A    We did not.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1  Q    So similarly to Derrick, you went there

2  unannounced, correct?

3  A    Yes, sir.

4  Q    Were you actually there when officers went to

5  Ms. Tashun White's residence?

6  A    I was not.

7  Q    Do you know what officers were there?

8  A    Yes, sir.

9  Q    Who are they?

10 A    Well, the primary agent in charge was Officer

11 Mickla (phonetically).

12 Q    Mickla?

13      You went to Derrick White's residence to execute

14 that search warrant, correct?

15 A    Correct.

16 Q    With respect to the -- I don't know if I'd call it

17 a garage, but the place where all those cars were

18 housed.

19      The Camaro, where was that?

20 A    The classic Camaro or the 2010 Camaro were located

21 in the warehouse associated with Jimmy McWherter and

22 Nicholas Hale.

23 Q    When you went to the warehouse, you actually went

24 there, correct?

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   A    Yes, sir.

2   Q    And when you went there, were you part of the first

3   group of officers to go to that location?

4   A    I was not.

5   Q    So officers went there executed -- did they execute

6   a search warrant there?

7   A    Yes, sir.

8   Q    They did that without you, correct?

9   A    Yes, sir.

10  Q    Everything you testified to those officers told you

11  what you had found or you saw subsequent to the search

12  warrant?

13  A    Well, when the search warrant of that warehouse was

14  conducted, it was secured.

15       And prior to anything being labeled or tagged or

16  searched more thoroughly and seized I had arrived.

17  Q    So same day then?

18  A    Yes, sir.

19  Q    Okay.  And all of the things that you testified to,

20  all of the exhibits, all of the things that were of

21  evidentiary value from that warehouse, you took pictures

22  of, correct?

23  A    Yes, sir.

24  Q    And you took into -- you took that into evidence.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1  correct?

2  A    Yes, sir.

3  Q    Similarly with respect to the execution of a search

4  warrant at Derrick's house, you took into evidence

5  anything of evidentiary value, correct?

6  A    Yes, sir.

7  Q    Took pictures and all that, correct?

8  A    Yes, sir.

9  Q    Now with respect to the search of Ms. White's home

10 what was taken into evidence there; anything?

11 A    Tashun White?

12 Q    Yes.

13 A    She refused to give consent to search her home.

14 Q    Are you sure she did not give consent, sir?

15      You were not there, so before you say that she did

16 not, I want to make sure.

17      Are you sure she did not give consent?

18 A    That's what I was told, yes.

19 Q    But you -- you're not -- are you saying she did not

20 or you're not sure?

21 A    I'm saying that I'm sure I was told that she did

22 not give consent to search the home.

23 Q    Okay.  Now if she did give consent to search the

24 home and something of evidentiary value was found

25 certainly you as the lead officer would expect that be

Usa v White  15-20040

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1    taken into evidence, correct?

2    A    Sure.

3    Q    When we say "taken into evidence," I mean the

4    police take it, bag it, all that stuff, right?

5    A    Yes, sir.

6    Q    What was taken from Tashun White's house, bagged

7    taken pictures of that you know of?

8    A    Nothing.

9    Q    Any watches?

10   A    No.

11   Q    Any jewelry?

12   A    Again, we couldn't get to that point because we

13   didn't have permission to search the home.

14   Q    If her home had been searched, you would have

15   expected them to take out any jewelry that might show

16   that she profited from this, correct?

17   A    I mean -- I hesitate because I don't want to be

18   all-encompassing and say a simple watch or simple ring

19   would be seized; it would be something of monetary value

20   that would be consistent.

21          THE COURT:  Mr. Jordan, we have an objection.

22          MR. GILMER-HILL:  Objection, calls for

23   speculation.

24          THE COURT:  That's sustained.  Lay a

25   foundation for what he knows.  He can testify to what he

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1    knows.

2        If he wasn't there, he certainly can't testify to

3    that.  So focus on the things that he knows.

4            MR. JORDAN:  I understand.  May we have a side

5    bar, Your Honor?

6            THE COURT:  Sure.

7        Okay.  Just a minute for our jury.

8            (The following was held at the bench,

9            outside the hearing of the jury)

10           THE COURT:  Carol, this is a test.

11           MR. JORDAN:  He's testifying to what other

12   officers did and he's been doing that throughout the

13   testimony of Mr. Gilmer-Hill.  He did not have personal

14   knowledge of everything he testified for.

15           THE COURT:  That was up to you to object.

16           MR. JORDAN:  I did.  I objected to relevance.

17           THE COURT:  Relevance isn't foundation.

18       Relevance is the material he's talking about,

19   doesn't have to do with this case.

20           MR. JORDAN:  Okay.

21       Judge, I can call the officer if that's what Carl

22   Gilmer-Hill wants me to do.  But, quite frankly -- we

23   can do that.  I'm trying to save time here.

24       I'm just asking --

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1          THE COURT:  To testify to what he knows.

2          MR. JORDAN:  But I think he knows what they

3    found, judge.

4          THE COURT:  What did they find?

5          MR. JORDAN:  They didn't find anything.

6          THE COURT:  He said that.

7          MR. JORDAN:  Right.

8      I was asking if they had found something, they

9    certainly would have tagged it.  I believe that was the

10   objection; wasn't that the objection?

11         MR. GILMER-HILL:  I believe the questions

12   posed by Mr. Jordan two or three were if.

13     Or are you saying she didn't consent you did not

14   search her house?

15     But if, if she had consented what would they have

16   found if she had consented.

17         MR. JORDAN:  Sorry?

18         THE COURT:  I think your question was --

19         MR. GILMER-HILL:  That's speculation.

20         THE COURT:  -- if she had consented and you

21   searched the house and you found something, would you

22   have tagged it.

23         MR. JORDAN:  Yeah.  That's not speculation.

24         THE COURT:  It's not important to the case.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   because none of that happened.

2         MR. JORDAN:  But let me tell you why it's

3   important, because they didn't find any of that value.

4   They did search her house.

5       I'm laying the foundation to argue he didn't find

6   anything.

7         THE COURT:  Let me make sure I understand the

8   facts.

9       She did not consent, they then went, got a search

10  warrant?

11        MR. JORDAN:  I'm sorry.

12      I think in the discovery you will see in the

13  consent I think he's wrong about that, that's why I kept

14  asking questions.

15      Go ahead.  I'm sorry.

16        MR. GILMER-HILL:  Frankly on that particular

17  point as I stand here this afternoon, I would have to go

18  back to whether she consented to the search of her

19  house.  I do know there was no search warrant for her

20  house or anything like that.

21        THE COURT:  She was -- ultimately it was

22  searched.

23        MR. JORDAN:  She's going to testify she

24  consented to a search.

25

Usa v White  15-20040

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1    I believe he can testify they did not find anything

2   as the officer in charge and I believe he can also

3   testify had -- if he found something, they would have

4   tagged it.  That's not speculation.

5           THE COURT:  As long as you lay the foundation,

6   that's fine.

7           MR. GILMER-HILL:  The question that I had

8   objected to was based upon the way it was phrased

9   because it was kind of too far afield not -- if they

10  had -- if she had consented you would have tagged

11  anything that was found.

12          MR. JORDAN:  I'll clean it up, judge.  I'm

13  sorry.

14          THE COURT:  Take it step by step.

15          (The following was held in open court)

16          THE COURT:  I bet you wish we didn't get that

17  fixed.

18      Go ahead, Mr. Jordan.

19  BY MR. JORDAN:

20  Q   My question to you is anyone who is a defendant in

21  a case, if you search that person's residence, you, as

22  an officer, an experienced officer, know that you are

23  going to take anything of evidentiary value, of course,

24  correct?

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   A    Well, again, I've got to pause because drugs can be

2   evidence.

3       But if it's not a drug search warrant, it's a

4   document warrant.  We can't take those without obtaining

5   the proper authorization.

6   Q    Are you familiar, officer, with this particular

7   exhibit book, the exhibit book that you've been

8   referring to?

9   A    Possibly it's the same as this, yes.

10  Q    It is the same.

11  A    Yes.

12  Q    Did you go through this exhibit book prior to

13  testifying today?

14  A    With the documents I was going to speak of, yes.

15  Q    With respect to that exhibit book, is there

16  anything in that exhibit book that comes from Tashun

17  White's house?

18  A    If there is, I would not be aware of it.

19  Q    But you are the officer in charge.

20      Ms. White is standing here charged with something

21  very serious.

22      Certainly if there's any evidence against her you

23  would be familiar with it, would you not?

24  A    Yes.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   Q    What evidence in that book was taken from Tashun

2   White's house, if you know, sir?

3   A    I do not know of it if it's contained in this book.

4   Q    So you've testified for quite some time about

5   money.

6        There are pictures in that exhibit book of money,

7   correct?

8   A    Yes, sir.

9   Q    And the sums of money that you've testified to I

10  believe you said $2.6 million alone was found in an

11  apartment in Royal Oak, correct?

12  A    Yes, sir.

13  Q    And you also had discussed large sums of money with

14  Mr. McDonough and Mr. Hale, correct?

15  A    Yes, sir.

16  Q    When you talked about large sums of money, it was

17  about the money they made traveling from Michigan to

18  Arizona and back, correct?

19  A    Yes, beyond that however.

20  Q    And what is beyond that as well?

21  A    Well, to try to get a handle on who's making the

22  money, who has the most money.

23       You asked about who's in charge in this case

24  Derrick and Leshoun.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1         So in order to further understand how much money

2    they could make and profit, you ask how much -- if they

3    have an idea how much they could make as well.

4    Q    There's no question that Leshoun benefited from

5    this enterprise in a monetary fashion, correct?

6    A    Yes.

7    Q    There's no question that Derrick White benefited in

8    a monetary fashion, correct?

9    A    Yes.

10   Q    There's no question that Jimmy McWherter and his

11   wife, Christy McWherter, benefited monetarily, correct?

12   A    Yes.

13   Q    Nicholas Hale benefited monetarily, correct?

14   A    Yes.

15   Q    Greg Johnson benefited monetarily?

16   A    Yes.

17   Q    Do you have any evidence to show Tashun White

18   benefited from this enterprise monetarily?

19   A    Well, we're aware of cash deposits that are going

20   in her bank.

21   Q    If you make a deposit and you make a withdrawal,

22   you do not necessarily get any of that money, correct?

23   A    Correct.

24   Q    Is there anything that shows Tashun White at any

25   time benefited monetarily from this enterprise; yes or

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   no, sir?

2   A    Yes.

3   Q    What is that?

4   A    Again, I'd say suspicious cash deposits that go

5   into her bank account.

6   Q    Let me stop you there.

7        When you say "suspicious cash deposits," what made

8   those deposits so suspicious, sir?

9   A    Random, random dollar amounts.

10  Q    Let me stop you there.  Random dollar amounts.

11       I am a lawyer.  I deposit sometimes 5000, sometimes

12  500.

13       When you say "random amounts", be more specific if

14  you will about why these random amounts were suspicious

15  to you.

16  A    Sure.

17       We became aware recently of amounts under $100 up

18  to $5,000 that were deposited into her bank account.

19  Q    Let me stop you there.

20       When you say "recently," are you talking about

21  within the last week, the last month?

22       When are you talking, sir?

23  A    I'd say within the last two weeks.

24  Q    So within the last two weeks you are telling me

25  that Ms. Tashun White made deposits that are -- make you

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1  suspicious that she might be benefiting still from this

2  enterprise?

3  A    I'm saying we became --

4           MR. GILMER-HILL:  Your Honor, objection.

5  Misleading, confusing.

6           THE COURT:  Rephrase your question.

7           MR. JORDAN:  Okay.  I'll rephrase.

8  BY MR. JORDAN:

9  Q    You said that within the last two weeks there was

10  some suspicious activity with respect to Ms. Tashun

11  White's account, correct?

12  A    Well to be clear, we discovered that there was

13  historic activity that took place associated with her

14  accounts and that discovery was made within the last few

15  weeks.

16  Q    Sir, when did you start this investigation of

17  Derrick White and the others?

18  A    2010.

19  Q    So this investigation has been going on for about

20  six years?

21  A    Sure.

22  Q    And you're telling me that just within the last

23  couple of weeks you found something that makes you even

24  more suspicious of Tashun White?

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   A    Absolutely.

2   Q    This case was set for trial well before two weeks

3   ago, was it not, sir?

4   A    It was.

5   Q    As a matter of fact, this case, my understanding,

6   was supposed to go to trial I believe way back this

7   Summer I think was the first trial day?

8   A    July.

9   Q    So you've continued your investigation of Ms. White

10  as this case is going on?

11  A    Yes.

12  Q    So other than what you are saying might be

13  suspicious bank account deposits or withdrawals,

14  anything else that you found that ties Tashun White to

15  this enterprise?

16  A    Well, the bank activity, the vehicles.

17  Q    Let me stop you there.  So you said the bank

18  account.

19       Now let's go to the vehicles.

20  A    Yes, sir.

21  Q    Somebody talked about the Lamborghini.

22       How much was it worth?

23  A    There were two.

24       The first one was a little over 300 -- excuse me.

25  I think right on $320,000.

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1           The second one, approximately, $170,000.

2     Q     Now the $320,000 car you would agree with me not

3     that many people can afford that; would you agree with

4     that?

5     A     I would.

6     Q     Not even $170,000 car; would you agree with that?

7     A     Yes.

8     Q     Did Ms. White have anything to do with that

9     $300,000 car directly?

10    A     Well, I'd have to review, see which, which of those

11    for the insurance records if she insured either one of

12    those.

13          But if it was then, yes, that would be a direct

14    link to that vehicle.

15    Q     But, Officer Campbell, we're in trial with

16    Ms. White today and I'm asking you about this $320,000

17    car and if Ms. White had any dealings with it.

18          Can you say to these jurors today, yes Miss White

19    had something to do with it or you do not know?

20    A     I'm not going to speak to the insurance records.

21    We have someone else to do that.

22    Q     What about -- do you have -- you talked to Leshoun

23    Byrd, correct?

24    A     Well, see, thank you for asking.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1       I want to clarify that of those seven defendants,

2   six have plead guilty.  But we have not sat with every

3   one of them, including Derrick White and Leshoun Byrd.

4   Q    You're going to trial with one individual, that

5   would be Ms. Tashun White?

6   A    Yes.

7   Q    When you go to trial, it's not the first time

8   you've been officer in charge of a trial, correct?

9   A    Correct.

10  Q    When you go to trial, you go to trial to win it, do

11  you not?

12  A    Absolutely.

13  Q    So you want to get all evidence you can from that

14  person saying they're not guilty, right?

15  A    Yes, we did.

16  Q    What evidence do you have that Ms. White had to do

17  with that $320,000 Lamborghini?

18  A    We're going to be bringing an expert from that

19  company to attest to that as opposed to me looking at a

20  document and saying what I believe it states.

21  Q    You testified for about three hours about documents

22  you did not have dealings with personally, correct?

23       Didn't you talk about some titles to cars?

24  A    The review of them, yes.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   Q    So I'm asking did you review anything with that

2   $320,000 car that shows you Tashun White had anything to

3   do with it.

4        If you did not personally, then just say no.

5   A    On the insurance side, no, sir.

6   Q    You keep saying on the insurance side.

7        Ms. White could have purchased that car herself,

8   correct?

9   A    Records do not indicate that for the Lamborghini.

10  Q    Had she done that, she certainly could use that as

11  evidence she had something to do with that Lamborghini

12  that?

13  A    Yes, sir.

14  Q    Did she purchase it?

15  A    She did not.

16  Q    What about that $170,000 car, did she purchase

17  that?

18  A    She did not.

19  Q    Did you talk to all of these other defendants about

20  three vehicles?

21       Did you talk to Leshoun, did you talk to Christi,

22  talk to Jimmy about the cars in this case?

23  A    We spoke with those that would speak with us and we

24  would bring up, when appropriate, about particular

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   vehicles.

2   Q     Well.  When you say "when appropriate," isn't it

3   appropriate when you're sitting with a defendant to ask

4   them about all the evidence that things shows they're

5   guilty?

6   A     Yes, over the course of the interview if they're

7   open to speaking with us.

8         However, some individuals chose not to answer the

9   questions or speak with us at all.

10  Q     But my understanding as you testified for the bulk

11  of this morning, this afternoon, is that a lot of your

12  information came from these individuals who chose to

13  speak to you, correct?

14  A     Yes.

15  Q     So are you saying they're willing to talk to you

16  about some things and then they claim up about others?

17  A     No.

18        A lot of times in these investigations in an effort

19  to protect their assets and their role in the

20  investigation --

21  Q     I'm sorry, sir.  I have to stop you there.  I want

22  you to focus on this particular investigation.

23        My question to you was these individuals that you

24  spoke to, did they talk about some things and then not

25  talk about others or did they open up and talk about

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1  this enterprise?

2  A    No.   That's what I'm trying to explain is in this

3  investigation, it's clear that there's

4  compartmentalization.

5       What that is in an effort to protect their assets,

6  their residence, their role in the organization they'll

7  keep other people unaware of what others are doing.

8  Q    Let me stop you there.

9       So you just said that some of these individuals who

10 were part of this organization they try to keep certain

11 things secret from other members of the organization,

12 correct?

13 A    Absolutely.

14 Q    So it very well could be that they kept all this

15 stuff you testified to this morning, they could very

16 well have kept that from Miss White, correct?

17 A    Well in some instances, but we weren't able to

18 speak with everyone to know exactly what was going on.

19 Q    My question to you is this.

20      Do you have any hard evidence to show that

21 Ms. Tashun White knew about that warehouse; yes or no?

22 A    None.

23 Q    Do you have any evidence at all to show that Tashun

24 White knew about that what -- was it a Red Roof Inn?

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1        What was that place you took a picture of?

2   A    Hilton Gardens.

3   Q    Anything to show Ms. Tashun White had anything

4   dealing with Hilton Gardens?

5   A    I can't prove that, no.

6   Q    But you can prove that some of these other

7   individuals did, correct?

8   A    Correct.

9   Q    As a matter of fact because the prosecutor asked

10  you once you learned about that information if you could

11  corroborate it, right?

12  A    Yes.

13  Q    Not only did you corroborate it, you flew all the

14  way out to Arizona took pictures of that place, correct?

15  A    Yes.

16  Q    You went and got the ledger, what have you, to show

17  that somebody had actually stayed there that confirmed

18  what you'd been told, correct?

19  A    Yes, sir.

20  Q    But throughout all that investigation, Tashun

21  White's name didn't come up, did it?

22  A    Through the course of this investigation it has,

23  but not in relation to the hotel.  No, sir.

24  Q    Not in relation to the hotel, not in relation to

25  any residences in Arizona, correct?

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1    A    Correct.

2    Q    Not in relation to that warehouse, correct?

3    A    Correct.

4    Q    Not in relation to the Lamborghini, correct?

5    A    Again for insurance records, I'll stipulate to the

6    expert that will testify to those on review of the

7    documents.

8    Q    What do you know, as the officer in charge, what

9    insurance do you know that Tashun White was involved in?

10   A    Well, there's numerous vehicles.

11   Q    Well, let me stop you there.

12        You said "numerous vehicles." I want the jury to

13   understand.

14        So we're talking about a 2008 Porsche, correct?

15   A    Yes, sir.

16   Q    2009 Porsche, correct?

17   A    Yes, sir.

18   Q    We're talking about another 2009 Porsche Turbo,

19   correct?

20   A    Yes, sir.

21   Q    We're talking about a Porsche I can't pronounce

22   Panamera?

23   A    I believe it's Panamera.

24   Q    Panamera.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1        Then we're talking about a '67 Camaro?

2    A    Uh-huh.

3    Q    We're talking about an '08 Challenger --

4    A    Yes, sir.

5    Q    -- that was purchased in Merryville, Indiana.

6    Right?

7    A    Yes, sir.

8    Q    Then we're talking about a minivan, correct?

9    A    Yes, sir.

10   Q    Then we're also talking about a Town and Country

11   and a Windstar, correct?

12   A    Yes, sir.

13       Are there any vehicles other than the ones I just

14   mentioned and the Lamborghini and the other $170,000

15   vehicle, are there any other vehicles I'm missing out

16   on?

17            MR. GILMER-HILL:  Objection, Your Honor.

18   Confusing.

19            THE COURT:  Sustained.  Well, I suppose --

20            MR. JORDAN:  I'm sorry, Your Honor.

21       If he's not --

22            THE COURT:  Excuse me.

23       If they were in the exhibits this morning, if there

24   were other vehicles that have not been mentioned, feel

25   free to mention them.

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   BY MR. JORDAN:

2   Q    The vehicles that I mentioned are the vehicles

3   you're familiar with, correct?

4   A    I am.

5   Q    Any other vehicles I left out that relate to this

6   investigation?

7   A    Yes.

8   Q    Okay.  But of the ones I mentioned to you, the

9   Porsche, the Pana -- the pan -- what is it?

10  A    Panamera.

11  Q    Panamera, the Town and Country and Windstar, those

12  are the ones I want you to focus on, perhaps the

13  prosecutor will ask you questions about others.

14       Of those vehicles, that's nine vehicles, do you

15  know which one Tashun White had any dealings with?

16  A    Well, again, as indicated, they're so voluminous

17  that I'm going to refer to the insurance documents for

18  the person that's -- see, there's so many that we have

19  one person to come in just to speak to that.

20  Q    I understand that.  I'm not worried about any

21  vehicles except for the ones that relate to Tashun

22  White.

23       So I'm asking you as the officer in charge of this

24  case to just direct your attention to the ones that

25  Ms. White is charged to have dealt with.

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1          THE COURT:  Mr. Jordan, at this point I'll
2   sustain the previous objection.
3      He can only testify to the portion of the case he's
4   familiar with.
5      So move to your next area of questioning.
6          MR. JORDAN:  May I lay a foundation, Your
7   Honor?  Because you said he can only --
8          THE COURT:  If you can.
9   BY MR. JORDAN:
10  Q    You testified about much of this case as things you
11  did not actually seize yourself, correct?
12     For example, you didn't touch every single one of
13  those watches, correct?
14  A    Correct.
15  Q    But you are going to testify to them, what,
16  because you are the officer in charge, right?
17  A    Yes.
18  Q    I'm simply asking you as the same officer in charge
19  to testify about the vehicles you know Ms. White dealt
20  with.
21     Can do you that or is that out of your area of
22  being able to testify to?
23  A    It's certainly out of my area.
24     I mean on the watches, for example, I'm asked for a
25  dollar amount, that's easy $500,000.

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1        But if you ask me how the interworkings of a watch

2   worked or what specific vehicle of ten was insured by a

3   person, I'm certainly going to get an expert as the case

4   agent to speak on my behalf and the Government's behalf

5   for that.

6   Q    Okay.  As the officer in charge, you know that

7   Tashun White was a target in this case, correct?

8   A    Yes, sir.

9   Q    And she's a target in this case because she's

10  supposed to have laundered some money, correct?

11  A    Yes, sir.

12  Q    She was supposed to have done that through getting

13  insurance for her brother, correct, through cars?

14  A    Not only -- well, yes, in addition to the purchase

15  of vehicles.

16  Q    Okay.  So if it's not a fair question please, you

17  know, try to answer it.

18       But you can't tell us what cars she purchased?

19  A    Certainly.  The 2008 Dodge Challenger.

20  Q    2008 Dodge Challenger?

21  A    Yes, sir.

22  Q    Okay.  How much was that car worth?

23  A    Approximately, $50,000.

24  Q    50,000.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1      You would agree with me that that's not an

2   exorbitant sum for a car these days 50,000?

3   A    Personally, yeah.

4   Q    Yeah, me, too.

5      But it certainly doesn't shock the conscious like a

6   $100,000 car, wouldn't you agree?

7   A    No.

8   Q    So we got a $50,000 Challenger.  What else?

9   A    She's affiliated with a 2010 Porsche.

10  Q    That's the Panamera?

11  A    I think so.

12  Q    How much is that Panamera worth?

13  A    She got it for zero per the documents.

14  Q    You're testifying now about her dealings.

15     So I want to make sure you feel comfortable doing

16  so.

17  A    Understood.

18  Q    Okay.  You're saying that she paid zero for the

19  Panamera?

20  A    Well, I'm testifying to the document that I

21  reviewed which shows the transfer.

22  Q    Okay.

23  A    Upon sale, the sale price that she received the

24  money for was 82,500, and then an additional 5000 cash

25  was paid out --

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   Q    Okay.  Now --

2   A    -- approximately.

3   Q    Do you know how you all of that occurred?

4        Do you know who touched that cash and all of that?

5   A    Do not.

6   Q    So really all you know is that she had some

7   dealings with this Porsche Panamera, she had some

8   dealings with it that, ultimately, was her brother's?

9   A    Well, in regards to who touched the cash, I can't

10  says every one individual, but I know that it did go

11  through her sole bank account.

12  Q    But you don't know if she walked in with $80,000

13  cash, do you, or whether she went in with a cashier's

14  check.

15       You don't know, do you?

16  A    Well, it's my understanding that a cashier's check

17  was sent to her and deposited into her account and then

18  later transferred to her brother, Derrick White.

19  Q    And through the course of your investigation, what

20  did she receive for that?

21  A    Well, you know, there's a lot of options.

22  Q    No, I'm not asking you to speculate.

23       Through the course of your investigation, could you

24  tell us this jury what she received for it?

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   A    Just --

2   Q    Let me stop, because you testified about somebody

3   getting a hundred dollars each time they went to

4   California or Arizona?

5   A    $100 per pound.

6   Q    So you testified about what people received from

7   this organization, correct?

8   A    Yes, sir.

9   Q    So for Ms. White dealing with this Panamera, what

10  did she receive?

11  A    We haven't had a chance to speak with her to find

12  out.

13  Q    Well, is it you haven't had a chance to speak with

14  her or are you expecting her to tell you something that

15  she said I don't have any information.

16       That's different, isn't it?  I'll withdraw the

17  question, Your Honor.

18       Okay.  Let's go to the next, next vehicle.  There

19  was you said the Challenger for 50,000, the Panamera.

20  That was the other vehicle she dealt with?

21  A    Again I'm going to refer to the insurance

22  representative to testify to which exact vehicle she

23  helped to ensure.

24  Q    But you said that there were several vehicles and

25  by my listening to the testimony, my review of discovery

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   I see that was involved with three.

2       Do you have any reason to believe there was more

3   then three she might have been involved with?

4   A    Yes, I know she insured multiples, we'll say at

5   least two on the insurance side.

6       But then the purchase of at least two, the

7   financial dealings and tight link of at least two

8   vehicles.

9   Q    That would be four, correct?

10  A    Yes.

11  Q    Four vehicles over the course of what amount of

12  time?

13  A    I think that ranges from 2008 through 2011.

14  Q    So three years.

15  A    Three years on the vehicle side.

16  Q    That constitutes a lot of transactions to you;

17  three transactions in four years?

18           THE COURT:  Sustained.

19           MR. JORDAN:  Judge, I'm asking him to base --

20  I'll lay a foundation.

21  BY MR. JORDAN:

22  Q    You've dealt with cases of laundering before,

23  correct?

24  A    Yes, sir.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   Q    You've dealt with cases involving vehicles before,

2   correct?

3   A    Yes, sir.

4   Q    Now someone saying they've dealt with four vehicles

5   or four transactions I should say of vehicles in three

6   years or is it the opposite?  Four vehicles I think in

7   four years.

8        But, in any event, this is a lot to you?

9              THE COURT:  Just a minute.

10             MR. GILMER-HILL:  Objection, Your Honor.

11  Confusing and misleading.

12             MR. JORDAN:  I'll rephrase.

13             THE COURT:  Okay.  And try not to assume facts

14  not in evidence.

15             MR. JORDAN:  Certainly, Your Honor.

16  BY MR. JORDAN:

17  Q    You, based on your experience, consider the number

18  of transactions that Ms. White dealt with pertaining to

19  cars to be a lot?

20  A    To be a lock?

21  Q    A lot.  You said numerous.

22       This is numerous to you?

23  A    Well, it's the multitude of what's taking place

24  over the investigation and then the dollar amount that

25  she's attributed with.

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1     Money laundering doesn't have a cap of it's got to
2  be over a certain million dollar mark.
3  Q    Sir, my question to you is about the number of
4  transactions, not the monetary amount.
5     You said numerous transactions.  I'm asking you
6  based on your investigation --
7          THE COURT:  Just a minute.
8          MR. GILMER-HILL:  Objection, Your Honor,
9  misstates the testimony.
10          THE COURT:  Yes.  Exactly.  The testimony
11  related to cash deposits and things of that nature.
12     So if you want to start at the beginning, just
13  start at the beginning we'll see what his answers are.
14  You can get right where you want to go.
15  BY MR. JORDAN:
16  Q    You did use the word numerous, did you not, when I
17  asked you about Ms. White's dealings.
18     Wasn't that your term "numerous"?
19  A    For vehicles, yes.
20  Q    So my question to you is quite simple.
21     You believe her transaction with respect to these
22  vehicles is numerous?
23  A    Absolutely.
24  Q    Okay.  What about the monetary amounts that she,
25  herself, benefited.

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1      You can't say that she made a dime off of this,
2  correct?
3  A    On the cash deposits into her bank accounts, I
4  can't account for what she did with that money, what it
5  was designated for.
6  Q    Let me stop you there.
7      Someone else in this case was charged with money
8  laundering, too, correct?
9  A    Yes, sir.
10  Q    Would that have been the McWherters or one of them
11  or both of them?
12  A    Yes.  Multiple people.
13  Q    Who was charged with -- was Christi McWherter
14  charged with money laundering?
15  A    Yes, sir.
16  Q    Her husband?
17  A    Yes, sir.
18  Q    You know that proceeds that they received from this
19  enterprise, they built a pool at their house, didn't
20  they?
21  A    Yes, sir.
22  Q    How much was that pool?  Over $100,000, wasn't it?
23  A    Yeah $120,000.
24  Q    So the McWherters built $120,000 pool and this
25  would have been at a time when Mr. McWherter really

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1    wasn't working a legitimate job, right?

2    A    Correct.

3    Q    And Miss McWherter wasn't working a legitimate job,

4    correct?

5    A    She was employed at a legitimate job, yes.

6    Q    But the bulk of their income came from this

7    enterprise?

8    A    Yes, sir.

9    Q    During the course of your investigation, did you

10   find Tashun White made any additions to her house

11   similar to the McWherters?

12   A    No, sir.

13   Q    During the course of your investigation, did you

14   find that Ms. Tashun White went out and personally,

15   herself, bought a high end vehicle to drive to and from

16   work?

17   A    No, sir.

18   Q    As a matter of fact, did you look to see where

19   Ms. White was working during the time that this

20   enterprise was going on?

21   A    Yes.

22   Q    Was she gainfully employed?

23   A    Yes.

24   Q    Where was she gainfully employed?

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   A    Corinthian College.

2   Q    Do you know what her job title was?

3   A    She's held many within that employment --

4   Q    And --

5   A    -- employer.

6   Q    -- do you know that the job that she's held at

7   Everest have allowed her to make a six figure income;

8   are you aware of that?

9   A    Recently.

10          THE COURT:  Just a minute.

11          MR. GILMER-HILL:  Objection, relevance.

12          MR. JORDAN:  It's kind of difficult for me not

13   to, because I want to respond.

14      But since we're not doing it that way --

15          THE COURT:  Just a couple of words.

16      What's the relevance of this to your case?

17          MR. JORDAN:  Judge, to say that this is not

18   relevant, how much money this woman makes, do you

19   really --

20          THE COURT:  No, we won't do this.

21          MR. JORDAN:  I think it's pretty clear it's

22   relevant, judge.

23          THE COURT:  I'll permit you to ask one more

24   question then we'll move on.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1          MR. JORDAN:  Judge, may we approach?

2          THE COURT:  Regarding the --

3   Ms. McWherter's -- ask your question, let's see where

4   you're going with it.

5   BY MR. JORDAN:

6   Q    My question simply was you are aware during the

7   period of this time that Ms. White, herself, was not

8   only gainfully employed, she had a six figure income.

9          You said yes right you learned of that?

10  A    I said recently became aware, yes.

11  Q    Did you check to see what her employment was back

12  during the time she was supposed to be helping out this

13  enterprise?

14  A    Yes.

15  Q    And what was she doing then?

16  A    It wasn't six figures.

17  Q    But she was still working, correct?

18  A    She was.

19  Q    When you say "it wasn't six figures", do you have

20  any reason, based on your investigation, to think that

21  she was supplementing her income through this

22  enterprise?

23         Did you come up with anything to show that?

24  A    Not through the bank statement that we received.

25

Usa v White  15-20040

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1  Q    Okay.  Now Derrick White had something called Ace

2  Five Properties.

3      He had 20 investment properties, correct?

4  A    Approximately.  Yes, sir.

5  Q    Ms. Tashun White, did her name ever come up with

6  those investment properties?

7  A    Well, possibly.

8  Q    I don't want you to guess; either it came up or it

9  did not.

10 A    Without the opportunity to speak with her and ask,

11 there's reason to believe she could have been, yes.

12 Q    Okay.  But through anyone else, through any of

13 these other defendants, did any one of them say she had

14 something to do with Ace Five Properties?

15 A    No.

16 Q    Now you went -- I believe it was you.

17     Did you go and speak to Ms. White, Tashun White's

18 mother?

19         MR. GILMER-HILL:  Your Honor, I apologize.

20     May we approach very briefly?

21         THE COURT:  Why don't we use this as an

22 opportunity to take a short break for the jury to

23 stretch.

24     Please rise for the jury and we'll come get you in

25 five to 10 minutes.

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

 1          (Whereupon the jury was excused

 2           from the courtroom at 3:15 p.m.)

 3

 4          THE COURT:  Okay, Mr. Gilmer-Hill.

 5          MR. GILMER-HILL:  I simply wanted to make a

 6   record as to some of the questions that counsel is

 7   posing appear to be eliciting from Agent Campbell

 8   comments with regard to Ms. Tashun's -- whether Miss

 9   Tashun White spoke with us or not, not, not questions

10   from the Government, questions from defense.

11          THE COURT:  Yes, I've noticed that.

12          MR. GILMER-HILL:  I wanted to alert the Court

13   to that and counsel so that there's not any mistakes

14   made or any misinterpretation with regard to her Fifth

15   Amendment privilege.

16          MR. JORDAN:  I don't think that -- if I've

17   opened the door to that, judge, it's fine.

18       I'm not going to say that the prosecutor has

19   elicited any testimony from this witness.  It's on

20   cross.

21       If I open the door, then I open the door, judge,

22   it's fine.  But she's going to testify anyway, quite

23   frankly.  But either way, I don't think that we have a

24   Fifth Amendment problem.  He hasn't talked about her not

25   willing to talk to me.

Usa v White  15-20040

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1    THE COURT:  The Fifth Amendment, it's your

2  clients, so as long as you and your client are clear

3  that the questions you're asking do not violate her

4  privilege against self incrimination then I think the

5  record is protected.

6    MR. GILMER-HILL:  Thank you, Your Honor.

7    MR. JORDAN:  Do I have time to run?

8

9    (Whereupon court was in recess at

10    3:17 p.m. and was back in session at

11    3:24 p.m. the jury was brought into the

12    courtroom)

13

14    THE COURT:  Please be seated.  And we will

15  conclude at 4:00 today, so hang in there with us.

16  You've been doing a great job, so thank you.

17    Okay.  Go ahead, Mr. Jordan.

18    MR. JORDAN:  Thank you.

19  BY MR. JORDAN:

20  Q    Agent Campbell, are you aware someone went to speak

21  to Ms. Tashun White and Derrick White's mother?

22  A    The mother, yes.

23  Q    Were you one of the agents that went to speak to

24  her?

25  A    Yes, sir.

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   Q    And what was your purpose for going to speak to

2   her?

3   A    Just to gain her knowledge about this

4   investigation, what she knows that can be of assistance.

5   Q    Now my understanding is that -- what is Derrick

6   White, Tashun's White's mother's name?

7   A    Alicia White.

8   Q    So Miss Alicia White, she actually had insured some

9   of the cars brought up during this trial, correct?

10  A    I'd have to -- not to my knowledge, top of my head.

11  Q    I thought that it was actually on direct testimony

12  that you testified that Alicia had dealt with -- grab my

13  notes here.

14       Didn't Alicia White deal with the '67 Camaro?

15       Wasn't it insured in her name?

16  A    No, sir, registered in her name.

17  Q    Registered in her name.

18       Now the fact that it was registered in her name but

19  was really Derrick's car, correct?

20  A    Yes, sir.

21  Q    Did you consider charging Alicia White with a

22  similar crime as to what Ms. Tashun White is charged

23  with?

24  A    You know she's clearly a nominee for the fact of

25  money laundering.

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1        THE COURT:  Just a minute.

2        MR. GILMER-HILL:  Objection, relevance.

3        THE COURT:  Yes.  Sustained.

4        MR. JORDAN:  Judge, may we please --

5        THE COURT:  Certainly.

6        MR. JORDAN:  -- have a side bar?

7

8        (The following was held at the

9        bench, outside the hearing of

10       the jury)

11       THE COURT:  I think there's a jury instruction

12  about it's not the jury's business to know why others

13  were charged.

14       MR. JORDAN:  That's not why I'm asking.

15       THE COURT:  You just asked him -- just a

16  minute.

17     Did you consider charging Derrick White's mother,

18  her mother?

19       MR. JORDAN:  Yes.

20       THE COURT:  What is the purpose?

21       MR. JORDAN:  The purpose is if she did the

22  same conduct or similar conduct -- judge, may I finish?

23       THE COURT:  That's the purpose of the jury

24  instruction.

25       MR. JORDAN:  Can I finish, judge?

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1          THE COURT:  You and I don't know the answer to

2    that.

3       Mr. Gilmer-Hill and the agents they know the

4    answers to that.

5       I don't know anything about the level of evidence,

6    the beyond a reasonable doubt, *et cetera*.  We don't know

7    about that and that's exactly why we don't expose the

8    jury to that.

9          MR. JORDAN:  I'm ready.  I just have to get my

10   response.

11         THE COURT:  Go ahead.

12         MR. JORDAN:  Our theory of the case is that

13   Tashun White didn't do anything really criminal at all,

14   it's the prosecutor saying she did simply because they

15   want to use her.

16      If there's somebody out there and the prosecutor

17   used their discretion to say I'm not going to charge

18   this person and not that, I certainly think that's

19   relevant.  That is relevant, judge.

20      How can you sit there and say it's not relevant?

21         THE COURT:  Slow down.

22         MR. JORDAN:  They went and interviewed the

23   person's giving them information similar to what this

24   person did and they decide to charge one and not the

25   other.

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1    He's the officer in charge and that's not relevant?

2         THE COURT:  Okay.  Let me let Mr. Gilmer-Hill

3    respond.

4         MR. GILMER-HILL:  I don't think there's been

5    any indication that Alicia White insured vehicles for

6    Derrick White.

7         THE COURT:  But what is the appropriateness of

8    inquiring into the agent's decision as to who to charge.

9    That's what I want to focus on.

10        MR. GILMER-HILL:  I do not think it's

11   appropriate or relevant to this case.

12    I was speaking to even the -- to the extent that

13   Mr. Jordan attempts to argue that there's some theory

14   that would make it relevant, I observe that his

15   underlying presumption for that theory is not there.  So

16   even if it were, I don't think it would be relevant.

17   But even what he's offering is not supported.

18        MR. JORDAN:  I haven't put on my case yet,

19   judge.  I may very well lay a foundation.

20    When Ms. White gets up there she'll tell you me and

21   not my Mom.

22        THE COURT:  Recall the agent if somehow the

23   mother becomes relevant.  But it's not appropriate for

24   the jury to be concerned about who was not charged in

25   this case.  There's a specific instruction about that so

Usa v White   15-20040

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1  eliciting --

2          MR. JORDAN:  I am allowed to ask him about his

3  questioning of her certainly.

4          THE COURT:  Sure.  Sure.

5          (The following was held in open court)

6  BY MR. JORDAN:

7  Q    So you went to speak to Ms. Alicia White, correct?

8  A    Yes, sir.

9  Q    When you spoke to Miss Alicia White, you were

10 trying to find out whether or not she could give you

11 some information pertaining to this case, correct?

12 A    Yes, sir.

13 Q    Now you spoke to Ms. Alicia White twice is that not

14 correct, on two occasions?

15 A    In a formal interview setting.

16 Q    Either way?

17 A    I've spoken with her five times including phone

18 conversations.

19 Q    When you spoke to her, did you write down any

20 notes?

21 A    Not on every occasion.

22 Q    But on some occasions you did?

23 A    Sure.

24 Q    Now did you ask her about Tashun White?

25 A    In part, yes.

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

 1  Q    And she didn't give you any information to indicate

 2  that Tashun White was involved in this, did she?

 3          MR. GILMER-HILL:  Objection, hearsay.

 4          THE COURT:  Sustained.

 5          MR. JORDAN:  Judge, I'm not asking for a

 6  statement, I'm just asking did she give you any

 7  information.  Information --

 8          THE COURT:  Information is a statement.  So

 9  it's sustained.

10  BY MR. JORDAN:

11  Q    Was anything of any evidentiary value gained after

12  you spoke to Ms. Alicia White as it relates to Tashun?

13  A    I didn't seize any physical evidence, but there was

14  information that was passed on to the prosecutor.

15  Q    Information that would tend to show Ms. White

16  committed this crime?

17  A    Information indicating that she should have known

18  some things.

19  Q    That information was given to the prosecutor?

20          When was that information given to the prosecutor?

21  A    Just in conversation following the interviews.

22          I guess in short, if I may explain?

23          Alicia White's claim that she was a failing health

24  so we wanted to speak with her to see if we could

25  possibly release her from having to come to testify so

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1  that was the purpose.

2      So upon conclusion of that interview, I updated the

3  prosecutor as to how that conversation went.

4  Q    So you were going to call her, have her come here

5  and testify?

6  A    She's still subpoenaed.  Yes, sir.

7  Q    What can she add as relates to Tashun White's guilt

8  or innocence to this?

9  A    She can add intimate knowledge about what the

10  family knew about other family members.

11  Q    Did she tell you she knew anything about Tashun

12  White as relates to money laundering.  No, right?

13  A    Well, again, you know, it's not like she could say,

14  yeah, I know she purchased two cars for Derrick or

15  insured cars for Derrick.

16      But she can give us or shared information with us

17  that indicated she should have known some of the

18  activity that was happening with her brother.

19  Q    Did she also give you information that Derrick

20  White had received a large settlement at some point in

21  his life?

22  A    I'm sorry.

23  Q    A large settlement at some point?

24          THE COURT:  Just a minute.

25

Usa v White  15-20040

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1           MR. GILMER-HILL:  Objection, hearsay.

2           MR. JORDAN:  Judge, I'm not offering it for

3     the truth of the matter asserted.  I'm not offering it

4     for truth of the matter asserted.

5           THE COURT:  I think you are.

6           MR. GILMER-HILL:  Objection, relevance.

7           THE COURT:  Yes.  So it's sustained on the

8     hearsay.  Go ahead.

9           MR. JORDAN:  But I didn't ask for a statement,

10    judge.  I simply said did she give you any information.

11          THE COURT:  Information is --

12          MR. JORDAN:  Information could be something

13    that someone is given personal, like a bank statement,

14    judge.

15          THE COURT:  This was a conversation.

16       So why don't you ask did you walk away with paper

17    that --

18    BY MR. JORDAN:

19    Q    I think I said did you get anything of any

20    evidentiary value after you spoke.

21    A    No evidence was seized, just notes.  I did maintain

22    notes.  I generated a report as a result of that

23    interview.

24    Q    Okay.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1      You did say that you transcribed some notes after

2  you spoke to the mother?

3  A    Not after, but during our conversation there's four

4  pages of notes.

5  Q    Okay.  Those are the notes you gave to the

6  prosecutor?

7  A    No.  Those notes are scanned and maintained in our

8  own system in DEA and in the case file.

9      What was passed on to the prosecutor was a report

10 generated as a result of the interview.

11 Q    So you did give him a report about that?

12 A    Yes, sir.

13 Q    And in that report it discusses you're asking her

14 questions about this case?

15 A    Yes.

16 Q    And about Ms. White specifically?

17 A    Yeah.  I mean there were specific questions.  But,

18 yes.

19 Q    So you've already indicated that Ms. White's role

20 here was not to handle any drugs, correct?

21 A    Correct.

22 Q    It was not to transport any drugs, correct?

23 A    Correct.

24 Q    You've already established that you could not find

25 anything to show that she took any money she gained from

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1   this and went out and bought a pool or anything like

2   that.

3         Nothing like that surfaced, correct?

4   A    No.  No pool.

5   Q    Okay.  Or anything that would raise some suspicion;

6   a fur coat, a trip to Las Vegas, anything?

7   A    Well as far as the bank statements, you know, again

8   that's a specialty that's going to be talked about

9   during this trial.

10  Q    So, Agent Campbell, take your focus away from any

11  bank notes, take your attention away from any

12  transactions involving insurance.

13        I simply want you to focus in on things like True

14  Religion Jeans, Rolex watches, speedboats, anything to

15  indicate that Ms. White spent money that she gained from

16  this enterprise on anything such as that?

17  A    Okay.  Well, for money laundering to happen, there

18  doesn't have to be an exchange.

19  Q    I'm not asking that question, sir.

20        I'm simply saying from this case Ms. White, not

21  asking you about theory of money laundering, Miss Tashun

22  White anything to show during the course of this

23  investigation she took money and bought any high end

24  items, anything.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1       Do you have any evidence of that?

2   A    No, sir.

3            MR. JORDAN:  I've no further questions.

4            THE COURT:  Mr. Gilmer-Hill, do you have

5   redirect?

6            MR. GILMER-HILL:  No, thank you, Your Honor.

7            THE COURT:  Okay.  Well then, Agent Campbell,

8   you may step down.

9                        (The witness was excused

10                        at 3:37 p.m.)

11           THE COURT:  Are you prepared to call your next

12  witness?

13           MR. GILMER-HILL:  Yes, Your Honor.

14           THE COURT:  If you'll take any water you were

15  drinking with you.

16      We sometimes have the situation of the witness

17  leaves the water, then I see the next witness going like

18  this and I'm going stop, so I'm trying to talk care of

19  that problem.

20      Okay.  So who would you like to call next?

21           MR. GILMER-HILL:  Your Honor, if I may have a

22  moment to check the status as to our witnesses --

23           THE COURT:  Oh sure.

24           MR. GILMER-HILL:  -- as to what their

25  immediate status is.

Usa v White  15-20040

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1        THE COURT:  Yes, certainly.  What we do during

2   trials is we do what we call sequester witnesses.

3       Unless you're a case agent and you're part of the

4   prosecution or you're the defendant, you're not

5   permitted to be in the courtroom listening to other

6   people's testimony.

7       So the case agent or the lawyers will have their

8   witnesses in the hallway and near by a restaurant.

9       Do we know the next witness is available?

10          (After a short delay, the proceedings

11          continued)

12          MR. GILMER-HILL:  I don't know the answer to

13   that.

14          THE COURT:  The other thing I can tell you

15   remember during jury selection we were talking about how

16   real life cases don't proceed the way they do on

17   television.

18       Here's an example where on television the witness

19   is up there.  But in real life we know they've just

20   stepped away and made a call so we make -- we're just

21   patient with that.

22          MR. GILMER-HILL:  I apologize, Your Honor.

23       Actually the next two if not three witnesses

24   actually have been here the last couple of days.

25

Jeffrey Campbell-Cross Exam/Mr. Jordan 11-29-16

1      Given the way the cross examination was developing

2   and the Court's indication we're breaking at four, I

3   believe that they left.  Prematurely dismissed.

4          THE COURT:  Okay.  All right.

5      Well then in that case so this is exactly that

6   example where it doesn't do like television.

7      So what we'll do is we will excuse the jury for the

8   day, we'll conclude our work for today.  I appreciate

9   your enormous patience and attention.  I can tell

10  everybody's focused.

11     So remember not to discuss the case with family,

12  co-workers, neighbors other people you might interact

13  with.

14     You can tell them you're serving as a juror but

15  nothing about the case.  Or and, please, also don't

16  discuss it among yourselves until the very end of the

17  case.

18     So with that, please rise for the jury and we'll be

19  back at 9 a.m. and go until one.

20          (Whereupon the jury was excused at 3:40 p.m.)

21          THE COURT:  Mr. Jordan, we have a hearing at

22  four in this case for the witness who wants to take The

23  Fifth.

24          MR. JORDAN:  I thought that witness -- I

25  thought Mr. Gilmer-Hill said he was gone.  Is that --

Separate Record 11-29-2016  Vol. 2

1        THE COURT:  That person -- I don't know what

2   order that person's coming in.  My case manager

3   scheduled her or him at 4:00 with a lawyer.

4      But in the meantime to make use of our time, I'd

5   like to talk about the jury instructions off the record

6   with you just to get a couple of -- so I'll come down

7   there.

8         (Whereupon court was in recess at 3:41 p.m.

9          Whereupon court was back in session at

10         4:01 p.m.)

11        THE COURT:  Could we have appearances, please.

12        MR. GILMER-HILL:  Certainly, Your Honor.

13      Carl Gilmer-Hill with the United States Attorneys

14   Office appearing on behalf of the United States.

15        MR. KRIGER:  Good afternoon, Your Honor.

16      Mark Kriger along with Allison Kriger on behalf of

17   Mr. Heraud who is a potential witness.

18        THE COURT:  Okay.  And Mr. Jordan on behalf of

19   Ms. White?

20        MR. JORDAN:  Yes.  Yes, Your Honor.

21      And I actually -- there was something that I needed

22   to take up that pertains to our trial today.  I didn't

23   know whether you wanted do that or do this first.

24        THE COURT:  Let's do this first.

25

Separate Record 11-29-2016  Vol. 2

1       I see Mr. Kriger is using a cane and I'm concerned
2   about his health.
3           MS. KRIGER:  I'm okay, judge.
4           THE COURT:  You're all right?  Okay.  We'll
5   take care of this.
6       I assume you want to be here for this, Mr. Jordan?
7           MR. JORDAN:  Yes, Your Honor.
8           THE COURT:  Okay.
9           MS. KRIGER:  I'm much better, judge.
10          THE COURT:  I'm glad you're feeling better.
11      So I understand that we have a witness in this case
12  who wishes to plead the Fifth Amendment Right to not
13  incriminate himself.
14          MR. KRIGER:  Correct, Your Honor.  He is in
15  the courtroom.
16          THE COURT:  Bring him up here.  Does he need
17  to sit?
18      (Whereupon the witness approached the podium)
19          THE COURT:  Okay.  So could you please state
20  your name.
21          THE WITNESS:  My name is Gary A. Heraud.
22          THE COURT:  Okay.  H-e-r-a-u-d.
23      All right.  And, Mr. Kriger, I understand your
24  witness or your client would like to plead the Fifth
25  Amendment and believes that he could be exposed to

Separate Record 11-29-2016   Vol. 2

1   possible prosecution if required to testify truthfully

2   under oath.

3              MS. KRIGER:  That's correct.  And I can give

4   the Court some background.

5              THE COURT:  Okay.

6              MR. KRIGER:  Well, they're really two I think

7   important cases.

8        One is *Hoffa v United States*.  And I called the

9   Court earlier today, gave the cites of the cases I would

10  be relying on today.

11       If the Court --

12             THE COURT:  I've got it right here.

13             MR. KRIGER:  Okay.  So in *Hoffman*, United

14  States Supreme Court ruled that if it is apparent from

15  the context of the case no offer of proof needs to be

16  made as to why it would incriminate him.

17       The second case that I think is important is *In Re*

18  Morganroth.  In that case, Mr. Morganroth who's an

19  attorney licensed to practice law in the State of

20  Michigan, said he would invoke his Fifth Amendment

21  privilege.

22       And the Sixth Circuit says, well, unless -- if

23  they're just innocent questions, unless it's clear from

24  the context you can't just take a blanket assertion of

25  The Fifth.

Separate Record 11-29-2016  Vol. 2

1      In this case as I understand the allegations that

2  there is a -- there was a conspiracy to launder monetary

3  instruments.  Okay.

4      According to I think it's a DEA 6 that I received,

5  Mr. Heraud made a statement which as in the first place

6  this is more like the *Morganroth* situation, that I

7  understand the Government does not feel is truthful.

8      But one of the allegations in the indictment is the

9  purchase of an Aston Martin vehicle.  It was Mr. Heraud

10  that sold that vehicle.  So I think from that context

11  it's very clear.

12      Now I understand that this sale took place many

13  years ago and there could be an argument it's -- I don't

14  know the statute of limitations so where is the

15  exposure.

16      And the exposure is and I gave you the *Dietrich*

17  case.  In the *Dietrich* case it says if you're involved

18  in an ongoing conspiracy, in a money laundering

19  conspiracy which is plead in this indictment and it

20  continues on even if you don't continue on yourself, the

21  acts of the co-conspirators would make you liable unless

22  you have an affirmative withdrawal.

23      There has been no affirmative withdrawal as I

24  understand in this case.

25

Separate Record 11-29-2016  Vol. 2

1    There's also the other issue, Your Honor, of

2  although this isn't the DEA 6, but I understand that --

3  well, that there's -- since there is an allegation that

4  he was not truthful in this statement there would be a

5  1001 violation.

6    There is one other matter I don't feel comfortable

7  saying in the court, but I would certainly do *in camera*

8  as an offer of proof.

9    THE COURT:  Well, first of all, I think I need

10  to hear from the prosecution what they intend to ask

11  your client and whether it touches upon the areas that

12  you've just discussed.

13    So -- because I need to be reassured that the

14  answers would, in themselves, support a conviction under

15  a federal criminal statute or that it would furnish a

16  link in the chain of evidence needed to prosecute the

17  claimant for a federal crime.  So I think state crimes

18  are involved as well.

19    So can I find out that first?

20    MR. GILMER-HILL:  Yes, Your Honor.  Hopefully

21  you'll allow me some leeway since I knew nothing about

22  this until we were about to begin the 2:00 session.

23    I knew -- the suggestion was made Mr. Heraud did

24  not want to appear before the Court and there's been

25  some discussions with co-counsel, Miss Kriger, but in

Separate Record 11-29-2016  Vol. 2

1   terms of today, but I can respond.

2            THE COURT:  Okay.

3            MR. GILMER-HILL:  It won't be as fully as I

4   otherwise might have.  I'd be happy to take care of

5   this.

6        Since we're in the middle of trial, I just assume

7   take care of this now as I actually have discussed or

8   attempted to discuss with counsel the area of inquiry

9   that the Government intends to elicit from Miss Heraud

10  at trial is actually very narrow and circumscribe.

11       Counsel is correct that Mr. Heraud made some

12  broader statements when he was interviewed before, but

13  we do not intend to impinge upon that information or go

14  into any of those areas.

15       The limited nature of the inquiry that we have for

16  Mr. Heraud at trial relates to his sale in August of

17  2006 of an Aston Martin to Derrick White and the fact

18  that it was a cash transaction that occurred in a

19  parking lot with another individual present who

20  physically then got up and went into the Secretary of

21  State and filed the title as to that Aston Martin.

22  That's essentially the nature of our inquiry for Mr.

23  Heraud.

24            THE COURT:  You'll ask him whether he went to

25  a parking lot with an Aston Martin that he sold to

Separate Record 11-29-2016  Vol. 2

1    somebody else who gave him cash and then met somebody

2    else and went into the Secretary of State?

3             MR. GILMER-HILL:  Yes.  But just so the

4    courts -- that he went to this parking lot and met with

5    Derrick White.

6             THE COURT:  Derrick White?

7             MR. GILMER-HILL:  And a third individual, a

8    woman who then went into the Secretary of State and

9    registered the vehicle.

10        Circumscribe relates to events that occurred in

11   2006, it relates to events, information that Mr. Heraud

12   has, frankly, already provided voluntarily.

13        And there's no -- it's not because, as counsel

14   observes, it is well past the statute of limitation.

15            THE COURT:  What is the statute of limitation?

16            MR. GILMER-HILL:  Five -- it would be five

17   years as it would be five years as to that action --

18   that transaction.

19            THE COURT:  What about Mr. Kriger's arguments

20   that this is part of a conspiracy and that he did not

21   affirmatively withdraw from the conspiracy?

22            MR. GILMER-HILL:  Well, I believe two things.

23        I believe Mr. Kriger said at several points as I

24   understand as I understand he also said as I understand

25   it's my understanding and recollection actually during

Usa v White  15-20040

Separate Record 11-29-2016  Vol. 2

1   the same debriefing where we obtained the statements

2   from Mr. Heraud I guess reaffirming earlier occasions

3   when he made similar identical statements to law

4   enforcement about this meeting in the parking lot Mr.

5   Heraud indicated a few other things.

6       He indicated that not only -- he indicated that

7   Derrick White himself had wanted to go clean.

8           THE COURT:  Wanted to go clean?

9           MR. GILMER-HILL:  To go clean to and I think

10  that related to --

11          THE COURT:  I guess all I care about -- I care

12  all about these things, but the things I care about

13  right now is what questions you're going to ask in the

14  course of this trial, not what he said earlier.

15          MR. GILMER-HILL:  So --

16          THE COURT:  Let me just ask you, Mr. Kriger,

17  what is or you, Mr. Gilmer-Hill, is there anything

18  unlawful about selling an Aston Martin for cash in a

19  parking lot?

20      I have to be reasonably assured that the answers

21  would support a conviction of the witness for violating

22  a federal or state criminal statute or that they would

23  furnish a link in the chain of evidence and I don't know

24  any.  It doesn't sound illegal to me.

25

Separate Record 11-29-2016  Vol. 2

1            MR. JORDAN:  Your Honor, right the sale of an
2    Aston Martin in a parking lot, even if it's a cash
3    transaction, I don't think there's any reporting
4    requirement because it's not in his trade or business.
5            But I think *Hoffman* is really instructive here.  In
6    *Hoffman* all they asked this fellow if he knew somebody's
7    whereabouts, completely innocent.  It was a link in the
8    chain of evidence.
9            One of the issues in this case is a money
10   laundering issue that he purchased vehicles he made.
11           THE COURT:  "He" is who?
12           MR. JORDAN:  Mr. White, a defendant who has
13   plead guilty.
14       I don't think that changes the analysis that he
15   conducted financial transactions and that was part of
16   the money laundering and the financial transaction was
17   conducted with my client.
18       But there's another really important thing here.
19   The Government has already made the statement that they
20   don't believe that all this statements he made in his
21   interview were truthful.
22           Now credibility is always an issue and those could
23   be subject to cross examination and I don't think we can
24   limit the scope of cross examination at least on the
25   issue of credibility.  And so that's another separate

Separate Record 11-29-2016  Vol. 2

 1  problem.

 2      There's a third problem, Your Honor, that I would

 3  address *in camera*.  But those two, I think, are more

 4  then sufficient that he has a proper invocation of Fifth

 5  Amendment.

 6      The Government certainly has the ability to compel

 7  his testimony and that's an option.  And if he's

 8  prepared to compel his testimony then, of course, he

 9  will testify because there is no risk of incrimination

10  once it's compelled.

11          THE COURT:  Mr. Gilmer-Hill, do you have a

12  response?

13      One of the issues I just heard is that on cross

14  examination certain information could come out that

15  would tend to incriminate him either for lying to the

16  DEA or something else being a part of this conspiracy.

17          MR. GILMER-HILL:  Thank you, Your Honor, that

18  does jog my memory with regard to the several points

19  that Mr. Kriger just raised.

20      As to the first point that he raised which I

21  believe related to any possible 1001 violation.  I don't

22  think that that would be implicated given the very again

23  narrow nature of the testimony that the Government

24  intends to elicit from Mr. Heraud.  So that's my

25  response as to that issue that he raises.

Separate Record 11-29-2016  Vol. 2

1   Relatedly with regard to the cross examination and

2   actually I remember a third aspect.

3   But relatedly as to cross examination again with

4   the narrow scope of inquiry by the Government that

5   should go a long ways, but counsel does -- I mean I

6   understand the point that Mr. Kriger is raising for the

7   first instance to me from Mr. Heraud as to that narrow

8   spin on things, if you will.

9   If I may, there is a, perhaps -- relatedly, there

10   is a third aspect.  The Court's initial comment was that

11   you don't see anything illegal about buying an Aston

12   Martin in a parking lot for cash.

13   THE COURT:  I don't know if it's illegal or

14   not. I'm asking you.  Doesn't sound like it.

15   MR. GILMER-HILL:  I suspect not.

16   And in that regard, Mr. Kriger's reference to the

17   indictment of Mr. White and Mr. White's intentions and

18   efforts laundering money are distinguishable from

19   Mr. Heraud's participation in a transaction.

20   If the individual participating in the transaction

21   doesn't hit all the elements it doesn't matter that Mr.

22   White does if Mr. Heraud does not.

23   So just because Mr. White commits money laundering

24   through this transaction that does not mean that

25   Mr. Heraud does.

Separate Record 11-29-2016  Vol. 2

1       And then lastly the other point that I'll -- I, in

2   disclosure I guess want to bring to the Court's

3   attention, I'm sure counsel for Ms. White already knows

4   from the discovery, the Aston Martin which Mr. Gary

5   Heraud sold to Derrick White was at the time titled in

6   the name of Brent Heraud, Gary Heraud's son, I believe

7   at the time of that transaction.  That's not anything

8   that the Government need get into with regard to our

9   narrow scope of inquiry.

10      And, again, even if that goes to credibility, if

11  Mr. Jordan wants to cross examine Mr. Heraud about that

12  fact, he's certainly welcome to at his potential peril.

13      But even if he does, that would not expose

14  Mr. Heraud to any criminal exposure relating to the 2006

15  sale of an Aston Martin in the parking lot that was in

16  the name of his son at the time.  It's in that regard

17  the statute of limitation becomes relevant.

18          MR. KRIGER:  But the problem --

19          THE COURT:  Mr. Kriger, let me just say for

20  what I'm hearing, the question -- the questions are

21  going to be very limited.

22      And I can permit your client to invoke the Fifth

23  Amendment as to questions that go into some area where

24  he could be exposed to criminal liability and limit him

25  to answering only those questions where he absolutely

Separate Record 11-29-2016  Vol. 2

1    has no risk.

2            MR. KRIGER:  Well, if he's asked at all about

3    the Aston Martin, Your Honor, that would, I think,

4    clearly be a risk because -- without getting into any

5    details.

6        What his knowledge is of where these proceeds came

7    from 10,000 in cash -- there's another case I didn't

8    give to the Court I think is instructive.  That's *Ohio*

9    *versus Reiner*.

10       That's a case where the Supreme Court was faced

11   with a situation where a defendant was charged with the

12   manslaughter of the murder of his child under the shaken

13   baby syndrome.

14       And he called -- the defendant called to the stand

15   the babysitter who spent time with that child.  It's

16   clear there is nothing illegal about being a babysitter

17   without question.

18           THE COURT:  Correct.

19           MR. KRIGER:  What happens is she invokes the

20   Fifth and then they compelled her testimony and he had a

21   grant of immunity.

22       The case went up to United States Supreme Court on

23   whether it was prejudicial to the defendant that the

24   Court had granted her immunity and the Court said even

25   though he had completely denied any complicity or any

Separate Record 11-29-2016  Vol. 2

 1  involvement in the death of this child, it was a link in

 2  the chain of evidence because she spent time with that

 3  child and that she had the right to invoke the Fifth

 4  even though he completely denied any involvement in the

 5  death of that child.  I did bring a copy of that case.

 6      But the point here is, Your Honor, this is an

 7  ongoing money laundering conspiracy if you look at the

 8  count in the indictment.

 9          THE COURT:  Count Three on page six.

10          MR. KRIGER:  I'm sorry.

11      Count Three on page six you said, Your Honor?

12          THE COURT:  That's what I remember.

13          MR. KRIGER:  In or about June of 2006

14  continuing through the date of this indictment which is

15  within the statute of limitations.

16      So if there's an ongoing money laundering

17  conspiracy and it's charged as a conspiracy and he takes

18  money for an Aston Martin, that is a financial

19  transaction that constitutes money laundering and he has

20  knowledge or even if he doesn't have knowledge, it's a

21  link in the chain of evidence.

22      I think it's apparent that he has a risk of

23  incrimination.

24      I mean Hoffman, the questions by themselves seem

25  innocuous.

Separate Record 11-29-2016  Vol. 2

1      Do you know where this man's whereabouts is?

2    What's -- what's a crime?  Do you know certain people?

3      But the Supreme Court held that that was a

4    sufficient link in the chain of evidence that they would

5    permit him to invoke the Fifth.  And, again, we still

6    have the issue of the 10001 violation.

7           THE COURT:  Okay.  You indicated that you had

8    something you would submit to the Court?

9           MS. KRIGER:  *In camera.*

10          THE COURT:  *In camera.*  I think that would be

11   helpful to making this decision.

12     Did you have anything right now, Mr. Gilmer-Hill?

13          MR. GILMER-HILL:  While it's fresh in my head

14   at least as to the point that Mr. Kriger was just making

15   as to his citation to a case which really I've not read

16   nor had an opportunity to review, it sounded like he was

17   making reference to a homicide prosecution as to which

18   the statute of limitation -- certainly there's no

19   statute of limitation as to homicide as far as I'm aware

20   which would be markedly different.  It's a markedly

21   different scenario.

22          THE COURT:  Has the statute run for -- let's

23   assume that Mr. Heraud is potentially a member of this

24   conspiracy.

25

Separate Record 11-29-2016

1        Has the statute run in that case?

2        Because what --

3              MS. KRIGER:   *Dietrich*, the *Dietrich* case.

4              THE COURT:   What date was the indictment

5   returned?   What date did this operation stop?

6              MR. GILMER-HILL:   The indictment itself was

7   returned in January of 2015.

8        The language I believe in the indictment is that of

9   2006 through the present which would have been

10  January 2015.

11             THE COURT:   We're still within the statute for

12  a member of a conspiracy.

13       So what I want to do is hear the *in camera* material

14  and I can turn on the white noise and we can go to the

15  side bar.

16             MR. JORDAN:   However the Court wants to do it.

17

18             -    -    -    -    -    -

19             (Whereupon an in camera sealed hearing

20              was held and transcribed in a separate

21              volume)

22

23             (Whereupon the proceedings continued)

24             THE COURT:   So where is Mr. Jordan and Ms.

25  White?

Separate Record 11-29-2016

1          MR. GILMER-HILL:  I had advised he may very

2    well still be in the lobby.  I suggested he check.

3          (The following was held in open court)

4          THE COURT:  Mr. Campbell, can you look for

5    them?

6          MR. GILMER-HILL:  Would you want to make sure

7    he waives his presence or client's presence?

8          THE COURT:  All right.

9      Well, Mr. Jordan, I wanted to make sure you had the

10   opportunity to be here during all stages of the

11   proceedings and your client as well.

12     You can certainly waive your presence and your

13   client's presence.

14         MR. JORDAN:  Actually, I don't think I ever

15   made my appearance on the record that's why I thought it

16   was okay to leave.  I never stated my appearance.

17         THE COURT:  I'm sorry.

18         MR. JORDAN:  What I want need to address -- I

19   can address that at some point tomorrow; it wasn't

20   anything major.

21         THE COURT:  Okay.

22         MR. GILMER-HILL:  For the clarity I think that

23   the appearance as part of these proceedings if it was,

24   Your Honor, at this point and I both feel confident we

25   can waive both of our appearances.

Usa v White  15-20040

Separate Record 11-29-2016

1            THE COURT:  Okay.  Fantastic.  All right.

2        So what I'd like to indicate now on the record is

3    we'll seal the portion of the record that was at the

4    side bar just now.

5        And what was indicated to me at the side bar in

6    this sealed proceeding is that enough information was

7    set forth that I am confident that Mr. Heraud can

8    properly invoke the Fifth Amendment right against self

9    incrimination; and that if questioned on some of the

10   information in the indictment, there could certainly be

11   answers that would support a conviction of the witness

12   for violating a federal or state criminal statute or

13   that his answers would at least furnish a link in the

14   chain of evidence needed to prosecute him for violating

15   the federal or state criminal statute.

16       And in light of the fact that the Government is

17   indicating there would be only a handful of questions,

18   there certainly could be cross examination that could

19   lead to this material as well, so both in the nature of

20   the direct and the cross.

21       I'm concerned that this possibility exists and so

22   the Court will grant Mr. Heraud the right to invoke this

23   privilege and I think that concludes this.

24            MR. GILMER-HILL:  Well and in that regard

25   then, Your Honor, I note that Mr. Kriger himself had

Separate Record 11-29-2016

1  observed the potential of immunity being an avenue by

2  which Mr. Heraud's testimony could still be presented.

3          THE COURT:  Absolutely.

4          MR. GILMER-HILL:  So I guess while we're on

5  the record, I want to make sure that that was in place

6  so I could have those discussions with Mr. Kriger.

7          THE COURT:  You may.

8      You'd like to engage in those discussions with Mr.

9  Kriger so you may grant immunity to this witness?

10         MR. KRIGER:  I think my co-counsel,

11  Ms. Kriger, has indicated that short of a compulsion

12  order he is not interested.  But if he gets a compulsion

13  order, he will comply with the order of the Court.

14         THE COURT:  Okay.  So that's for you yet to

15  decide what you're doing.

16         MR. KRIGER:  Right.

17     If the orders there, he will be in court and

18  testify truthfully.  He's required to.

19         MR. GILMER-HILL:  Given that then the subpoena

20  remains in place that will allow me an opportunity to at

21  least investigate whether that's something for our

22  office to pursue.

23

24         MR. KRIGER:  Thank you.

25

Separate Record 11-29-2016

1

2              (Whereupon court was in recess

3              for the day at 4:30 p.m.)

4

5

6

7                CERTIFICATE OF COURT REPORTER

8

9    I certify that the foregoing is a correct transcript

10   from reported proceedings in the above-entitled

11   matter.

12

13

14

15

16  s/Carol S. Sapala, FCRR, RMR      May 8, 2017

17

18

19

20

21

22

23

24

25